John R. Clemency (Bar No. 009646)
Michael R. Ross (Bar No. 016735)
Craig Solomon Ganz (Bar No. 023650)
GALLAGHER & KENNEDY, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Telephone:    (602) 530-8000
Facsimile:    (602) 530-8500
Email:        john.clemency@gknet.com
Email:        michael.ross@gknet.com
Email:        craig.ganz@gknet.com

*Attorneys for Diversified Funding Group, LLC*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re DANIEL L. HENDON,<br><br>        Debtor. | Chapter 11<br><br>Case No. 2:11-bk-21164-EWH |
| DIVERSIFIED FUNDING GROUP, LLC,<br>an Arizona limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>DANIEL L. HENDON,<br><br>        Defendant. | Adversary No. 2:11-ap-01972-EWH<br><br>**NOTICE OF FILING EXPERT REPORT** |

NOTICE IS HEREBY GIVEN that Diversified Funding Group, LLC, by and through its undersigned counsel, has filed the attached Expert Report of MCA Financial Group, Ltd.

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

DATED this 3rd day of October, 2013.

GALLAGHER & KENNEDY, P.A.

By:
Michael R. Ross
John R. Clemency
Craig Solomon Ganz
2575 East Camelback Road
Phoenix, Arizona 85016-9225
*Attorneys for Diversified Funding Group, LLC*

COPIES of the foregoing mailed this 3rd day of October 2013 to the following:

Michael W. Carmel, Esq.
MICHAEL W. CARMEL, LTD.
80 E. Columbus Avenue
Phoenix, AZ 85012-2334
*Attorney for Defendant*

United States Trustee
230 N. First Avenue, Suite 204
Phoenix, AZ 85003-1706

# MCAFinancialGroup

Expert Report
of
MCA Financial Group, Ltd.

*In Regards to:*

Diversified Funding Group, LLC
v.
Daniel L. Hendon

October 3, 2013

Respectfully submitted,

Morris C. Aaron
President & Senior Managing Director

*MCA Financial Group, Ltd.*
*4909 N. 44ᵗʰ Street*
*Phoenix, AZ 85018*
*(602) 710-2500*
*www.mca-financial.com*

## Table of Contents

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    CASE BACKGROUND AND TIMELINE ...................................................... 1

III.    MCA'S OPINIONS ........................................................................................... 3

IV.    FINDINGS USED IN SUPPORT OF MCA'S OPINIONS ........................... 4

V.    DOCUMENTS AND INFORMATION CONSIDERED ............................. 21

VI.    PAYMENT FOR SERVICES ......................................................................... 21

VII.    MORRIS C. AARON CURRICULUM VITAE AND TESTIMONY EXPERIENCE ............... 21

i

I.    Introduction

MCA Financial Group, Ltd. ("MCA") has been retained as an expert witness by Gallagher & Kennedy, P.A., as attorneys on behalf of Diversified Funding Group, LLC ("Plaintiff" or "DFG").

MCA performed the following services:

a)    Reviewed and analyzed existing financial information and documents provided by the Plaintiff, Daniel L. Hendon ("Defendant" or "Hendon") and the Defendant's related entities;

b)    Developed expert opinions as set forth in this report regarding Defendant's personal financial statements and Plaintiff's claims that Defendant obtained funds from Plaintiff through fraud and false statements, and that Hendon obtained loan extensions and an amendment through false statements and false pretenses, in support of Plaintiff's nondischargeability claim;

c)    If necessary, provide testimony and deposition support, and

d)    Provide additional assistance as requested.

In the preparation of this report, MCA reviewed various financial statements and transactions provided by Defendant, and attended the two depositions of Defendant's Chief Financial Officer.

This report was prepared by Morris C. Aaron, as assisted by members of MCA[1]. The curriculum vitae of Mr. Aaron, as well as Mr. Aaron's previous deposition and testimony experience are also provided.

MCA reserves the right to modify this report or submit additional reports at any time as new information is made available. This report has been prepared only for the purposes stated herein and shall not be used for any other purpose or disseminated to third parties without the prior written approval of MCA.

II.    Case Background and Timeline

DFG entered into a loan agreement with Rightpath Limited Development Group, LLC ("RLDG" or "Borrower") on August 31, 2007, for $7.76 million for the purpose of the development of specific commercial real estate holdings (the "Loan"). At the time RLDG entered into the loan agreement with DFG, the three members of RLDG were 1) Hendon MLB Development Group, LLC, (Hendon was the Manager and sole member of this LLC), 2) Banovac Properties, LLC (Robert Banovac had controlling interest in this LLC,

---

[1] Karrilyn Thomas, Managing Director, assisted in the preparation of this report.

("Banovac")) and 3) Rightpath Holdings, LLC (Richard Burton had controlling interest in this LLC, ("Burton")), (collectively, the "members" or "partners"). Each member held a one-third interest in RLDG. At all times leading up to this Loan, during the Loan period, and subsequent to the Loan default, Hendon MLB Development Group, LLC was the manager of RLDG, and Hendon was the sole member and manager of Hendon MLB Development Group, LLC; therefore, Hendon directly controlled RLDG. According to Plaintiff, RLDG, Banovac and Burton represented that they each had limited financial resources and cash flow in which to service the debt; therefore DFG relied primarily on the unconditional personal guarantee, supported by the personal financial position and cash flow of Hendon.

Hendon is the principal owner of several car wash operations and real estate developments, most notably recognized in Arizona as Danny's Family Car Washes. Hendon represented to Plaintiff that he solely controlled the operations and assets of the car washes, which provided significant cash flow to Hendon personally.

Borrower could not repay the Loan upon the original maturity date of August 31, 2008, and after several extensions, RLDG eventually defaulted on the Loan with DFG. Subsequently, Hendon filed personal bankruptcy. The following is a timeline of events relevant to this report and Plaintiff's case against Hendon:

- *June 30, 2007* – Personal Financial Statements of Hendon as of this date showing net worth of $104 million were provided to DFG, on which DFG relied upon for loan underwriting.

- *August 1, 2007* – Commitment Letter signed by Hendon (on behalf of RLDG) and DFG to enter into loan agreement.

- *August 31, 2007* – Loan Agreement signed by Hendon (on behalf of RLDG) and DFG.

- *August 31, 2007* – DFG funded net Loan of **$6,857,049.10** to RLDG[2].

- *August 31, 2008* – Initial Loan maturity date. Loan extension between DFG and RLDG was agreed upon for one month.

- *September 30, 2008* – Loan extension maturity date. RLDG did not repay the Loan or request a second one-month extension.

- *October 6, 2008* – DFG notified RLDG of default under Loan Agreement.

- *October 2008* – DFG and RLDG amended the Loan Agreement and extended with additional terms and a new maturity date of October 2009.

---

[2] The Loan contained an interest reserve of $776,000, therefore no monthly payments were required during the original one-year Loan period.

- *December 3, 2009* – DFG and RLDG executed an additional loan extension (First Amendment) with new maturity date of January 15, 2010. Hendon and RLDG made material commitments regarding payment and representations about pending bond refinancing. DFG relied on these representations in deciding to extend the Loan deadline. In addition, as a condition of this First Amendment, RLDG promised to record a second position Deed of Trust, with DFG as the lienholder, on the Glendale Airpark, and an Intercreditor and Subordination Agreement. That promise to provide additional security was also material to Plaintiff's extension of the Loan.

- *January 2010* – Final loan extension matured, no bond financing materialized, Loan was not repaid by RLDG, and Hendon ceased communications with Plaintiff altogether. RLDG also failed to record the Deed of Trust and Intercreditor and Subordination Agreement, in accordance with the First Amendment of the Loan Agreement.

- *February 16, 2010* – Plaintiff filed lawsuit against Defendant for principal, interest and fees due under the Loan Agreement.

- *March 31, 2011* – Judgment entered against Hendon personally for approximately $17.7 million, plus accruing interest, and attorney's fees and costs.

- *July 25, 2011* – Hendon filed for Chapter 11 bankruptcy protection, Case No. 2:11-bk-21164-EWH.

III.   MCA's Opinions

   i.   Defendant knowingly and wilfully intended to use, and indeed did use, the Loan for personal purposes and intentionally misled DFG in order to induce DFG to make the Loan. Defendant willfully and intentionally breached the Loan immediately upon its funding in violation of the terms of the Loan by diverting funds from RLDG to Hendon for Hendon's personal use and benefit.

  ii.   Defendant knew that Plaintiff was relying solely on Defendant's personal guarantee and cash flow of Hendon individually as the secondary – and possibly primary -- form of repayment of the Loan. Defendant also knew that his guarantee, and his represented liquidity, was the only security for the Loan. With such knowledge, Hendon knowingly and wilfully provided personal financial statements to DFG that Hendon knew or should have known were materially false and misleading in order to induce DFG to accept the Hendon personal guarantee as security for the Loan. DFG relied, in deciding to fund the Loan, on Hendon's reported state of financial affairs underlying his personal guarantee.

---

iii. Hendon intentionally maintained an environment that lacked any financial controls within RLDG. Hendon had absolute control over the RLDG funds and accounts and treated such funds as his personal property. The RLDG Chief Financial Officer was fully aware of Hendon's actions and did nothing to prevent the fraudulent transfer of funds from RLFG to Hendon's personal accounts.

IV. <u>Findings Used in Support of MCA's Opinions</u>

    *i.*    *Defendant had the intent to defraud Plaintiff by immediately violating the terms of the loan agreement on the date of funding.*

        a. <u>Signed Commitment Letter and Loan Agreement Between DFG and RLDG</u>

A commitment letter was issued and signed by Jeremy Lewis of DFG to RLDG on August 1, 2007. This letter was initialed and signed by Hendon on August 2, 2007, through his entity, Hendon MLB Development, LLC, which indicated Hendon's acceptance and agreement with the terms and conditions of the letter. Hendon signed in his capacity as Manager of RLDG and not in his personal capacity. The following are significant items of notation per the commitment letter (See Conditions Precedent section on Page 3 of Exhibit 1):

1. "<u>Assignment of Proceeds</u>. Borrower shall have duly executed an assignment of proceeds, satisfactory to Lender and Lender's counsel, confirming that Borrower will make no distributions to its members or manager(s) without Lender's prior written consent. For purposes of this condition, "Member Distributions" shall include all Company distributions, except those for debt service, principle reduction/ release requirements, legal fees and costs, title or escrow costs, and the cost of any third-party brokerage commissions, reports, surveys or engineering studies, and distributions from loan proceeds."

**This condition was initialed by Hendon directly.**

2. "<u>Personal Guarantees</u>. Danny Hendon, Robert Banovac and Rick Burton, together with their respective spouses (if applicable), shall each have executed unlimited personal guarantees satisfactory to Lender."

**This condition was initialed by Hendon directly.**

3. "<u>Penalties</u>. Upon the occurrence of any member distribution to a Manager or member without Lender's prior written consent, a penalty in the amount of $2,800,000, not to exceed 2 times the amount of such distribution, shall be due Lender and deemed fully earned and payable."

**This condition was initialed by Hendon directly.**

The final Loan Agreement ("Agreement") (See Exhibit 2) between DFG and RLDG was dated August 31, 2007. The Agreement was signed by Ceasar Perez, as Manager of DFG, on behalf of the Lender. The Agreement was signed on behalf of the Borrower by RLDG (Daniel L. Hendon, as sole Managing Member of Hendon MLB Development, LLC). Again, Hendon was acting is his capacity as a Manager of RLDG and not in his personal capacity. The principal amount of the loan was not to exceed $7,760,000 at a pre-default interest rate of 10%. $776,000 of the principal was withheld by the Lender for the establishment of an interest reserve. The term of the loan was for twelve months, with a maturity date of August 31, 2008.

Additional interest, fees, extension terms, etc... were also defined, however, the clauses pertinent to MCA's report are noted as follows:

- *ARTICLE 1, Section 1.5(j) Key Loan Provisions* (Page 4 of Exhibit 2): **Loan Purposes.** "... to provide financing or refinancing in conjunction with the acquisition, development and/ or construction of the real property and/ or the improvements to be constructed on the "Property" or "77 Acre Property" that is the subject of the 77 Acre Purchase Contract or any other part of the so-called "Camelback Ranch Property", the "Rightpath Property", the "RLDG Land" and/or the "Airport Property" (any and all such properties may be referred to as the "Specified Property" or "Specified Properties"), and as such Specified Properties are or may be further described, defined or referenced in (1) a "Development Agreement for Camelback Ranch Property" or (2) any similar or comparable "development agreement" (a "Qualified Development Agreement") by and among the City of Phoenix, Arizona, the City of Glendale, Arizona, Borrower and the Western Loop 101 Public Facilities Corporation, or any two or more of such parties."

Specifically, per MCA's discussion with Shahram Sodeifi of DFG, the intended and agreed upon uses of proceeds from the Loan were for the RLDG project in Glendale, which consisted of the following properties only:

77 Acre Property
RLDG Land
Rightpath Property
Camelback Ranch Property
Airport Property

<u>Specifically, the funds were not to be used for the Desert Ridge Holdings development, nor were the funds to be used personally by the members. Upon funding of the Loan, Hendon immediately violated the Loan provisions, as discussed further in this report.</u>

- *ARTICLE 5, Section 5.2.2 Negative Covenants* (Page 9 of Exhibit 2):
  "Borrower hereby agrees that until the Loan is fully paid and performed...none of the Selling Parties will make any distributions that are or would otherwise be payable to any of their respective members or owners from the "Net Available Proceeds" derived from any such resale, without Lender's prior written consent...."

D. Kent Despain ("Despain") was the Chief Financial Officer ("CFO") of Danny's Family Companies since 2005 and also compiled the personal financial statements for Hendon, which were provided to Lender. Despain's deposition was taken in relation to this case on March 6, 2013 (Volume 1), with a continuation of the deposition on July 10, 2013 (Volume 2). Despain was questioned regarding his interpretation of the loan purposes as defined in the loan agreement, to which he testified the following:

"... I would say that they are saying a suggestion for how the loan proceeds should be used." As a follow up question, Despain was asked: "In your view, you think it was just a suggestion in the contract?" Despain's response was: "Well, I don't – I have not read the whole thing, but I, as CFO, am normally concerned with the negative covenants, and anything other than that, I would consider a suggestion."[3]

In addition to the authorized properties specifically delineated in the Loan Agreement, DFG added an additional layer of specificity by listing the legal parcel numbers in Exhibits A and B to the Loan Agreement, setting forth the properties for which Loan proceeds may be used (Refer

---

[3] Testimony taken from Despain's deposition, Volume 2, Pages 242-243.

Case 2:11-ap-01972-SHG   Doc 78   Filed 10/03/13   Entered 10/03/13 15:54:01   Desc
Main Document   Page 10 of 107

to MCA Report Exhibit 2). Hendon's CFO knew or should have known that the relevant provisions of this Loan Agreement, and the relevant exhibits, were not suggestions but were contractual obligations. Despain's statement only serves to show that Hendon and his organizations had no reason other than wilful misconduct to breach this provision of the Loan Agreement.

b. <u>Loan Funding and Immediate Fraudulent Disbursements to Members and Other Related Entities</u>

The timeline and exhibits discussed below depict the immediate fraudulent use of the Loan proceeds for distributions to members and other entities controlled by Hendon – in direct contravention of the Loan Agreement. These transfers were not made for purposes defined under the Loan Agreement. There was no discussion, let alone written agreement, with DFG regarding the use of proceeds in such a manner and no prior approval from DFG was obtained in accordance with the Commitment Letter and Loan Agreement terms cited under (a.) above.

**The balance in the RLDG corporate bank account at First National Bank of Arizona on August 31, 2007 prior to the Loan funding was only <u>$586.18 (Refer to Exhibit 5).</u>**

DFG funded the loan to the Borrower on August 31, 2007 by wire transfer to RLDG's business bank account at First National Bank of Arizona (account #6047) in the amount of <u>**$6,857,049.10**</u>. On that day, and within a few short days after that date, the following outbound wire transfers were made by Hendon or at Hendon's direction:

i. $530,330.72 was transferred on August 31, 2007 to Hendon's personal bank account (#3511) at Wells Fargo Bank (See Exhibit 3, page 2). Per Despain's testimony[4], the $530,000 payment was made to Danny personally and used to repay Nell Hendon (Hendon's mother), who Despain thinks loaned RLDG money. However, Despain could not recall if there was supporting documentation for such a transaction.

Per Hendon's personal bank account statement for August 2007 (Exhibit 3, Page 2), the balance in Hendon's bank account prior to August 31, 2007 was $74,121.96. After the DFG Loan funds of approximately $530,000 were transferred to Hendon personally, he wrote a check to Kelly Carroll, Hendon's former spouse, on August 31, 2007 for $160,000 (Exhibit 3, Page 3). <u>It is clear that Hendon, but for the DFG Loan funds, did not have the personal funds to make the $160,000 transfer to his wife prior</u>

---

[4] Despain deposition, Volume 1, page 172

Case 2:11-ap-01972-SHG    Doc 78    Filed 10/03/13    Entered 10/03/13 15:54:01    Desc
Main Document    Page 11 of 107

to August 31, 2007- there is no question that the DFG Loan proceeds were the source of these funds.

ii. $1,625,000.00 was wired to Banovac's personal bank account (#0435) at Compass Bank (See Exhibit 4 for wire transfer request). Note the wire origination request was dated August 31, 2007, but the wire was not executed until September 6, 2007. Although the supporting bank statement was not provided by the Defendant, MCA also noted this distribution recorded on RLDG's general ledger. This was not a specified use of Loan proceeds defined by the DFG Loan Agreement with RLDG.

iii. $1,000,000.00 was transferred from the First National Bank of Arizona account for RLDG (#6047) to Danny's Family Companies III ("DFC III") (#6578), another entity controlled by Hendon, on August 31, 2007. Per the internal wire transfer request, the purpose of the wire was "Equity contribution by Danny to DFC3". (Refer to Exhibit 5). The balance in the DFC III account was only $8,462.21 prior to the $1 million transfer. This was not a specified use of Loan proceeds defined by the DFG Loan Agreement with RLDG.

iv. Another $1,529,000.00 was transferred from the same RLDG bank account (#6047) on September 6, 2007 to DFC III (#6578), with an internal wire transfer request notation of "Equity Transfer". (Exhibit 6). This was not a specified use of Loan proceeds defined by the DFG Loan Agreement with RLDG.

v. $918,671.91 was transferred from the same RLDG bank account (#6047) on September 6, 2007 to DFC III (#6578), with an internal wire transfer request notation of "Rick uses Equity withdrawal to pay back Danny/DFC3 for outstanding loans. Equity contribution by Danny to DFC3". (Exhibit 7). This was not a specified use of Loan proceeds defined by the DFG Loan Agreement with RLDG.

vi. $103,000.00 was transferred on September 11, 2007 from RLDG (#6047) to Desert Ridge Holdings ("Desert Ridge") (#7027), another entity owned / controlled by the members of RLDG. (See Exhibit 8). As shown in this Exhibit, the bank balance in the Desert Ridge account prior to the transfer was a *negative* $102,270.21 – the account was overdrawn; therefore, RLDG transferred these funds to specifically cover the overdraft in the Desert Ridge account. In fact, according to the QuickBooks general ledger report provided during the Defendant's document production, total payments to Desert Ridge Holdings from

RLDG from September 11, 2007 through December 7, 2007 from the First National Bank of Arizona account were $387,465.00, per Exhibit 8, Page 3).

Exhibit 9, shows the RLDG internally prepared balance sheets as of August 31, 2007 and September 30, 2007, which list a note receivable from Desert Ridge of over $12 million. Despite, Desert Ridge being excluded from the list of properties defined in the loan purposes under the terms of the Loan Agreement with DFG, RLDG continued to use Plaintiff's funds to directly support the Desert Ridge project.

Exhibit 9 also shows the effects of the member distributions on the equity of RLDG, which totaled a negative $770,000 at August 31, 2007 and dropped to a negative $7.7 million, after the members finished with their inappropriate and fraudulent distributions and adjustments to true up their capital accounts.

**In all, total unauthorized and fraudulent transfers to members of RLDG and their entities within 12 days of the Loan being funded were $5,706,002.63 (see summary below). Those disbursements represent 83% of the net amount funded by DFG only days earlier.**

| Summary of Distributions to Members August - September 2007 | | |
|---|---|---|
| Member/ Entity | Date | Amount |
| Hendon - personal | 8/31/2007 | $ 530,330.72 |
| DFC III - Hendon entity | 8/31/2007 | 1,000,000.00 |
| DFC III - Hendon entity | 9/6/2007 | 1,529,000.00 |
| DFC III - Hendon entity | 9/6/2007 | 918,671.91 |
| **Total Hendon** | | **3,978,002.63** |
| **Banovac Properties** | 9/6/2007 | **1,625,000.00** |
| **Desert Ridge Holdings (Hendon)** | 9/11/2007 | **103,000.00** |
| **Total Fraudulent Transfers** | | **$ 5,706,002.63** |

**Due to the self-dealing and intentional pilfering by the members of the Borrower, the balance remaining from the DFG Loan proceeds for potential use under the terms of the loan agreement was only $1.15 million in less than two weeks.**

Case 2:11-ap-01972-SHG   Doc 78   Filed 10/03/13   Entered 10/03/13 15:54:01   Desc
Main Document      Page 13 of 107

Defendant may try to explain such payments as repayments for funds previously advanced / spent or show that the funds were recorded as equity contributions by the partners; however, that does not change the fact that the funds were directly and immediately distributed to the members in clear violation of the Loan Agreements.

The developments for which the Loan proceeds were intended were never given a chance to succeed due to the immediate impermissible use of funds by Hendon and the other members of RLDG. If the DFG funds would have been properly used for the development of the specified parcels, the Glendale project may have been successfully completed.

In addition to the Lender spelling out the restrictions in both the Commitment Letter and the Loan Agreement, Mr. Sodeifi of DFG sent an email on July 24, 2007 to Curtis Leonard, CFO of Rightpath Limited (which is a separate entity owed by Burton), with a copy to Burton, Hendon and Despain stating the following:

"Lender shall have the right to receive a pay-down or pay-off of the loan ahead of **any** distributions to the members. This priority proceeds pledge / distribution is to only fall behind items such as (debt service and legal expenses, appraisal costs, surveys, engineering costs). Any other items to come ahead of lender's priority distribution must first be approved by lender and not be a line item expense that back-doors any distributions to members of the LLC." (See Exhibit 10).

Again, both Hendon and Despain were copied on this email, so they were fully aware of the restrictions in place by the Lender. Defendant made the decision to willfully ignore this condition and made fraudulent distributions totaling several million dollars within days of Plaintiff funding the Loan in direct contravention with the Loan Agreements.

c. Testimony of Despain Regarding Distribution Approval Process and Purpose of Member Distributions

Only Hendon and Despain had signatory authority on the First National Bank of Arizona account for RLDG[5]. Despain testified that RLDG's bank account was controlled by Hendon and that none of the transfers would have happened without Hendon's specific approval and certainly not without Hendon's knowledge.[6] According to Despain, the three partners agreed upon the distribution of funds to themselves and Despain did not recall discussing the financial position of RLDG with the partners before the distributions were made.[7] Despain also testified that Banovac, Burton and

---

[5] Despain deposition, Volume 1, page 43
[6] Despain deposition Volume 1, pages 100 and 166.
[7] Despain deposition, Volume 2, page 241

Hendon did not physically work in the same office in August 2007 and Hendon didn't use email that much.[8] Per Despain, the approval process between the three members for member distributions was verbal and probably took between one day and one week.

Several of the transfers directly to members were either made on August 31, 2007 or the internal transfer request was dated on that day, with the transfer being executed a few days later. Based on Despain's testimony, it was not a quick process for the members to decide to take a distribution and then communicate the approval amongst themselves and with Despain; therefore, it is likely that the members of RLDG had this distribution planned and were anxiously awaiting the funding of the DFG Loan in order to immediately and intentionally use the funds for purposes prohibited by the Loan Agreements -- and all the transfers were for the personal benefit of Hendon, Banovac and Burton.

When questioned about the purposes of the member distributions, Despain did not know the answer. Per Despain's testimony, Volume I, page 169, he was questioned about a reconciliation showing the partner's equity distributions, as follows:

*Question:* "Do you remember the circumstances surrounding the preparation of this document?"

*Answer:* "The partners were looking at how much money they had, and they wanted to –"

*Question:* "Spend it?"

*Answer:* "They wanted to use it – actually, they wanted to use it wisely."

*Question:* "They spent it, didn't they?"

*Answer:* "I can't remember exactly all what that is, but it looks like it."

The testimony above illustrates that members of RLDG saw the Loan proceeds as their personal funds and willfully and intentionally chose to take the funds for personal use. Hendon personally guaranteed this Loan and is contractually responsible to repay the liability.

Per Despain's testimony, he agreed that the payments (distributions) to members were not required to run the operations of RLDG. The following line of questioning is taken directly from Despain's deposition, Volume 2, Page 255:

---

[8] Despain deposition, Volume 2, pages 263-265

---

*Question:* "As of the time the payments went out the door out of the account to Mr. Banovac and Mr. Hendon, were they required to run the operations of RLDG?"

*Answer:* "Were they required – that cash required? No."

*Question:* "Was the payment, the distribution to Mr. Hendon, necessary to run the operations of RLDG in August of 2007?"

*Answer:* "No."

*Question:* "In September of 2007?"

*Answer:* "I don't believe so."

*Question:* "Was the payment to Mr. Banovac that was made out of those funds required to run the operations of RLDG in either August or September of 2007?"

*Answer:* "No."

**By Hendon's entities' CFO's own admission, there was no business purpose to support the distribution of funds to / on behalf of Hendon, Banovac and Burton. The payments were in direct violation of the Loan Agreement and Hendon had full knowledge of that violation, but chose to take the funds anyway.**

ii. *Hendon's personal financial statements were false and misleading, and Hendon had full knowledge of Plaintiff's reliance on such statements.*

Hendon originally provided DFG with PFS dated May 31, 2007 and June 30, 2007, on which they relied for Loan approval and funding[9]. DFG requested updated PFS from Hendon on multiple occasions after the Loan funded; however, Hendon refused to provide additional PFS. It was only later, during a contentious discovery process in connection with the lawsuit, that Hendon's PFS were produced for additional time periods surrounding the Loan date. Once produced, Plaintiff learned there were vast fluctuations in values reported for real estate owned and Hendon's net worth. For purposes of this report, MCA will focus on Hendon's PFS on various dates produced from January 2007 through December 2008 in order to address issues correlating directly to the loan funding period and shortly thereafter. Specifically, DFG relied on Hendon's PFS dated June 30, 2007, as this was the PFS provided by Hendon shortly before the Loan approval and closing date.

---

[9] There were no changes in value reported on Hendon's PFS between May 31, 2007 and June 30, 2007.

MCA prepared a summary of Hendon's PFS dated January 31, 2007, June 30, 2007, September 6, 2007, January 31, 2008 and December 1, 2008, which is included as Exhibit 11 attached to this report. This summary shows the vast fluctuations in Hendon's net worth – jumping 47% from approximately $70 million at January 31, 2007 to $104 million at June 30, 2007, and then again to $149 million at January 31, 2008 (another 43%). The increase from January to June 2007 is primarily attributed to a significant increase in net Real Estate Owned of about $40 million in just five short months. Hendon's one-third interests in both Desert Ridge Holdings, LLC and Mainstreet Glendale account for this change, as these properties were not included on Hendon's PFS at January 31, 2007. Refer to Exhibit 12 (page 3), which shows the net fair market value that Hendon is reporting for these two real estate projects at June 30, 2007.

Per MCA's interviews with Mr. Sodeifi, DFG placed the upmost importance on the personal guarantees of the members of RLDG, and most particularly Hendon. As an entity, the Borrower had few assets, and no cash flow, and DFG was promised the backing of Hendon's net worth and strong cash flows from the car was operations, in order to service the debt and help facilitate Loan repayment. Banovac and Burton did not have the individual assets or cash flow comparable to Hendon, so DFG approved the Loan primarily based on Hendon's personal representations[10]. According to DFG, this reliance on Hendon's PFS was repeatedly conveyed to RLDG, so the Members were continually aware of the importance of Hendon's PFS to DFG. Exhibit 13 shows an email that was sent by Mr. Sodeifi on July 8, 2007 to Burton and Rightpath Limited's CFO, Curtis Leonard requesting personal financial statements, where Mr. Sodeifi stresses the weight placed on such documents:

"Since every time I bring up issues / concerns... the personal guarantees are thrown at me like they are gold... I expect them to be thrown at me with the same enthusiasm now that we are going to do the necessary due diligence for investors."

Per the email chain, Mr. Sodeifi's email was forwarded to Despain, who in response provided Hendon's personal financial statement. According to Despain's testimony, in addition to his role as CFO of Danny's Family Companies, Despain compiled Hendon's personal financial statements. When questioned regarding what the word 'personal' means in relation to the PFS, Despain responded "...what Danny has some say in" "Or that he has an interest in."[11]

Despain never voiced any concern or heard the members tell DFG that Hendon's personal financial statements could not be relied upon. His

---

[10] Again, the personal guarantees were the only true security/ collateral for this multi-million dollar loan.
[11] Despain deposition, Volume 1, pages 36-41

testimony regarding that subject follows, and is taken from Volume 1 of Despain's deposition, page 48:

*Question:* "Did you ever personally tell a third party that they should not rely on the information in one of Danny's personal financial statements?"

*Answer:* "No."

*Question:* "Did you ever see any correspondence in which Mr. Hendon said, 'You should not rely on the information that's in my personal financial statement?"

*Answer:* "No."

Hendon's PFS dated June 30, 2007 (Exhibit 12):

According to DFG, and consistent with the form of presentation of the PFS by Hendon, the June 30, 2007 PFS purports to include the fair market value of each individual asset and related liabilities as of the date of the PFS. The format of the PFS and purpose for which they were provided reflects that the basis for the valuation of each entity, property and other asset was an appraisal and recent sale comparable for certain real estate. Though it is not clear from the PFS themselves, DFG was led to believe that the underlying valuation data used by Hendon (or at least represented to have been used by Hendon) would have adjusted asset values for lack of marketability and proportion of ownership as it is clear that DFG requested the PFS to ascertain the fair market value of Hendon's personal net worth.

The following section of this report discusses the details of Hendon's personal financial statement as of June 30, 2007, which was relied on by DFG to underwrite and fund the Loan. As shown, the first issue noted on these statements by MCA is that they are dated June 30, 2007, but signed by Hendon on June 6, 2007. MCA is not certain if this was a clerical error or if in fact the valuation date was June 6, 2007 not June 30, 2007.

*Cash & Short Term Investments $9,900,000:*
On Page 2 of this PFS, this category is further divided into Cash of $2.5 million, a Note Receivable from Burton for $900,000 and a Note Receivable from Desert Ridge Holdings of $6.5 million. The following discussion will factually show that Hendon intentionally reflected assets in his PFS that he knew had zero value, including the $9.9 million in cash and short term investments. Hendon sought the Loan from DFG to cover his personal obligations and for his personal benefit – not for the intended use as set forth in the Loan Agreements. Specifically, the following transactions clearly demonstrate that Hendon's actions were premeditated and designed to induce DFG into making a loan for one purpose while Hendon had no

intentions of following the terms of the Loan Agreement, as Hendon schemed an entirely different plan for the use of the Loan proceeds all along.

According to Despain, Burton either owed Hendon personally or one of Hendon's entities the $900,000 for which Burton had no ability to pay. In other words, the receivable had no value. Per MCA's discussion on personal withdrawals made by members earlier in this report, $918,671.91 was transferred from RLDG to DFC III on August 31, 2007 with a notation "Rick uses Equity withdrawal to pay back Danny/DFC3 for outstanding loans. Equity contribution by Danny to DFC3". When questioned about the unauthorized member distributions, Despain confirmed that Hendon and Banovac took money out of RLDG and then Despain reconciled it with the $900,000 that Burton owed to come up to equal amounts totaling the $3 million in partner distributions.[12] Hendon immediately used Plaintiff's funds to repay the Notes Receivable he indicated to DFG was an asset on his PFS. This was not an intended or permitted use of loan funds.

The Note Receivable from Desert Ridge Holdings of $6.5 million is allegedly based on funds Hendon loaned personally for the Desert Ridge project with funds Hendon obtained from a second mortgage on his personal residence (there is also a mortgage loan payable to Oxford Investments for $6.5 million on Hendon's PFS). The fair market value and collectability of the asset is based on the underlying value of the entity, Desert Ridge. Desert Ridge was a new commercial development that was not near completion, with no cash inflows or sources to repay a receivable of this magnitude. Hendon knew or should have known at the time that Desert Ridge was insolvent and that the value of the account receivable was likely zero. He also knew or should have known that Desert Ridge, as a project, had no liquidity or ability to repay the account receivable on its own. Hendon, after all, controlled the Desert Ridge asset. Again, Hendon intentionally misled DFG to induce the loan by knowingly overstating his PFS.

DFG indicated to MCA that it was initially impressed by Danny's $2.5 million of available cash, which by itself represents 32% of the Loan amount. However, through subsequent discovery, Plaintiff learned that the $2.5 million did not represent personal cash held by Hendon, but instead was allegedly cash held within the various car wash entities and other business holdings that Hendon controlled. The cash reflected in Hendon's PFS was clearly not his personal asset and based on subsequent fact finding in this matter, would not even be available to Hendon as a personal asset to satisfy or support his personal guarantee. The PFS already reflected what Hendon represented to be the fair market values of the business entities in another section of the PFS – which would mean that Hendon was double counting the "value" of the cash in his PFS by separately listing the balance.

---

[12] Refer to discussion in Despain's deposition, Volume 1, page 177

The value of the cash in the Hendon PFS is likely worth zero, a fact that Hendon knew or should have known, and shows his intentions to mislead DFG and induce DFG to make a loan supported by his personal guarantee. It should be noted that many of Hendon's car wash operations later filed for Chapter 11 reorganization. As part of the Chapter 11 process, documents were filed with the Federal Bankruptcy court showing substantial amounts of secured debt at the cash wash entity level. Accordingly, Hendon knew at the time of the loan that any cash held by the car wash operations was already likely the collateral of other secured lenders. This is another indication of Hendon's knowing and intentional actions to fraudulently induce DFG into making the Loan based on Hendon's PFS.

Despain was questioned during his deposition regarding the $2.5 million in cash on Hendon's PFS at June 30, 2007 (Per Despain's deposition, Volume 1, pages 83-89). When asked whose cash that was and what accounts the cash was held in, Despain's response was "I can't remember, but it would have been the companies that he controls and his personal, if he had any, and whatever. That's how we would put it together."

*Question:* "And were you – did you make any efforts to distinguish between what Danny had in his personal accounts and what was cash balances of any of the companies?" "Is any distinction reflected on the personal financial statement?"

*Answer:* "No". "... I viewed it that Danny could, yeah, write – he could take a dividend, and he could have the cash."

As MCA previously discussed earlier in this report, Hendon's personal cash balance was only $74,121.96 per the personal Wells Fargo bank statement for August 2007. Such statement was provided by Defendant (Exhibit 3).

*Unlisted Securities of $105,930,203 with Related Notes Payable of $63,851,000:*
The Unlisted Securities consist of Hendon's car wash and other business entities. According to Despain, when he compiled the PFS of Hendon, he based the fair market values on a combination of appraisals for the car wash entities and cash flow for each location. Per Despain, Hendon owned 100% interest in all car wash entities. Despain indicated that most of the locations were not making much money, but that the car wash industry was strong and past locations that had sold had brought large earnings multiples.

As discussed above, the fair market values should be based on one or a combination of the following: recent sales comparables or business appraisals / valuations. MCA compared the book values of car wash locations at December 31, 2007 (with depreciation added back based on internal financial statements provided by Defendant), to the fair market

values shown on Hendon's PFS. MCA noted the fair market values were approximately 3.8 times higher than the book values of the car washes. MCA also reviewed appraisals provided by the Defendant for the majority of the car was locations. Many of the fair market values listed in the PFS at June 30, 2007 were based on these appraisal amounts, but most values listed by Hendon were much higher than the appraisal values. In addition, MCA noted that the appraisals were dated back in 2004 and 2005, 2-3 years prior to the date of the PFS. Such appraisals would not be considered timely for fair market value reporting purposes and in fact, considered stale and inappropriate to use.

According to Despain's testimony (Despain deposition, Volume 1, page 17), when asked about his expertise in business valuations, Despain responded that he has a little in car washes, based on reading a few appraisals. Further inquiry regarding the timeliness of the appraisals follows:

*Question:* "And did you think that the appraisals as of 2004 were still valid in June of 2007?"

*Answer:* "I thought that that would be a good starting point, as I said. You start with the 2004. You look at the cash flows, and then you say, well, I think that it's probably worth about that much."[13]

There was no direct support or calculation provided by Defendant, nor could Despain explain, specifically where the value of each individual car wash and business entity came from. Despain has no valuation credentials or professional training in valuation. Notwithstanding the inaccurate and unsupported fair market values on the June 30, 2007 PFS, Hendon took the mis-representations one step further. Hendon reflected values in his PFS that he knew were for 100% of the business value meaning that these car washes and other business holdings were wholly-owned assets of Hendon's personally. In fact, Hendon's ownership flowed through complex business ownership layers and structures. Per MCA's interview with Mr. Sodeifi of DFG, Hendon represented to DFG that, "Danny and the car washes are one and the same. Hendon owns the cash, the car washes, with no partners – it's all him."

*Net Real Estate Owned of $50,066,000 (Net of Related Debt):*
Real estate owned consisted primarily of Danny's personal residences, the corporate office building for Danny's Family Companies, the Barcelona restaurant and business center, and two large real estate development projects for RLDG: Desert Ridge Holdings and Mainstreet Glendale.

---

[13] From Despain's deposition, Volume 1, page 104

Personal Residences

The values of Hendon's personal real estate holdings were not based on appraisals or sales comparables. Per Despain's deposition (Volume 1, page 69), Despain relied on Hendon to tell him the value of Hendon's homes to include in the PFS. The line of questioning below was taken from Despain's deposition, Volume 1, pages 123 – 124:

*Question:* "What information would Danny have given you to support the value of the $9 million for this Paradise Valley home?"

*Answer:* "On occasion, he would have said – well, he – it could have been an appraisal because he got a loan against it. It could have been – I don't know. I can't remember."

*Question:* "Would it have been your practice when Danny gave you the values of the real estate that he owned, would it have been your practice to ask him to support it in any way?"

*Answer:* "Not to me. Just – he's signing it. It's his personal financial."

*Question:* "You would have accepted his representations at face value."

*Answer:* "Yes."

Mainstreet and Desert Ridge

According to Despain (Despain's deposition Volume 1, page 174), 90% of the RLDG value was Mainstreet and Desert Ridge, so that's how Danny's interest in RLDG was reflected on his PFS. This reference was based on questioning regarding how Hendon's personal interest in RLDG was reflected on his PFS, as Hendon's RLDG ownership was not separately listed on his PFS.

The Desert Ridge and Mainstreet properties made up the majority of the net real estate asset value as reflected in the PFS that Hendon represented he owned on June 30, 2007, with Hendon's one-third interest listed as $39,791,000, net of related debt.

Per Despain, the fair market value for Mainstreet and the related debt was given to Despain by either Burton or Curtis Leonard (the CFO) from Rightpath Limited. Despain may have looked at a spreadsheet to support the value (which just listed Rightpath's parcels and the value of each), but he couldn't remember. There is no other supporting documentation for the value, such as appraisals or recent sales comparables. Despain did not ask

for appraisals to support the parcels, but just took Rightpath Limited's word on the value of the property.[14]

Despain was questioned regarding the use of specific appraisals, broker opinions of value, or reports on values of comparable properties, to which he responded that he did not locate any such records to support the values stated in the PFS (Despain deposition, Volume 1, Pages 128-129).

*Question:* "With respect to the figures on the Real Estate Owned category, did you find any reports from third parties that you would have based these calculations on back when you put them on this specific personal financial statement?"

*Answer:* "I did not."

When Despain was specifically questioned regarding his reliance on any industry experts or third party verification for the values of the properties included in Hendon's PFS on June 30, 2007, he replied "...I would have relied on Rick for the Mainstreet." "And Bob would have helped with the Desert Ridge." (Testimony taken from Despain's deposition, Volume 1, page 80).

Defendant provided several letters of intent from parties potentially interested in buying the Desert Ridge property. These were not purchase offers and were based on buyer interest at the completion of the project and delivery of a finished product. DFG later discovered that the property was nowhere near the state of completion that was represented by RLDG. MCA discussed the status of the Desert Ridge development with Mr. Sodeifi of DFG. Mr. Sodeifi stated that Hendon represented to DFG that 'everything was sold' and 'the money is coming'. DFG's understanding from Hendon was that everything was done at Desert Ridge (escrow opened, purchase agreements signed and closing date set), and the cash flow would be available for Loan repayment before the original maturity date.

Hendon completely misled Plaintiff regarding the level of completion of Desert Ridge. In fact, DFG later learned that the property had no water, and therefore was not even close to completion, much less being able to solicit and close on sales offers. Interestingly, Desert Ridge ended up suing the State of Arizona in 2009, alleging that the State did not provide enough water for the development of the property when scheduled. Desert Ridge lost their case against the State in October 2011, and the State in turn obtained a summary judgment against Desert Ridge for breach of contract related to the development. The State won based on their counterclaim that

---

[14] Per Despain's deposition, Volume 1, pages 72-74, related to line of questioning on Hendon's 6-30-2007 Personal Financial Statement.

Desert Ridge failed to make payments under the contract and failed to begin and complete construction of Phase 2.[15]

This lawsuit, brought on by Desert Ridge (Hendon), and then the subsequent ruling in favor of the State, is further evidence that this property was not near completion and any letters of intent to support property values meant nothing – and Hendon knew it. <u>There was a complete lack of support for the value of this $40 million net asset shown on Hendon's personal financial statement at June 30, 2007. Hendon intentionally used this knowingly false information to induce, by fraud, DFG to make its Loan.</u>

In summary, Hendon's PFS paints a picture of great net worth and Hendon's access to immediate liquidity that could have been used to repay Plaintiff. In fact, the assets shown on the PFS are held by other corporate entities with competing interests (trade creditors and secured lenders, among others), and are intentionally and knowingly misstated and fraudulent, as there was no basis in fact to support such values. Further, even assuming a basis for the fair market value of the assets, Hendon applied no discounts or adjustments for lack of marketability. Hendon knew the reliance that DFG placed on his PFS and Hendon also knew that but for the PFS and substantial values, DFG would not have made the Loan. Hendon intentionally inflated, and in some cases, fabricated his net worth in order to obtain funding for RLDG, which he in turn, immediately pilfered – based on spending plans determined before DFG funded the Loan.

iii. *Hendon intentionally maintained an environment lacking any financial controls for his personal benefit.*

By Despain's own admission, he did not review the Loan Agreement for use restrictions and what he did know of the Loan conditions, he saw as 'suggestions'. Despain testified that he basically did what Hendon told him to do – no questions asked. It appears Despain willingly followed Hendon's direction, even when that direction was only for Hendon's personal benefit. In MCA's opinion, the use restrictions were known to both Despain and, more importantly, Hendon – they just chose to ignore such restrictions.

Despain indicated that all three members needed to approve the distribution to themselves before Despain would execute the transaction (which MCA does not consider a valid control). Per Despain's deposition testimony, Volume 2, pages 245-246:

---

[15] Desert Ridge Holdings, LLC v. State of Arizona, et al., CV 2009-011362 in the Superior Court of Arizona, Maricopa County

CONFIDENTIAL

*Question:* "So did you ever place, personally, any controls or restrictions on the use of RLDG money?"

*Answer:* "No." "...What I did was I went to the partners and asked them if it was okay. That's what I did."

Hendon and Despain knew the material representations in the PFS would be relied on by Plaintiff in deciding whether to fund the Loan. Hendon knew that Despain would simply do what he was asked without question. Despain admittedly took Hendon's and the other members stated values, with little to no supporting documentation or basis for conclusion, and put them in the PFS. The intent of Hendon and the other RLDG members, as supported by their actions immediately subsequent to the Loan funding, was to obtain the DFG Loan proceeds and use the funds personally and for other uses not permitted by the Loan Agreements. The premeditated actions planned by Hendon and then implemented upon funding of the Loan proves that Hendon had no intention to honor or abide by RLDG's contractual agreement or their representations to the Plaintiff regarding the use of funds.

V.  Documents and Information Considered

- Depositions of D. Kent Despain, Volumes 1 and 2
- Financial records and other documents provided by the Defendant during discovery requests, including Hendon's personal financial statements, various accounting and financial statements for Hendon's business entities, business and property appraisals provided
- Interviews of Shahram Sodeifi of DFG regarding Borrower and Loan history and correspondence
- AICPA Statement of Position 82-1, Accounting and Financial Reporting for Personal Financial Statements

VI.  Payment for Services

Compensation for MCA's expert witness services is based on the following hourly rates; $375 per hour for Senior Managing Directors, $295 per hour for Managing Directors, $250 per hour for Directors, and $95 per hour for administrative and research personnel. MCA shall be reimbursed for all direct expenses incurred in performing such services plus an administrative charge for indirect costs equal to three percent of fees to cover fax, phone, copying and other related costs. MCA's compensation is not contingent on the conclusions contained herein or any supplemental report prepared pursuant to the engagement or ultimate resolution of this Litigation Matter.

VII.  Morris C. Aaron Curriculum Vitae and Testimony Experience

# MCAFinancialGroup

Morris C. Aaron
602.710.2501
maaron@mca-financial.com

| | |
|---|---|
| **EXPERIENCE** | **MCA Financial Group, Ltd. – October 2000 to Present**<br>**Founder & President** - Provides financial advisory services to businesses, financial institutions and investor groups in the areas of Financial Restructuring, M&A advisory services, Business Oversight/Monitoring, Corporate Finance and Capital Formation. |

**The Network Connection, Inc (NASDAQ Listed) (Majority owned subsidiary of Global Technologies) - May 1999 – December 2000**
**Executive Vice President, Chief Financial Officer, Secretary; President – Systems Group** - Member of senior executive team responsible for this business turnaround.

**Global Technologies, Ltd. (NASDAQ Listed)** - September 1998 – December 2000
**Vice President, Chief Financial Officer (September 1998 – December 1999); Vice President – Finance (December 1999 – December 2000)** - Hired in 1998 as part of newly appointed management team to turn around this distressed high-tech company.

**Employee Solutions, Inc. (NASDAQ Listed)** - January 1996 – September 1998
Phoenix, Arizona
**Chief Financial Officer / Treasurer** - Responsible for all corporate finance, acquisitions, accounting, cash management, budgeting, and financial reporting of this $1 billion revenue NASDAQ company. Significant involvement in company-wide strategic planning and business development. Raised $85 million in high yield offering and arranged various bank financing transactions.

**Arthur Andersen LLP** - September 1986 - January 1996
New York, New York

- **Senior Manager** in Arthur Andersen's **Corporate Finance Practice** and **Corporate Recovery Services Group** specializing in corporate finance, corporate turnaround, loan workout, and bankruptcy situations. December 1989 to January 1996.
- **Senior - Audit Practice:** September 1986 to November 1989.

**EDUCATION**  **Columbia University, New York, New York**
Masters in Business Administration, August 1993 -- Concentrations in Finance and Management of Organizations. Full scholarship provided by Arthur Andersen.
**The Pennsylvania State University, University Park, Pennsylvania**
Bachelor of Science in Accounting, May 1986

**PROFESSIONAL AFFILIATIONS**
- Zila, Inc. – Outside Director, Chairman of Audit Committee (NASDAQ: ZILA) 1/03 to 11/05
- Certified Public Accountant; New York State & Arizona
- Adjunct Professor - Arizona State University Graduate School of Business:- Instructed a full-semester course on Turnaround Consulting in the MBA program
- Lecturer at the Wharton School and Penn State on business turnarounds
- Turnaround Management Association: Certified Turnaround Professional, Former Member of the Board of Directors, AZ Chapter

# MCAFinancialGroup

**MANAGEMENT**
**EXPERIENCE**

- *General Management*: member of executive management teams of three public companies from 1996 to 2000. Member of public company Board of Directors. Responsible for general management of large teams of professionals and staff personnel.
- *Finance*: managed budget, forecast, capital allocation and banking processes. Oversight of customer and product profitability analyses and product pricing. Directed investor relations and maintained regular contact with Wall Street analysts and investment bankers. Negotiated and executed senior bank facilities, acquisition financing, high-yield offerings, private placements (mezzanine, preferred stock and common stock) and secondary offerings.
- *Acquisitions*: developed strategic acquisition plans, identified targets, performed valuations, negotiated transactions, performed and managed due diligence, and managed post acquisition integration.
- *Accounting*: managed accounting operations with over 45 full time staff, developed and implemented JD Edwards solution.
- *Cash Management*: developed nationwide cash management programs. Developed daily cash reporting and forecasting tools.
- *SEC & Financial Reporting*: Form 10-Q, 10-K, registration statements, and others as required. Responsible for Annual Report to Shareholders. Extensive knowledge of GAAP and Regulations S-X and S-K. Responsible for reporting to management, outside banking institutions and Board of Directors. Experienced with SarBox regulations.
- *Human Resources*: Experience in executive compensation, personnel management and benefit plans.

**ADVISORY**
**EXPERIENCE**

**Corporate Recovery Services & Corporate Finance:**

- Corporate turnaround and Loan workout activities include managing and performing financial analyses, capital restructuring, strategic planning, productivity and profitability studies of an organization's operations and products, operational reengineering, and cash management; assisting clients in workout negotiation, crisis management, and the development of business plans; assisting lenders in collateral evaluation and monitoring of collateral.
- Bankruptcy activities include advising debtors and creditor groups on business plans and financial projections to maximize their recovery in bankruptcy, performing due diligence on behalf of creditors' committees and other interested parties, preparing debtor schedules and Statement of Financial Affairs, reviewing for fraudulent conveyances in highly leveraged transactions, preparing and evaluating debtor liquidation analysis, and reviewing for preferential payments and reclamations.
- Corporate finance activities include business valuation, private placement transactions, developing business plans, advising on corporate finance issues, and lender negotiations.
- Industry experience: technology and networking solutions, manufacturing, wholesale distribution, retail, apparel, telecommunications, hospitality, aviation, and real estate development.

**Listing of all the cases in which the witness has testified as an expert at trial or by deposition in the past several years.**

|     | Approximate Date | Description / Court |
| --- | --- | --- |
| 1. | June 2013 | *EXX Inc., vs. Timothy Stabosz et al., Case No. A-11-652516-B, District Court, Clark County, NV:* Valuation expert for Respondents in shareholder dispute case. |
| 2. | May 2013 | *AZ-Tech Radiology & Open MRI, LLC et al., Case No. 2:12-bk-04702-RJH for the District of Arizona:* Expert witness for Lender on plan feasibility and interest rates. |
| 3. | May 2013 | *Carmichael Real Esate LLC, Case No. 2:11-bk-14026GBN for the District of Arizona:* Expert witness for Lender on plan feasibility and interest rates. |
| 4. | December 2012 | *The Makena Great American Anza Company, LLC: Case No. 11-bk-48549-JPC for the Northern District of Illinois:* Expert witness for Lender on plan feasibility and interest rates. |
| 5. | December 2012 | *GAC Storage El Monti, LLC: Case No. 11-bk-42638-JPC for the Northern District of Illinois:* Expert witness for Lender on plan feasibility and interest rates. |
| 6. | November 2012 | *Loretta T. Avent et al. v. Paragon Gaming, LLC and Paragon Gaming, Inc: Case No. CV2010-017742.* Valuation expert for defendant in shareholder dispute case. |
| 7. | June 2012 | *MV AZ v. Moon Valley Country Club:* Served as financial and business expert on behalf of Moon Valley in a proposed Receiver action. |
| 8. | March 2012 | *N'Genuity Enterprises Co., Debtor; Case No. 2:11-bk-28705-GBN.* Expert witness on behalf of Debtor on valuation, feasibility and related matters. |
| 9. | September 2011 | *eMove Inc. v.SMD SMD Software, Ind.; Case No. CV 10-2052-PHX-NVW.* Expert witness on economic damages. |
| 10. | April 2011 | *D I of Nachez, Inc.; Case No. 10-01677-EE So. District of MS.* Interest rate expert for Debtor. |
| 11. | April 2011 | *Timothy Ray Wright; Case No. 2:09-bk-32244-SSC District of Arizona.* Plan Feasibility and Interest Rate expert |

1

| | | |
|---|---|---|
| 12. | March 2011 | ***Goodrich v. Barness & Papas; Case No. CV2009-018049.*** Expert witness on behalf of Plaintiffs in a fraud and misrepresentation case in the areas of financial and accounting matters and securities offerings. |
| 13. | February 2011 | ***Avondale Gateway Center Entitlement LLC: Case No. 2:09-bk-12153-CGC.*** Expert witness for secured lender on plan feasibility and interest rates. |
| 14. | August 2010 | ***Wells Fargo Bank, NA et al. vs. Bashas'.*** Expert witness for secured lender group on plan feasibility (with valuation opinions), and interest rates. |
| 15. | August 2010 | ***Spectrum Town Center Property, LLC; Case No. 2:09-bk-13764-CGC.*** Expert witness on valuation, plan feasibility and interest rates. |
| 16. | March 2010 | ***Antimite Arizona Inc. vs. S.O.S. Heritage Inc. Sherman Fogal, Arbitrator.*** Expert witness for Plaintiff on valuation methodology and damages from sale transaction. |
| 17. | March 2010 | ***Starpoint Adera Condominiums Limited Partner Case No.: 09-bk-33625.*** Expert witness for lender on valuation, claims and feasibility matters. |
| 18. | February 2008 | ***Valley Realty Advisors Cash No: 07-04217-CGX.*** Interest rate expert for secured claim. |
| 19. | January 2008 | ***First Mangnus Financial Case No.: 4:07bk-01578:*** Financial advisor to Debtor and expert on plan feasibility, liquidation analysis and other confirmation matters. |
| 20. | March 2007 | ***Randall Bernard vs. Epstein Webber & Conover PLC Case No: CV 2005-015542.*** Expert witness for Plaintiff in commercial litigation matter. |
| 21. | September 2006 | ***Handmaker Jewish Services for the Aging:*** US Bankruptcy Court for the District of AZ; Case No: 4:05-bk-05924-EWH. Expert witness on Plan feasibility. |
| 22. | July 2006 | ***Pashit and Rama Patel et al.:*** US Bankruptcy Court for the District of AZ; Case No: Case No. 2-03-bk-19706-RJH; Case No. 2-03-bk-19708-RJH; Case No. 2-03-bk-09715-RJH. Expert witness on Plan feasibility. |
| 23. | March 2006 | ***Commission Advance:*** US Bankruptcy Court for the District of AZ. Fact witness related to Director's & Officers Liability matter. |

2

| 24. | March 2006 | *Sonora Behavioral Health Hospital:* Testified in Superior Court in Tucson, AZ to serve as court appointed receiver. |
|---|---|---|
| 25. | February 2006 | *Textron Financial Corporation vs. John F. Turner and Company:* United States District Court, Eastern District of California. Valuation expert and Receiver over assets and operations. |
| 26. | November 2005 | *The CIT Group/Business Credit, Inc. v. Creative Friction, L.L.C.* Served as damages expert witness on behalf of CIT. |
| 27. | March 2005 | *GTI Capital Holdings, LLC, dba Rockland Materials; G.H. Goodman Investment Companies, LLC:* Expert witness on behalf of secured creditor in surcharge litigation. |
| 28. | 2004 / 2005 | *Mandall Armor Design and Manufacturing*: Testified as Court Appointed Receiver on business valuation, business operations and other matters. (Superior Court) |
| 29. | December 2004 | *SG New York, LLC*: Superior Court of Arizona: Served as expert witness on insurance claim in support of damages. Provided expert report and deposition testimony. |
| 30. | October 2004 | *Arizona Surgical Hospital, LLC*: Testified as to qualifications to serve as Court Appointed Receiver with authority to sell assets and business operation (valuation & M&A qualifications). (Superior Court) |
| 31. | July 2004 | *Cold Stone Creamery, Inc., as Respondent and Nuts on Top, Inc., and Owen Brown Enterprises, Ltd., collectively, as Claimants ("NUTS")*. American Arbitration Association Case No. 002-OQP-Z6K. Retained as expert witness on valuation and damages. Provided deposition testimony. Matter concluded. |
| 32. | March 2004 | *Human Dynamics Corporation vs. Seibels Bruce Group*: Retained as damages expert by defendant in state court. Submitted Expert Report and provided deposition testimony. Matter pending. (Superior Court) |
| 33. | January 2004 | *Castle Boutique*: Interest Rate Expert retained by secured lenders in U.S. Bankruptcy Court. Provided expert testimony at trial. Matter concluded. |

| | | |
|---|---|---|
| 34. | May 2003 | ***GTI Capital Holdings, LLC (d/b/a Rockland Materials) & G.H. Goodman Investment Companies***: Court appointed receiver. Testified at court hearing regarding experience to serve as receiver and related business matters. (Superior Court) |
| 35. | 2003 / 2004 | ***Phoenix Automatic Fire Sprinklers***: Retained as damages expert by defendants in state court. Submitted Expert Report. Provided deposition testimony. Matter pending. (Superior Court) |
| 36. | April 2003 | ***Page Ice Company, Inc.***: Court appointed receiver. Testified at court hearing regarding experience to serve as receiver and related business matters. (Superior Court) |
| 37. | March 2003 | ***Interpipe Equipment, Inc.***: Court appointed receiver. Testified at court hearing regarding experience to serve as receiver and related business matters. (Superior Court) |
| 38. | January 2002 | ***Hillside Communities***: Testified as to qualifications to serve as Court Appointed Receiver to operate, manage and sell this senior living community. (Superior Court) |
| 39. | October 2001 | ***Pennysaver News of Long Island, Carrier Pigeon of Long Island, Tucson Shopper, Penn Media Group as defendants vs. Wells Fargo Bank***: Provided expert testimony on behalf of secured creditor in Bankruptcy Court regarding valuation and business condition. (U.S. Bankruptcy Court) |
| 40. | January 2001 | ***CenterStance, Inc.***: Testified at trial on behalf of creditor with respect to valuation and business acquisition. (U.S. Bankruptcy Court) |
| 41. | 2001 / 2002 | ***FourthStage Technologies, Inc.***: Advisor to Debtor. Testified at trial regarding valuation and plan feasibility. (U.S. Bankruptcy Court) |
| 42. | 2001 | ***Sun Valley Furniture***: Testified at trial regarding plan feasibility, valuation and DIP financing. (U.S. Bankruptcy Court) |
| 43. | 2000 / 2001 | ***Sunrise Airlines***: Testified at trial regarding valuation and plan feasibility. (U.S. Bankruptcy Court) |

4

# EXHIBIT 1



**DFG**
Diversified Funding Group, LLC

August 1, 2007

Rightpath Limited Development Group, LLC
3131 E. Camelback Road, Suite 212
Phoenix, AZ 85016

Re: **Loan on Ferrantino transaction**

Gentlemen:

This letter evidences the commitment of Diversified Funding Group, LLC to fund the above-referenced loan (hereinafter, the "Loan") to Rightpath Limited Development Group, LLC (hereinafter, "RLDG") upon: a) the operative loan terms outlined below, and b) satisfaction of each of the conditions precedent, which follow.

### LOAN TERMS:

| | |
|---|---|
| Borrower: | Rightpath Limited Development Group, LLC, a Delaware limited liability company |
| Loan Amount: | $7,500,000, minimum (DFG is working towards an aggregate funding of $8.4M) |
| Funding Date: | ~~As soon as possible~~ August 10th 2007 *PH* |
| Interest: | Interest shall be payable monthly at a rate of 10% per annum from the Interest Reserve account funded at closing via the Loan proceeds. |
| Interest Reserve: | A full term interest reserve will be established and held by Lender. |
| Term: | 12 months |
| Loan Fees: | 2.50% of the Loan Amount shall be payable at funding to Lender from the Loan proceeds. |
| Exit Fees: | Exit fees in the amount of 22.50% per annum (or, 1.875% per month, after expiration of the Lock-Out period; see below) shall be due and payable upon maturity. If the Loan is extended beyond the 12-month base Term (see "Extensions", below), additional |

7595 E. McDonald Drive, Suite 120, Scottsdale, Arizona 85250
Office (480) 874-1400  •  BK 0905638  •  Facsimile (480) 947-0019

extension fees (beyond the Exit Fees in the amount of 1.875% per month) shall be charged.

**Collateral:** Pledge and full assignment with execution rights of all purchase contracts and development rights pertaining to approximately 70 acres of land generally known as the "Ferrantino property", together with proceeds pledges (defined below) from RLDG and personal guarantees from all RLDG principals (and their spouses, if applicable).

**Guarantees:** Lender will receive RLDG's guaranty, together with full personal guarantees from Borrower's principals (and spouses, if applicable).

**Security:** The Loan will be made pursuant to a Loan Agreement and Promissory Note to be prepared by Lender's legal counsel. As security for such note, the Borrower shall execute, or cause to be executed, a pledge or assignment of the applicable escrow and contract, as amended; any guarantees; and, any other such documents as may be deemed reasonably necessary to preserve Lender's security.

**Extensions:** Two (2), one-month extensions will be provided, given: 1) Borrower's provision of 15 days' prior written notice of its election to extend; and 2) Borrower's payment with each such notice of a loan extension fee equal to 1.25% of the Loan Amount.

**Payments:** Monthly interest only payments in arrears from interest reserve account funded at closing, and controlled and disbursed by Lender.

**Lock-Out:** Any prepayment of the Loan which may occur during the first ~~180~~ 120 days immediately following Lender's Funding of the Loan (hereinafter, the "Lock-Out" period) shall nevertheless obligate Borrower to pay all Interest and Exit Fees otherwise due during said Lock-Out.

**Prepayment:** At any time after expiry of the Lock-Out, Borrower may reduce or prepay the Loan in whole or in part upon 30 days prior written notice to Lender.

**Costs:** All costs incurred in connection with the Loan, including title, *not to exceed the $25,000 deposit.* escrow, appraisal, legal, underwriting, UCC searches, account servicing, etc., will be paid by Borrower. As a condition to the effectiveness of this commitment, Borrower shall provide Lender with a deposit in the amount of $25,000 to be applied towards such costs, $15,000 of which shall be deposited as a retainer with

Lender's counsel in order to commence documentation of the Loan at issue, and the balance of which shall immediately be deemed earned by Lender as an underwriting fee.

## Conditions Precedent:

Lender's obligation to perform under this commitment shall be contingent upon Borrower's satisfaction of the following conditions, as determined in good faith by Lender and Lender's outside counsel:

1. Assignment of Proceeds.   Borrower shall have duly executed an assignment of proceeds, satisfactory to Lender and Lender's counsel, confirming that Borrower will make no distributions to its members or manager(s) (hereinafter, "Member Distributions") without Lender's prior written consent. For purposes of this condition, "Member Distributions" shall include all Company distributions, except those for debt service, legal fees and costs, title or escrow costs, and the cost of any third-party brokerage commissions, reports, surveys or engineering studies (hereinafter, "Approved Distributions"). *and distributions from loan proceeds.*

   *[handwritten margin note: Principle reduction/release requirements]*

2. Personal Guarantees. Danny Hendon, Robert Banovac and Rick Burton, together with their respective spouses (if applicable), shall each have executed unlimited personal guarantees satisfactory to Lender.

3. Penalties.     Upon the occurrence of any Distribution to a Manager or *Member* member without Lender's prior written consent, a penalty in the amount of $2,800,000 *not to exceed 2 times the amount of such distributions* shall be due Lender and deemed fully earned and payable. If said distribution is not cured within the applicable cure period, then, in addition to the penalty recited above, Borrower shall irrevocably forfeit all rights with respect to the Ferrantino escrow.

4. Escrows; Proceeds.   Lender shall have a direct interest in and full right to all proceeds from sale escrows, subject only to: a) Borrower's payment of any Approved Distributions, and b) any other distribution expressly approved by Lender in advance, in writing. Lender shall also receive full disclosure from Borrower as to all existing and pending escrows and any modifications or material changes related thereto.

5. Legal Opinion.       Borrower shall have caused its attorneys, Snell & Wilmer LLP, to provide Borrower with a letter, on Snell's letterhead, addressed to Rightpath and substantiating that it is that firm's opinion that Rightpath's proffered pledge and/or assignment of the Ferrantino contract is entirely permissible within the confines of Borrower's various ancillary agreements with the city of Glendale, Mortgages Ltd., etc.

6. Development Approvals.    Lender shall have received a legal opinion from its own counsel to the effect that, in the event of Borrower's default on the Loan (and Lender's subsequent exercise of the Ferrantino escrow, if applicable), any development approvals pertaining to the Collateral by virtue of its zoning status or inclusion within any then-

executed Development Agreement with Glendale would pass in full to Lender or any successor-in-interest.

7. <u>Full Assignment.</u>    Borrower shall have assigned to Lender both the Ferrantino contract/escrow, as amended, together with: a) any and all of Borrower's execution rights thereupon; b) any and all LOIs, contracts, and offers by end users for the parcel, or portions thereof; and c) any and all plans, specifications, architectural drawings or renderings, third-party reports or studies then in Borrower's possession and pertaining to the Ferrantino property. While Borrower shall have made a full assignment of its rights under the Ferrantino escrow as otherwise provided herein, it shall be Borrower's (and only Borrower's) obligation to: a) pay any and all extension or other fees due or which may become due on the Ferrantino contract no less than 10 days in advance of when said payment are due, and b) provide Lender with timely proof of said payment. If any such payment is not timely made by Borrower, and Lender is required to advance any such payment on Borrower's behalf, this shall constitute a material event of default, and Borrower's right, title and interest in and to the Ferrantino contract shall terminate (although Borrower's liability to Lender for payment of Lender's principal balance and exit fees, together with the proceeds pledge and the guarantees, shall not).

8. <u>Full Disclosure.</u>    Borrower shall provide Lender with a letter, signed by each of its members, confirming to Lender that: a) <u>all</u> material information which concerns the bargained-for Collateral (defined as, without limitation, both the Ferrantino contract, the assignability thereof to Lender, or any development approvals or issues thereunder) then in Borrower's possession or which Borrower knows to exist has been provided to Lender; and b) there are no other material items or issues related to those topics then in Borrower's possession or known to Borrower to exist which would: i) otherwise be material to Lender or Lender's willingness to enter into the Loan, or ii) otherwise conflict with Borrower's ability to enter into the Loan structure contemplated above. For purposes of this section, "knows" or "known" shall mean the actual conscious knowledge of either Rick Burton, Danny Hendon or Robert Banovac.

<u>**ACCEPTANCE:**</u>
Gentlemen, if the terms of this commitment are acceptable to Borrower, please so signify by signing where indicated below and faxing a copy to DFG (480-556-5301), then returning both the original signed copy, together with the $25,000 deposit, to our offices prior to 5:00 p.m. on August 6th, 2007.

Upon receipt of that transmittal, we will engage counsel and begin documentation of this Loan.

Sincerely,

Jeremy L. Lewis
Diversified Funding Group, LLC

Page 4 of 5

ACCEPTED and AGREED to this ___2ⁿᵈ___ day of __August__, 2007.

Borrower:

**Rightpath Limited Development Group, LLC**
a Delaware limited liability company

By:   Hendon MLB Development, LLC
Its:   Manager

By:   _____
      Daniel L. Hendon
Its:   Member/Manager

# EXHIBIT 2

# LOAN AGREEMENT

This loan agreement (the "Agreement") is made as of August 31, 2007, by and between Diversified Funding Group, LLC, an Arizona limited liability company, whose address is 7595 E. McDonald Drive, Suite 120, Scottsdale, AZ 85250 ("Lender"), and Rightpath Limited Development Group, LLC, a Delaware limited liability company, whose address is c/o Rightpath Limited, 3131 E. Camelback Road, Suite 212, Phoenix, Arizona 85016 ("Borrower").

## RECITALS

Borrower, whose federal tax identification number is 14-1983600, desires to obtain a loan (the "Loan") from Lender in a principal amount not to exceed Seven Million Seven Hundred Sixty Thousand and No/100 Dollars ($7,760,000.00), and Lender is willing to make the Loan, subject to the terms and conditions set forth herein.

Now, therefore, in consideration of the mutual covenants herein set forth, the parties agree as follows.

## ARTICLE 1

## THE LOAN

1.1    Subject to the terms and conditions of this Agreement, Lender will make the Loan to Borrower in a principal amount not to exceed Seven Million Seven Hundred Sixty Thousand and No/100 Dollars ($7,760,000.00) (the "Loan Amount") and bearing current monthly interest ("Interest") at the pre-default rate of ten percent (10.00%) per annum (the "Interest Rate"), in addition to other amounts that Borrower agrees to pay Lender as further consideration for the Loan. In the event of payment or partial payment, Borrower shall have no right to re-borrow from Lender any amount(s) so paid to Lender.

1.2    The Borrower's obligation to repay the Loan shall be evidenced by a promissory note of even date herewith (the "Note").

1.3    Upon Lender's receipt of a duly executed set of Loan Documents, as determined by Lender in Lender's sole discretion, Lender shall reserve, deduct or pay from the Loan Amount the following (all of which shall be charged to Borrower when paid):

(a)    Closing Costs. All filing, recording, escrow, and/or title insurance premiums, costs or fees, together with any other costs incurred therein or associated therewith (i.e., fees or charges for facsimile transmissions, messenger/delivery services, etc.) that in any way relate to the Funding or Closing of the Loan.

(b)    Lender's Expenses. All fees and costs paid or incurred by Lender in connection with the negotiation, investigation, evaluation, processing and closing of the Loan, including, but not limited to, reasonable attorneys' fees (of Lender and of any participant in the Loan) and related costs for any inspections, appraisals or confirmations thereof, surveys or confirmations thereof, and any other document preparation or other fees or costs incurred by Lender in connection with the Loan that are not specifically referenced in this Agreement ("Lender's Expenses" or "Loan Expenses"), together with any interest accrued on the Loan Amount if there is a Funding but a Closing does not take place. The parties acknowledge, however, that Borrower has deposited $25,000.00 with Lender to assure payment of the foregoing Lender's expenses. If the Lender incurs attorneys' fees in an amount

Case 2:11-ap-01972-EWH    Doc 1-2    Filed 10/27/11    Entered 10/27/11 14:45:30    Desc
Exhibit B Loan Agreement    Page 2 of 21

Case 2:11-ap-01972-SHG    Doc 78    Filed 10/03/13    Entered 10/03/13 15:54:01    Desc
Main Document    Page 39 of 107

less than $15,000.00, (and provided that Lender's other Loan Expenses do not then exceed $10,000.00), Lender will remit to Borrower the amount by which its attorneys' fees are less than $15,000.

(c) **Lender Fee.** Borrower agrees to pay to Lender as additional consideration for the Loan a "Loan Fee" of 2.5% of the Loan Amount, or One Hundred Ninety-four Thousand and no/100 Dollars ($194,000.00) at the time of Closing, which amount may be deducted and withheld by Lender from the gross Loan Amount at the time of Funding.

(d) **Interest Reserve.** The sum of $776,000.05 shall be withheld by Lender for Lender's establishment of an interest reserve account ("Interest Reserve") to be held in Borrower's name at a national financial institution of Lender's election, funded therein at time of closing of the Loan, and thereafter disbursed periodically at Lender's direction in order to pay and service all applicable Note interest otherwise due monthly under the terms of the Note (or, for the full Loan Amount, monthly interest-only payments of $84,666.67 during the initial term of the Note). If the Loan is repaid in full prior to exhaustion of the Interest Reserve, any remaining Interest Reserve balance shall be paid to Borrower or as Borrower may direct; conversely, if the Loan is not repaid in full prior to exhaustion of said Interest Reserve, or the term of the Note is extended as provided therein for one or two additional months' term, Borrower shall then make any and all interest payments (including partial payments) when due, and without the requirement for any notice thereof from Lender.

(e) **Balance.** The balance of the Loan Amount to Borrower or as Borrower may direct, on or before August 31, 2007 (the anticipated "Closing Date").

1.4 **Exit Fee Payment(s).** As further consideration for the Loan, Borrower agrees to pay Lender "Exit Fee" amount(s) as follows:

(a) In addition to regular interest, Borrower agrees to pay Lender 1.875% per month (or an annualized 22.50%) of and on the full Loan Amount, which amount will accrue during the "closed to prepayment" period of the first four (4) full months of the Loan Term, plus each full or partial month thereafter, until the Loan is paid in full to Lender (by way of example only, if the Loan is properly prepaid by Borrower in the middle of the eighth (8th) month of the Loan Term, the total amount then due will be the Loan Amount, plus 1.875% of and on that amount per month for each of those 8 full or partial months, for a total Exit Fee of $1,164,000, and a total sum then due Lender of $8,924,000; by way of another example only, if the Loan is instead paid in full on the initial Due Date, and without any Extension, the total amount then due Lender will be the Loan Amount, plus 1.875% of and on that amount per month for each of those 12 full or partial months, for a total Exit Fee of $1,746,000, and a total sum then due Lender of $9,506,000).

(b) If the Loan Term is extended as provided herein, for each Extension period, whether in full or in part, and before payment of principal and all other amounts then due hereunder, Borrower will pay Lender 1.875% of and on the full Loan Amount, which amount will be added to the total sum then due Lender, in addition to any otherwise applicable and accrued Exit Fee then due for the preceding initial Term of 12 months, and in addition to any Extension Period Fee provided for in section 1.4(e) hereof.

5

(c) If the Loan is prepaid by Borrower contrary to the prohibition against any prepayment during the first four (4) months of the Term (the "closed to prepayment" period), Borrower will owe and must pay Lender (i) all interest for the full 4-month period, in arrears and in advance and (ii) the full Exit Fee due under 1.4(a) above for the entire 4-month period, not as a penalty but as agreed upon liquidated damages and compensation to Lender for the loss of interest and Exit Fee that it would otherwise have received during that "closed to prepayment" period.

(d) If the Loan matures due to acceleration following an actionable and uncured Event of Default, then the Exit Fee that otherwise would be due under Sections 1.4(a) or 1.4(b) above, will be due and payable in full, again not as a penalty but as agreed upon liquidated damages and compensation to Lender on account of such Event of Default.

# 437541.9 (see end of document)                    2

1.5    **Key Loan Provisions.** Other general provisions of the Loan are provided in the Note, and further clarified below:

(a)    **Loan Amount.** Seven Million Seven Hundred Sixty Thousand and No/100 Dollars ($7,760,000.00).

(b)    **Interest.** The Loan shall bear interest at the rate ("Interest Rate") of ten percent (10.00%) per annum. The interest provided herein shall be calculated on the basis of a 360-day year/30-day month and if not paid by the tenth (10th) day of each month, the due and unpaid interest shall be compounded effective on the first (1st) day of each month.

(c)    **Default Interest.** During any Event of Default, the Interest Rate shall be increased an additional eight percent (8.00%) per annum, with said default rate thus aggregating eighteen percent (18.00%) per annum ("Default Rate") from the date of said Event of Default, assuming Maker's failure to cure said Event of Default as provided herein.

(d)    **Term.** The term ("Term") of the Loan shall be for a period of twelve (12) months from the Funding (as defined in this Agreement) of the Loan, and the date by which all outstanding principal and interest must be paid (the maturity date or "Due Date" but see below in 1.5(e)(iii)) shall thus be August 31, 2008.

(e)    **Extension of Term.** Provided that there is not an existing Event of Default under the Loan Documents, or, if there is a non-monetary Event of Default and Maker has commenced and is diligently prosecuting a cure as provided in the Loan Documents, Maker shall have the right to extend the Term and Due Date for up to two (2) additional one (1) month periods (an "Extension"), for a total Term of up to fourteen (14) months, subject to the following:

(i)    **Notice.** Maker shall give Lender written notice ("Extension Notice") of its election for the Extension at least fifteen (15) days prior to the expiration of the then-remaining Term (or, as to the second Extension Term, prior to the expiration of the first Extension Term).

(ii)    **Extension Period Fee(s).** Maker shall pay to Lender at the time of any said Extension Notice an additional Extension Fee in an amount equal to 1.25% of the original Loan Amount, or $97,000.00 for each such Extension, due upon giving the Extension Notice for either or both of such Extensions.

(iii)    **Revised Due Date, if extended.** Assuming Maker has elected to extend in conformance with this Section 1.5(e), the new Due Date shall thus be either September 30, 2008 (if due after the first Extension) or October 30, 2008 (if due after the second Extension) (if and as applicable thereto, the "Revised Due Date"). All other provisions of the Note and the Loan Agreement shall remain the same.

(f)    **Payments.** Interest shall be payable monthly in arrears on the first day of each month until the end of the Term, on which Due Date all otherwise accrued but unpaid interest and principal, together with all other sums then due Lender shall be paid in full.

(g)    **Late Charge.** Borrower shall pay Lender a late charge of ten percent (10%) ("Late Charge") of any payment not received by Lender within ten (10) days after said payment is due, including the unpaid balance of the Loan at the end of the Term (provided, however, such late charge shall not apply to any interest only installment that is paid to Lender out of the Interest Reserve, but shall apply to any interest installment due during any Extension of the Term, assuming that Borrower has not replenished the Interest Reserve as provided herein).

(h)    **Prepayment.** The Loan is absolutely and unconditionally "closed to prepayment" during the first four (4) months of the Loan Term (through the interest installment due on December 31, 2007). Thereafter, but only thereafter, Borrower may prepay the Loan in whole or in part at any time, without premium or penalty therefore (not including the payment of any Exit Fee that is then

Case 2:11-ap-01972-EWH    Doc 1-2    Filed 10/27/11    Entered 10/27/11 14:45:30    Desc
Exhibit B Loan Agreement    Page 4 of 21

Case 2:11-ap-01972-SHG    Doc 78    Filed 10/03/13    Entered 10/03/13 15:54:01    Desc
Main Document    Page 41 of 107

due, or any other interest, Loan fees or Extension Fees that may otherwise then be due) upon 30 days prior written notice to Lender of any such permitted prepayment.

(i)     Account Servicing.   At or after the Closing, and at Lender's sole election, Lender and Borrower may establish a collection account ("Account") with Grand Canyon Title Agency, Inc., 2720 E. Camelback Road, Suite 100, Phoenix, Arizona 85016 (telephone 602-468-7857) with Kathy O'Brien-Flores ("Collection Agent") and shall sign the standard form of agreement with Collection Agent. The cost to establish and maintain the Account (estimated to be $150.00) shall be paid at Closing by Borrower, and subject to the following:

1)     A payment shall be deemed to have been paid to Lender as of the date the payment is processed by Lender as long as Borrower's check is honored by Borrower's bank. Borrower acknowledges that the processing of funds by Lender shall be performed in the ordinary course of Lender's business and that the time involved in the processing may vary depending upon the administrative workload of Lender. Lender shall conditionally accept any payment received by Lender until such time as the processing of the payment is completed.

2)     Payments shall be applied in the order received by Lender and as provided in the Note (as defined herein).  Lender will make all monthly interest payments for available funds in the Interest Reserve to itself and not through the Account, but will notify Collection Agent of each such payment as soon as it is made, and Collection Agent will enter the fact of any such payment in the Account records and ledger.

3)     Borrower shall make payments to Lender as required by the Note and other Loan Documents without the need for a notice from Lender to Borrower that any such payment is due.



(j)     Loan Purposes.   The Loan is for commercial use, not residential or personal or household use, and Borrower is entering into it in order to provide financing or refinancing in conjunction with the acquisition, development and/or construction of the real property and/or the improvements to be constructed on the "Property" or "77 Acre Property" that is the subject of the 77 Acre Purchase Contract (as defined and described below) or on any other part of the so-called "Camelback Ranch Property," the "Rightpath Property," the "RLDG Land" and/or the "Airport Property" (any and all such properties may be referred to as the "Specified Property" or "Specified Properties"), and as such Specified Properties are or may be further described, defined or referenced in (1) a "Development Agreement for Camelback Ranch Property" or (2) any similar or comparable "development agreement" (a "Qualified Development Agreement") by and among the City of Phoenix, Arizona, the City of Glendale, Arizona, Borrower and the Western Loop 101 Public Facilities Corporation, or any two or more of such parties.  Borrower agrees that, upon an uncured Event of Default under this Agreement or the Loan Documents, Lender may succeed to the position and role of "Developer" with respect to the 77 Acre Property for purposes of such Qualified Development Agreement, and that Lender herein if need be may and will be recognized as a permitted successor and assign of "Developer" with respect to the 77 Acre Property under any such Qualified Development Agreement for any and all purposes.  Borrower hereby agrees to provide Lender, while this Agreement remains in effect and the Loan is in any way outstanding and the Note is not paid in full, with copies any such executed Qualified Development Agreement and copies of all notices it receives under any such Qualified Development Agreement.  ("Borrower" as "Declarant" under any such Qualified Development Agreement will also be deemed to include any affiliate or related party of Borrower or its principals (the individual Guarantors under the Guarantees defined below), including without limitation Rightpath MLB 77, LLC, a Delaware limited liability company (herein "Rightpath 77").).

ARTICLE 2

SECURITY

2.1     To secure payment of the Loan and the performance of all obligations of Borrower to Lender pursuant to this Loan Agreement and the other Loan Documents, Borrower shall

# 4373413.9 (see end of document)                          4

Borrower. Rightpath 77 has just been organized and formed, but will provide financial statements when prepared for it to Lender.

(e) <u>Litigation</u>. There are no actions, suits or proceedings pending, or to the knowledge of Borrower threatened in any court or before any federal, state, municipal or other governmental agency which, if decided adversely would have a material adverse effect upon Rightpath 77 or the 77 Acre Property or the financial condition, business or properties of Borrower or Rightpath 77 other than those matters previously disclosed by Borrower to the Lender. Borrower is not in default with respect to any order of any court or with respect to any applicable statute, order, rule or regulation of any governmental agency where the impact to the business would be materially adverse.

(f) <u>Margin Stock</u>. No part of the proceeds of any Loan hereunder will be applied for the purpose of purchasing or carrying any "Margin Stock" registered on a national securities exchange or O.T.C. exchange as said stock is defined in Regulation "U" of the Board of Governors of the Federal Reserve System.

(g) <u>Binding Agreement</u>. When executed, the Loan Documents, and any other instruments pertaining to the Loan, when issued, executed and delivered pursuant hereto for value received, will, as appropriate, constitute the valid and binding obligations of Borrower and/or Rightpath 77 and are enforceable in accordance with their respective terms.

(h) <u>Default on Existing Indebtedness</u>. Neither Borrower nor Rightpath 77 is in default in the payment of the principal or interest on any indebtedness for borrowed money, nor is either of them in default under any instrument or agreement under and subject to which any indebtedness for borrowed money has been issued; and no event has occurred under the provisions of any instrument or agreement which, with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default thereunder.

(i) <u>Consent</u>. No consent, approval, order, license, permit, certificate or authorization of or registration, declaration or filing with any regulatory commission, board, or other governmental agency is necessary or required with respect to the execution, delivery or performance of the Loan Documents or any other instruments or transactions contemplated or related hereto, or if required, has been or will be obtained before Closing of the Loan.

(j) <u>Commercial Purposes</u>. The proceeds of the Loan will be used solely for commercial purposes, and shall not be used in any way for non-commercial, personal or household purposes and Section 1.5(j) is hereby reaffirmed in full.

(k) <u>Non-Foreign Status</u>. Neither Borrower nor Rightpath 77 as an entity is a "foreign corporation," "foreign partnership," "foreign trust," or "foreign estate," as those terms are defined in the Internal Revenue Code and the regulations promulgated thereunder. Borrower's U.S. employer identification number is as set forth in the Recital at the start of this Agreement.

(l) <u>Status of Collateral and Related Agreements</u>. The sole economic member and owner of Rightpath 77 is Borrower, and Borrower has full right, power and authority to grant, and has so authorized the granting of, the complete pledge of and security interest in the sole economic membership interests and rights in Rightpath 77 to Lender as security for the Loan (Lender will have a non-economic interest in Rightpath 77 in accordance with that entity's limited liability company agreement that has been approved by Lender). The primary asset of Rightpath 77 as of the date of the Loan is the purchaser's interest in that certain Purchase and Sale Agreement dated as of August 21, 2006 between Ferrantino Enterprises-Arizona, LLC (and any successors and assigns) as "seller" ("Seller"), Rightpath No. 1, LLC as "original buyer," Borrower as immediate successor to original buyer, and now Rightpath 77 as immediate successor to Borrower, as such buyer's interest therein was first duly assigned to Borrower pursuant to Assignment and Assumption of Purchase and Sale Agreement (Escrow No. NCS-251333-PHX1), and then secondly duly assigned to Rightpath 77 by a comparable Assignment and Assumption instrument effective before or on August 31, 2007, with the Purchase and Sale

provide Lender with a duly executed Pledge of membership interests and Security Agreement in all of Borrowers membership interest in and of Rightpath 77, together with such other security interests and pledge agreements that may be required by Lender regarding the Interest Reserve or any other collateral for the Loan (individually or collectively, a or the "Security Document"), together with duly executed personal unconditional guarantees from each of the individual principals of Borrower of any and all amounts due and owing under the Note or Loan Documents (collectively hereinafter, the "Guarantees"), also of even date herewith.

2.2     Borrower authorizes the delivery by Lender or its agents for filing of one or more Uniform Commercial Code Financing Statement(s) ("UCC1's") to perfect Lender's security interests as granted in any Security Document. Lender agrees to release/terminate or authorize the release and termination of the UCC1's upon full payment of the Loan as provided by applicable law.

2.3     This Agreement, the Note, the Security Document, the Guarantees and the UCC1's and all other documents or instruments ancillary to the Loan may collectively hereafter be referred to as the "Loan Documents."

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

3.1     To induce Lender to make the Loan, Borrower and Rightpath 77 each represents and warrants to Lender as follows:

(a)     <u>Company Existence and Power</u>. Borrower and Rightpath 77 each is duly formed, organized and existing as a limited liability company under the laws of the State of Delaware, and Borrower has duly registered as a foreign limited liability company in the State of Arizona, and each such company will continue to be duly formed and validly existing under the laws of the state of its formation, and Borrower will continue to be registered to do business within the State of Arizona. If Rightpath 77 hereafter acquires ownership of the 77 Acre Property while the Loan is outstanding and unpaid, Rightpath 77 also will register as a foreign limited liability company in Arizona. Borrower and Rightpath 77 each has the authority to own its property including but not limited to the 77 Acre Property and to carry on its business as now being conducted.

(b)     <u>Authority</u>. Borrower and Rightpath 77 each has full power and authority to enter into this Agreement, to make the borrowings hereunder, to execute and deliver the Note and any Security Document, incur the obligations and grant the collateral security provided for herein, all of which have been duly authorized by all proper and necessary action by and on behalf of Borrower or Rightpath 77. No consent or approval of any public authority is required as a condition to the validity of this Agreement or any Loan Document or other instrument executed pursuant thereto.

(c)     <u>No Conflicting Agreements</u>. There are no provisions in Borrower's or in Rightpath 77's certificates of organization or limited liability company agreements or in any mortgage, indenture, contract or agreement to which Borrower or Rightpath 77 is a party or by which either is bound, which prohibits the execution and delivery of the Loan Documents or any other instruments executed pursuant hereto, or the performance or observance by them of any of the terms or conditions of the Loan Documents or any other instruments executed pursuant hereto.

(d)     <u>Financial Condition</u>. The financial statements, if any, heretofore furnished to Lender are complete and correct, and they fairly present the financial condition of Borrower and the results of its operation as of such date and for the period ending on such date. To the best of Borrower's knowledge and belief there are no liabilities, direct or indirect, fixed or contingent, as of the date of such balance sheets, not disclosed by said financial statements that should be disclosed. Said financial statements were prepared in accordance with generally accepted accounting principles and practices of accounting consistently applied. Since the date thereof, there have been no material adverse changes in financial condition from that set forth in the financial statements of that date furnished by

Agreement having been amended and modified by (i) First Amendment to Purchase and Sale Agreement dated as of September 20, 2006, by (ii) Second Amendment to Purchase and Sale Agreement dated October 30, 2006, by (iii) Third Amendment to Purchase and Sale Agreement dated as of November 9, 2006, by (iv) Fourth Amendment to Purchase and Sale Agreement dated November 29, 2006, and by (v) any subsequent and further permissible amendment or modification thereto (collectively, the " 77 Acre Purchase Contract"). Borrower and Rightpath 77 represent and warrant to Lender that the 77 Acre Purchase Contract is (a) in full force and effect between Seller and Rightpath 77 as current "Buyer", (b) no "events of default" thereunder exist or with the passage of time will come into existence, (c) the First Option to Extend has been duly exercised thereunder so that the presettlement for Close of Escrow is not later than January 8, 2008, at a Purchase Price to be determined under the Fourth Amendment, Section 3.2, to the 77 Acre Purchase Contract, (e) that Rightpath 77, Borrower, or original buyer has paid all amounts due to Seller, including the First Extension Deposit, (d) that the deadline to exercise the Second Extension Option is on or before January 8, 2008, (e) that the "net square footage" of the "Property" under the 77 Acre Purchase Contract [which is described in the attached Exhibit A hereto as the "77 Acre Property"] presently is determined to be 3,122,994 square feet, after taking into account the Excluded Property of up to 86,000 square feet therefrom, (f) that the remaining "Remedial Work" that remains to be performed by the Buyer under the 77 Acre Purchase Contract (if any) is as described in Schedule 3.1(l) attached to this Agreement, (g) that the Second Earnest Money Deposit, the Third Earnest Money Deposit and the Fourth Earnest Money Deposit each has, in fact, been made and deposited in the Escrow on or before its respective due date under the terms of the 77 Acre Purchase Contract (g) that the termination of the Early Occupancy Agreement has taken place and such termination has not resulted in any material prejudice to either Borrower or to Rightpath 77 respectively as the "Buyer," and (h) there are no agreements or understandings among Seller, the original buyer, Borrower, or Rightpath 77 (either as a "Buyer" or as "Borrower") that have not been disclosed to Lender in writing by Borrower or Rightpath 77 or by Seller or that are not duplicated in the terms of the 77 Acre Purchase Contract as amended in the amendments thereto as are set forth above.

(m)     Survival.    The representations and warranties made in this Agreement, and each and every other provisions of this Agreement and the Loan Documents, shall survive the delivery thereof and shall be deemed to be continuously until the Loan shall have been paid in full.

## ARTICLE 4

### CONDITIONS OF LENDING

4.1     The obligation of the Lender to make the Loan is subject to the following conditions precedent:

(a)     Approval of Lender's Counsel. All legal matters incident to the documentation hereby contemplated shall be satisfactory to counsel for Lender.

(b)     Compliance. At the time of the making of the Loan:

(i)     Borrower and Rightpath 77 each shall have complied, and shall then be in compliance, with all the terms, conditions and covenants of this Agreement and of the 77 Acre Purchase Contract, and Rightpath 77 is and will be the sole "Buyer" of the 77 Acre Property under the terms and conditions of the 77 Acre Purchase Contract as described above in Section 3.1(l).

(ii)     There shall exist no "Event of Default" as defined in Section 8 and no event which, with the giving of notice or the passage of time, or both, would constitute such an Event of Default; and

(iii)     The representations and warranties contained in Article 3 shall be true and correct in all respects as of the date of Closing.

Case 2:11-ap-01972-EWH    Doc 1-2    Filed 10/27/11    Entered 10/27/11 14:45:30    Desc
Exhibit B Loan Agreement    Page 8 of 21

Case 2:11-ap-01972-SHG    Doc 78    Filed 10/03/13    Entered 10/03/13 15:54:01    Desc
Main Document    Page 45 of 107

(c)     <u>Documentation</u>. Lender shall have received duly-executed and in form satisfactory to Lender the Agreement, the Note, the Security Document and all such other instruments as may be appropriate in its opinion and discretion to evidence the indebtedness owed under the Loan, Note and this Agreement, and to create and perfect the security interests, pledges, collateral assignments and liens contemplated by this Agreement and the Security Document.

(d)     <u>Additional Deliveries</u>. Lender shall have received, prior to Closing, each of the following:

(i)     <u>Good Standing Certificates; Resolutions</u>. (1) Good standing certificates (or their equivalents) each for Borrower and for Rightpath 77 from each such entity's state of organization and Borrower's registration in Arizona as a foreign limited liability company; and (2) certified resolutions from the Members of Borrower authorizing, confirming and ratifying the Loan transaction and Loan Documents described herein.

(ii)     <u>Incumbency Certificate</u>. An incumbency certificate from Borrower which shall: (i) identify by name and title, and bear the signatures of, the authorized representatives of such entity and (ii) be certified to Lender by each of Borrower's authorized representatives.

(iii)     <u>Borrower's Disclosure Letter</u>. A letter, signed by each Member of Borrower and Rightpath 77, confirming to Lender that: a) all material information which concerns the bargained-for collateral or underlying support for the Loan (including the pledge of the sole membership interest in Rightpath 77, the status and continuing viability of the 77 Acre Purchase Contract or of any development approvals, entitlements or issues related to the 77 Acre Property) then in Borrower's possession or which Borrower knows to exist has been provided to Lender; and b) there are no other material items or issues related to those topics then in Borrower's possession or known to Borrower to exist which would: (x) otherwise be, material to Lender or Lender's willingness to enter into the Loan, or (y) otherwise conflict with Borrower's ability to enter into the Loan structure described in this Agreement. For purposes of this section, "knows" or "known" shall mean the actual conscious knowledge of either Rick Burton, Danny Handon or Robert Banovac.

(iv)     <u>Borrower's Counsel Letter</u>. Borrower shall have caused its attorneys, Snell & Wilmer LLP, to provide Borrower with an opinion letter in the form and content that has been pre-approved by Lender as being sufficient under the applicable terms and conditions of the Loan's commitment letter.

(e)     (Omitted.)

## ARTICLE 5

## PARTICULAR COVENANTS OF BORROWER AND RIGHTPATH 77

5.1     <u>Affirmative Covenants</u>. So long as Borrower is indebted to Lender and until payment in full of the Loan to Lender, Borrower and Rightpath 77 each agrees that, unless Lender shall otherwise consent (which consent may be granted or withheld in Lender's sole and absolute discretion) in writing, each of them must and will:

(a)     <u>Litigation</u>. Promptly give notice in writing to Lender of all litigation and of all proceedings before any governmental regulatory agency which, if adversely determined, would materially impair the ability of the Borrower or Rightpath 77 to perform its respective obligations under this Agreement or any other Loan Document or under the 77 Acre Purchase Contract;

(b)     <u>Existence</u>. Preserve and maintain its existence and all of its rights, privileges, and franchises;

# 431541.9 (see end of document)          8

(c)    **77 Acre Purchase Contract.** Rightpath 77 and Borrower as its sole economic member will take all actions and pay all amounts necessary to preserve the 77 Acre Purchase Contract in full force and effect so long as the Loan is in any way unpaid and outstanding. Rightpath 77 and Borrower as its sole economic member or otherwise will provide Lender with copies of any changes, amendments or other documentation pertaining in any way to the 77 Acre Purchase Contract immediately upon the receipt of the same by either or both of them.

(d)    **Financial and Other Data.** Furnish Lender with written financial statements of Borrower, Rightpath 77 and any Guarantor, and any other written reports deemed pertinent to the Loan transaction, any or all upon request by Lender;

(e)    **Compliance with Pledge.** Comply with all the terms of the Loan Documents and especially the Security Document and any similar instruments to be executed and delivered to Lender as hereinabove provided; and

(f)    **Additional Documentation.** Execute and deliver to Lender all such further instruments and documents and do all such other acts and things as Lender may reasonably request or that may be necessary or desirable to effect the purposes of this Agreement.

(g)    **After-acquired Title and Lien.** If Rightpath 77 should acquire any title to the 77 Acre Property greater than its executory contract "Buyer's" interest therein before the Loan is paid and satisfied in full, Borrower as its sole economic member will, immediately upon Lender's demand therefore, cause Rightpath 77 to provide Lender with a direct deed-of-trust lien on whatever greater title then exists in and to the 77 Acre Property, in addition to maintaining the pledge in the sole economic membership interest of Rightpath 77. Lender understands, however, that such deed-of-trust lien may be subordinate and subject to any reasonable and customary purchase money financing utilized by Rightpath 77 when it acquires such greater title in the 77 Acre Property. To the extent requested by any such senior financing, Lender agrees to execute an appropriate subordination in customary form evidencing such subordination.

5.2    **Negative Covenants.**

5.2.1    In conformance with the Security Document and until payment in full of all indebtedness whatsoever of Borrower to Lender contemplated by this Agreement or due under the Note, Borrower and Rightpath 77 each agrees that without the prior written consent of Lender (which may be granted, withheld, conditioned or delayed in Lender's sole and absolute discretion), neither Borrower nor Rightpath 77 will encumber or allow the further encumbrance of the sole economic membership interest or any other interest whatsoever in and to Rightpath 77 held by Borrower or in the "Buyer's" right, title and interest in and under the 77 Acre Purchase Contract or in any other collateral described in and encumbered by the Security Document.

5.2.2    Borrower hereby agrees that until the Loan is fully paid and performed, upon any bona fide resale by Borrower, or Rightpath 77, or their principals (the individual Guarantors under the Guarantees) or any of their affiliates or related parties (the "Selling Parties"), to an unaffiliated third-party of any portion of (i) the Specified Properties or (ii) the 77 Acre Property (whether as part of a "second leg" or "double escrow" transaction that is related to a purchase of any property, or as part of a subsequent resale following an earlier purchase of any property), none of the Selling Parties will make any distributions that are or would otherwise be payable to any of their respective members or owners from the "Net Available Proceeds" derived from any such resale, without Lender's prior written consent. ["Net Available Proceeds" means net resale proceeds otherwise available to and/or payable to Borrower, Rightpath 77 or their affiliates, after payment of all amounts due and owing to Mortgages Limited or any other holder at the time of any resale closing of a lien or liens that must be discharged in full or in part upon such closing, and all third-party expenses, fees, premiums and costs (such as, by way of example only, real estate broker commissions, escrow fees, recording and filing charges, title premiums, survey costs, and the like) of any such resale transaction. (Among other lienholders who must be paid at any such closing, Mortgages Limited is an intended third party beneficiary of this Section

5.2.2.) ]. Upon any such resale closing, the "Net Available Proceeds" will either be paid to Lender in partial or total satisfaction of the Loan (to the full extent so available, but not to exceed amounts needed to pay and satisfy the Loan in full) or will be pledged to Lender and encumbered in a "deposit account" as direct "cash collateral" to secure the repayment and performance of the Loan.

## ARTICLE 6

### EVENTS OF DEFAULT

6.1     Any one or more of the following shall constitute an "Event of Default":

(a)     Subject to any prior notice or grace periods in any other Loan Document, Borrower's failure to pay any payment of principal or interest of Borrower to Lender, or any other sum owing by Borrower to Lender pursuant to the Note or the Security Document, or upon the failure of Borrower to pay any amount otherwise due to Lender under the terms of this Agreement, followed by the failure to cure such monetary default within ten (10) days after notice thereof;

(b)     Upon the occurrence of any curable non-monetary Event of Default and the failure of Maker to cure such default within thirty (30) days after notice thereof, unless the Event of Default cannot be cured within thirty (30) days and Borrower commences a cure within the thirty (30) days and diligently prosecutes the cure until it is complete, in which event, Borrower shall have a reasonable amount of time after the thirty (30) days to cure a non-monetary default. Provided, however, that any non-monetary Event of Default that is by its very nature not "curable," or that constitutes a breach that is dealt with in Sections 6.1(c), (d), (e), (f) or (h) below, shall not require any such 30-day notice and cure period, but will constitute an immediate Event of Default without any requirement of notice except as otherwise may be set forth therein (such as Section 6.1 (h) );

(c)     Without the requirement of notice, any representation or warranty of Borrower contained in any of the Loan Documents or in any certificate or report furnished pursuant hereto shall be incorrect in any material respect;

(d)     Without the requirement of notice, failure of Borrower to comply with any of the provisions of Section 5.1 (excepting only subsection (e) therefrom, which is controlled by Sections 6.1 (a) and (b) ).

(e)     Without the requirement of notice (except as provided therein), a breach by Borrower of the provisions of Section 5.2; specifically, breach of Section 5.2.2 will include (i) Borrower's failure to provide written notice to Lender within 5 calendar days thereof, of Borrower's execution of a signed resale contract or purchase and sale agreement for all or any portion of a Specified Property, (ii) Borrower's failure to provide written notice to Lender within 5 calendar days thereof, of Borrower's opening of any related escrow to handle such sale or resale, (iii) Borrower's failure to provide written notice to Lender within 5 calendar days thereof, of Borrower's closing of any such sale or resale escrow, and any final HUD-1 settlement statement therefrom, (iv) Borrower's failure to preserve in escrow all Net Available Proceeds so that Lender may deal with the same as provided in Section 5.2.2, and (v) Borrower's payment of Net Available Proceeds in any amount in violation of the non-distribution agreements in Section 5.2.2.

(f)     Without the requirement of notice, Borrower or any Guarantor shall have made a general assignment for the benefit of creditors; or not pay its debts generally as they become due; or shall have an order for relief entered in a proceeding pursuant to the federal Bankruptcy Code; or if any creditor petitions under the Bankruptcy Code for an order relief against them or any of them; or if a receiver or trustee or custodian has been appointed for any of its property or assets or if it has requested the appointment of such receiver, trustee or custodian; or if it is adjudged insolvent under any state insolvency law;

(g)     Default in the performance of any covenant, condition or agreement

contained in the Security Document or any other collateral security or similar documents executed and delivered to Lender as provided herein (subject to any notice and grace periods therein); or

        (h)    Without the requirement of notice, if Borrower shall fail to pay and have fully released or satisfied any final judgment which may be obtained against it or shall fail to bond or stay any such judgment, in either instance within 60 days of the entry of such judgment.

## ARTICLE 7
## REMEDIES OF LENDER UPON DEFAULT

        7.1    At any time after any Event of Default described in the foregoing Section 6.1 has occurred and taken effect, Lender may, without presentment, further demand (if and as required in Section 6.1), protest or further notice of any kind (all of which are hereby expressly waived by Borrower and each Guarantor) and, notwithstanding the provisions contained in any other document or instrument executed or to be executed by Borrower to Lender hereunder or contained in any other agreement including any Guaranty, take any one or more of the following actions:

        (a)    Declare the entire principal and any accrued interest on the indebtedness provided hereunder, together with all late charges under Section 1.5(g) and the maximum amount of the Exit Fee that otherwise would be or would have been due under both Sections 1.4(a) and (b) hereof, together with all other fees, costs and expenses due or owing under any of the Loan Documents, to be immediately due and payable, and to enforce payment thereof by any means permitted by applicable statute, at common law or in equity;

        (b)    Terminate any commitments contained in any other agreement between Lender and Borrower to make any further loans or advances to Borrower;

        (c)    Without accelerating payment, enforce the payment of sums of principal and interest then due (including any post-default interest or other amounts due to Lender from Borrower);

        (d)    Require Borrower to take any action which may be necessary to cure such Event of Default and to obtain injunctive or other equitable relief with respect thereto;

        (e)    Declare immediately due and payable any one or more, or all other debts or obligations of Borrower to the Lender then outstanding;

        (f)    Upon any breach under Section 5.2.2, exercise any rights and remedies available hereunder, and in addition: (i) if Borrower or Rightpath 77 receives any otherwise prohibited distribution, Lender will be paid immediately upon demand a liquidated damage amount in the amount of ten times (10 times) any such amount distributed, together with the amount of such distribution (although the aggregate total of such liquidated damages paid to Lender, over and above the distribution amount(s) paid and disgorged, shall not exceed $2,800,000.00); and (ii) if payment is not received by Lender within 5 calendar days of any such demand, such non-payment will constitute an immediate, un-curable default under the terms of the Security Document and will entitle Lender to exercise all remedies available thereunder, including the Lender's realization upon and permanent retention of the full membership interest in Rightpath 77.

        (g)    Exercise its rights provided in any applicable statute, at common law or in equity or permitted under this Agreement, the Security Document, the other Loan Documents or any other similar documents or instruments executed pursuant hereto, and exercise any power of sale permitted therein or any other foreclosure-related remedy available thereunder.

        7.2    In the election of any remedy Lender shall not be deemed to have waived any right with respect to any other remedies to the fullest extent permitted by applicable law. In all cases

# 437541.9 (see end of document)      11

Lender, in invoking any remedy, shall be entitled to recover from Borrower its costs incurred in connection therewith, including its reasonable attorney fees, whether or not suit is brought. Lender shall be entitled to all the rights and remedies available in any court of competent jurisdiction for the enforcement of its rights and Borrower gives its consent thereto to the full extent such consent may be required or such waiver in connection therewith may be permitted by law or in equity.

## ARTICLE 8
## MISCELLANEOUS

8.1    Indemnity.  Borrower shall indemnify, defend and hold Lender Parties harmless for, from and against any and all liabilities, claims, damages, costs and expenses (including, but not limited to, Lender's legal fees and related disbursements) in any actions or proceedings now or hereafter pending or threatened against Lender arising out of or resulting from, in whole or in part, the Loan, the Loan Documents, the Security Documents and the collateral security thereunder, or from any violations of any laws, regulations, codes, ordinances, permits, orders or the like, or any defective workmanship or materials asserted against Borrower and, in each such instance, not otherwise due to acts or omissions of Lender.  Upon demand by Lender, Borrower shall defend any actions or proceedings brought against Lender parties against which Borrower has herein agreed to defend Lender parties with counsel acceptable to Lender, or Lender parties may elect to conduct their own defense at the expense of Borrower through counsel of their own choosing.  The provisions of this Section 8.1 shall survive the termination of this Agreement and the repayment of the Loan.

8.2    Expenses.  Borrower promises to pay or reimburse the Lender for all out-of-pocket expenses which Lender may incur in connection with this Agreement and the transactions herein embodied, any security agreement(s), the making of any loans provided for herein, or the collection of Borrower's indebtedness including, but not limited to, expenses related to the recording or filing of UCC1 financing statement(s), expenses related to the collection of the obligations of Borrower hereunder, and expressly including reasonable attorneys' fees incurred in the preparation of the Loan Documents or otherwise under this Agreement or any other Loan Document.

8.3    Severability.  Any provision of this Agreement which is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or non-authorization without invalidating the remaining provisions hereof or affecting the validity, enforceability or legality of such provision in any other jurisdiction.

8.4    Waivers.  No delay or omission of Lender to exercise any right or power hereunder or under any note, trust deed, or security agreements, or otherwise, shall impair such right or power shall not preclude other or further exercise thereof or the exercise of any or the right, and no waiver whatsoever shall be valid unless in writing and signed by Lender, and then only to the extent in such writing specifically set forth.  All remedies herein or afforded at law or in equity shall be cumulative and all shall be available to Lender until Lender has been paid in full in good and sufficient federal funds.

8.5    Binding Effect.  The terms, conditions, warranties, representations and convents herein made shall be binding upon the parties hereto and their respective successors and assigns.

8.6    Governing Law.  This agreement shall be governed by the laws of the State of Arizona.  The parties consent to the sole and exclusive jurisdiction of the Superior Court of Maricopa County, Arizona, venued in Phoenix, with respect to any dispute arising hereunder or under any of the Loan Documents.

8.7    Time.  Time is of the essence of this agreement and all of its provisions.

# 437541.9 (see end of document)                    12

8.8     **Limitation on Recordation.** Lender agrees with Borrower that Lender will not record this Agreement or any other Loan Document (including but not limited to UCC financing statements or amendments thereto) that contains therein a copy of any Exhibit B "Specified Property" legal descriptions, unless and until there exists an uncured Event of Default under this Agreement, the Note or the Security Document.

8.9     **Notice.** Any communications between the parties hereto or notices provided herein to be given may be given by (i) personal service; (ii) delivery by a recognized courier service; or (iii) mailing the same by United States certified or registered mail, return receipt requested, postage prepaid, such notice to be addressed as follows, or to such other addresses as either party may in writing may hereafter indicate in accordance with the requirements of this Section 8.8, and shall be deemed effective upon the earlier of receipt or three days after dispatch.

*If to Borrower:*     RIGHTPATH LIMITED DEVELOPMENT GROUP, LLC
c/o Rightpath Limited
3131 E. Camelback Road, Suite 242
Phoenix, Arizona 85016
Attn: Rick L. Burton

*If to Lender:*     DIVERSIFIED FUNDING GROUP, LLC
7595 East McDonald Drive, Suite 120
Scottsdale, Arizona 85250
Attn: Ceasar A. Perez

8.10     **Publicity.** Upon or after closing of the Loan, and with the prior review and consent of Borrower (not to be unreasonably withheld), Lender may publicize the Loan Transaction in a customary and commercially reasonable manner.

[SIGNATURES FOLLOW]

In Witness Whereof, the parties hereto have executed this Agreement effective as of the day and year first above written.

LENDER:

Diversified Funding Group, LLC
an Arizona limited liability company

By: _____
      Ceasar A. Perez
Its:   Manager

BORROWER:

Rightpath Limited Development Group, LLC
a Delaware limited liability company

By:   Hendon MLB Development, LLC,
       an Arizona limited liability company

Its:  Manager

      By: _____
            Daniel L. Hendon
      Its:  sole managing Member

RIGHTPATH 77:

Rightpath MLB 77, LLC
a Delaware limited liability company

By:   Rightpath Limited Development Group, LLC
       a Delaware limited liability company

Its:  sole managing Member

      By:   Hendon MLB Development, LLC,
             an Arizona limited liability company

            By: _____
                  Daniel L. Hendon
            Its:  sole managing Member

LEGAL DESCRIPTION

PARCEL NO. 1:

THAT PORTION OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 8;

THENCE WEST AND PARALLEL TO THE NORTH BOUNDARY LINE OF SAID SECTION, A DISTANCE OF 1100 FEET;

THENCE NORTHERLY TO A POINT ON THE NORTH BOUNDARY LINE OF SAID SECTION WHICH LIES 674 FEET WEST OF THE NORTHEAST CORNER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE EAST ALONG SAID NORTH BOUNDARY LINE, A DISTANCE OF 674 FEET TO THE NORTHEAST CORNER OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE SOUTH TO THE POINT OF BEGINNING;

EXCEPT THAT PART OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 8, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WEST (ASSUMED BEARING) 50 FEET FROM THE NORTHEAST CORNER OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION 8;

THENCE WEST, 624.01 FEET TO A POINT;

THENCE SOUTH 22 DEGREES 12 MINUTES WEST, 54.0 FEET TO AN IRON PIPE;

THENCE SOUTH 22 DEGREES 12 MINUTES WEST, 864.01 FEET TO AN IRON PIPE;

THENCE EAST, PARALLEL TO THE NORTH LINE OF SAID SECTION 8, A DISTANCE OF 723.58 FEET TO AN IRON PIPE;

THENCE NORTH 22 DEGREES 15 MINUTES 40 SECONDS EAST, 313.12 FEET ON AN IRON PIPE;

THENCE NORTH 14 DEGREES 08 MINUTES 40 SECONDS EAST, 525.82 FEET TO AN IRON PIPE;

THENCE NORTH 50 FEET TO THE PLACE OF BEGINNING; AND ALSO

EXCEPT THE FOLLOWING DESCRIBED PARCEL:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 8;

THENCE ALONG THE NORTH LINE OF SAID SECTION SOUTH 87 DEGREES 36 MINUTES 07

437541.9\db9509\18381-001

SECONDS WEST, 43.00 FEET;

THENCE SOUTH 02 DEGREES 10 MINUTES 28 SECONDS EAST 50.00 FEET TO THE SOUTH LINE OF THE NORTH 50 FEET OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER, AND THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 02 DEGREES 10 MINUTES 28 SECONDS EAST, 6.07 FEET;

THENCE CONTINUING, 989.573 FEET ALONG A TANGENT CURVE TO THE RIGHT, HAVING A RADIUS OF 1400.67 FEET;

THENCE SOUTH 38 DEGREES 18 MINUTES 18 SECONDS WEST, 342.56 FEET TO THE SOUTH LINE OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE ALONG SAID LINE SOUTH 88 DEGREES 55 MINUTES 54 SECONDS WEST 553.68 FEET TO THE WESTERLY LINE OF PARCEL NO. 1, AS DESCRIBED IN DOCKET 11593, PAGE 1330, MARICOPA COUNTY RECORDS; ALONG SAID LINE NORTH 19 DEGREES 25 MINUTES 41 SECONDS EAST 388.80 FEET TO THE SOUTH LINE OF PARCEL NO. 2, AS DESCRIBED IN DOCUMENT NO. 87-478918, MARICOPA COUNTY RECORDS;

THENCE ALONG SAID LINE NORTH 87 DEGREES 36 MINUTES 07 SECONDS EAST, 717.13 FEET TO AN IRON PIPE;

THENCE NORTH 19 DEGREES 51 MINUTES 47 SECONDS EAST (NORTH 22 DEGREES 15 MINUTES 40 SECONDS EAST RECORD), 313.12 FEET TO AN IRON PIPE;

THENCE NORTH 11 DEGREES 44 MINUTES 47 SECONDS EAST, 526.13 FEET (NORTH 14 DEGREES 08 MINUTES 40 SECONDS EAST, 525.82 FEET, RECORD) TO THE SOUTH LINE OF THE NORTH 50 FEET OF SAID NORTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE ALONG SAID LINE 87 DEGREES 36 MINUTES 07 SECONDS EAST, 6.90 FEET TO THE TRUE POINT OF BEGINNING; AND ALSO

EXCEPT THAT PORTION OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION;

THENCE SOUTH 00 DEGREES 36 MINUTES 00 SECONDS WEST ALONG THE NORTH- SOUTH MIDSECTION LINE, 1236.16 FEET;

THENCE SOUTH 88 DEGREES 43 MINUTES 51 SECONDS WEST, 1090.62 FEET TO THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 88 DEGREES 43 MINUTES 51 SECONDS WEST, 9.38 FEET;

THENCE NORTH 19 DEGREES 37 MINUTES 53 SECONDS EAST, 389.80 FEET;

THENCE NORTH 87 DEGREES 23 MINUTES 39 SECONDS EAST, 8.45 FEET;

THENCE SOUTH 19 DEGREES 13 MINUTES 13 SECONDS WEST, 388.91 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL NO. 2:

437541.9 \ d99509 \ 18381-001

FARM UNIT "A" (OR THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER) OF SECTION 8, TOWNSHIP 2 NORTH, RANGE, 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THE FOLLOWING DESCRIBED PARCEL:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION 8;

THENCE ALONG THE NORTH LINE OF SAID SECTION SOUTH 87 DEGREES 36 MINUTES 07 SECONDS WEST, 43.00 FEET;

THENCE SOUTH 02 DEGREES 10 MINUTES 28 SECONDS EAST, 56.07 FEET;

THENCE CONTINUING, 989.573 FEET ALONG A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 1400.67 FEET;

THENCE SOUTH 38 DEGREES 18 MINUTES 18 SECONDS WEST, 342.56 FEET TO THE NORTH LINE OF SAID SOUTHEAST QUARTER OF THE NORTHWEST QUARTER, AND THE TRUE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 38 DEGREES 18 MINUTES 18 SECONDS WEST, 1311.43 FEET TO THE WEST LINE OF SAID SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE ALONG SAID LINE NORTH 00 DEGREES 59 MINUTES 18 SECONDS EAST, 1014.43 FEET TO THE NORTHWEST CORNER OF SAID SOUTHEAST QUARTER OF THE NORTHWEST QUARTER;

THENCE ALONG THE NORTH LINE OF SAID SOUTHEAST QUARTER OF THE NORTHWEST QUARTER NORTH 88 DEGREES 55 MINUTES 54 SECONDS EAST, 795.53 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL NO. 3:

THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

SAID PARCELS 1, 2 AND 3 BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING A PORTION OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST, OF THE GILA AND SALT RIVER MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTH QUARTER CORNER OF SAID SECTION;

THENCE SOUTH 00 DEGREES 36 MINUTES 00 SECONDS WEST, ALONG THE NORTH/SOUTH MID-SECTION LINE, 50.08 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING, SOUTH 00 DEGREES 36 MINUTES 00 DEGREES WEST, ALONG SAID NORTH/SOUTH MID-SECTION LINE, 1188.08 FEET TO THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE NORTH 88 DEGREES 43 MINUTES 32 SECONDS EAST, 1327.70 FEET TO THE NORTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION;

437541.9 \ db9509 \ 18381-001

THENCE SOUTH 00 DEGREES 12 MINUTES 32 SECONDS WEST, 1268.39 FEET TO THE SOUTHEAST CORNER OF THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION;

THENCE NORTH 89 DEGREES 58 MINUTES 04 SECONDS WEST, 1335.71 FEET TO THE CENTER OF SAID SECTION;

THENCE NORTH 89 DEGREES 56 MINUTES 49 SECONDS WEST, 1335.34 FEET TO THE SOUTHWEST CORNER OF THE SOUTHEAST QUARTER OF THE NORTHWEST QUARTER OF SAID SECTION;

THENCE NORTH 00 DEGREES 47 MINUTES 09 SECONDS EAST, ALONG THE WEST LINE OF SAID SOUTHEAST QUARTER, 193.45 FEET TO A POINT ON THE SOUTHEASTERLY RIGHT-OF-WAY LINE OF NEW RIVER FLOOD CONTROL CHANNEL;

THENCE NORTH 38 DEGREES 05 MINUTES 50 SECONDS EAST, ALONG SAID RIGHT-OF-WAY LINE, 1653.55 FEET TO THE BEGINNING OF A CURVE HAVING A RADIUS OF 1400.67 FEET;

THENCE NORTHEASTERLY AND NORTHERLY, ALONG SAID CURVE TO THE LEFT AND SAID RIGHT-OF-WAY, THROUGH A CENTRAL ANGLE OF 40 DEGREES 28 MINUTES 46 SECONDS, AN ARC LENGTH OF 989.57 FEET;

THENCE NORTH 02 DEGREES 22 MINUTES 56 SECONDS WEST, 5.87 FEET TO THE SOUTHERLY RIGHT-OF-WAY LINE OF GLENDALE AVENUE;

THENCE NORTH 87 DEGREES 23 MINUTES 39 SECONDS EAST, PARALLEL WITH AND DISTANT SOUTH 50.00 FEET FROM THE NORTH LINE OF SAID SECTION, AND ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE, 40.96 FEET TO THE POINT OF BEGINNING.

437541.9 \ db9509 \ 18381-001

**EXHIBIT B**
**"Specified Property or Specified Properties"**

All, or any part or portion thereof, of the property or properties that are now owned (as of the date of the attached Agreement) or hereafter owned by Rightpath Limited Development Group, LLC, or any other "Selling Party" (as defined in the Agreement), in or as part of the so-called "Camelback Ranch Property," the "Rightpath Property," the "RLDG Land", and/or the "Airpark Property," as the same properties are or may be further described, defined or referenced in (1) a "Development Agreement for Camelback Ranch Property" or (2) any similar or comparable "development agreement" by and among the City of Phoenix, Arizona, the City of Glendale, Arizona, Rightpath Limited Development Group, LLC and/or Rightpath MLB 77, LLC (or any of their affiliates), and the Western Loop 101 Public Facilities Corporation, or any two or more of such parties.

(Excluding therefrom the 77 Acre Property specifically described in the foregoing Exhibit A.)

437541.9\069309\16381-001

## EXHIBIT B
### "Specified Property or Properties—(but Excluding Therefrom the 77 Acre Property)"

### Parcel 1

Parcel No. 1A:

That part of the Southwest quarter of the Southeast quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Beginning at the Northeast corner of said Southwest quarter of the Southeast quarter of Section 8;

Thence South 00 degrees 20 minutes East, along the East line of said Southwest quarter of the Southeast quarter of Section 8, 1,239.71 feet to a set pipe;

Thence South 86 degrees 34 minutes West, along a fence line, 248.35 feet;

Thence North 00 degrees 20 minutes West, 1,250.60 feet to a point on the North line of said Southwest quarter of the Southeast quarter of Section 8;

Thence North 89 degrees 05 minutes East, along the North line of the Southwest quarter of the Southeast quarter of Section 8, 248.00 feet to the point of beginning;

Except that portion of the Southeast quarter of said section 8, which was conveyed to the State of Arizona in deed recorded in Document No. 1998-995631, Maricopa County Records, described as follows:

Commencing at the Southeast corner of said Section 8;

Thence South 89 degrees 27 minutes 05 seconds West, along the South line of said Southeast quarter, 1,351.10 feet;

Thence North 00 degrees 25 minutes 47 seconds East, along the East line of the Southwest quarter of the Southeast quarter of said Section 8, 67.92 feet to the point of beginning;

Thence North 00 degrees 25 minutes 47 seconds East, continuing along said East line, 216.14 feet;

Thence South 87 degrees 02 minutes 52 seconds West, 163.43 feet;

Thence South 78 degrees 46 minutes 47 seconds West, 86.63 feet;

Thence South 00 degrees 25 minutes 47 seconds West, 202.31 feet;

Thence North 87 degrees 21 minutes 32 seconds East, 248.35 feet (record) to the point of beginning.

Parcel No. 1B:

A non-exclusive easement for ingress and egress purposes over that property described as follows:

Beginning at a point which is 1,343.41 feet North of the Southeast corner of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona;

Thence West, 1,500 feet;

Thence South, 45.00 feet;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

Thence East, along an imaginary line which divides the North half and the South half of the Southeast quarter of said Section 8, 156.75 feet;

Thence North, 20.00 feet;

Thence East, to a point on the East line of said Section 8;

Thence North, 25.00 feet to the point of beginning.

**Parcel 2**

Parcel No. 2A:

The North half of the Southeast quarter of section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona;

Except that portion lying South and West of the lateral running North and South on the West side of said Southeast quarter; and

Except that part conveyed to the Roosevelt Irrigation District in Book 218 of Deeds, page 93, Maricopa County Records; and

Except that portion conveyed to the Roosevelt Irrigation District in Book 230 of Deeds, page 363, Maricopa County Records; and

Except the East 33.00 feet as conveyed to the County of Maricopa in Book 145 of Deeds, page 182, Maricopa County Records; and

Except commencing at the East quarter corner of said section 8;

Thence South 00 degrees 48 minutes 04 seconds East, along the East line of said Section 8, 338.83 feet;

Thence North 89 degrees 19 minutes 03 seconds West, 33.01 feet to the point of beginning;

Thence North 89 degrees 19 minutes 03 seconds West, 2,615.47 feet;

Thence North 54 degrees 04 minutes 51 seconds West, 33.43 feet to a point on the North-South mid-section line of said section 8;

Thence North 00 degrees 08 minutes 24 seconds West, along said North-South mid-section line, 257.04 feet to the center of said Section 8;

Thence North 89 degrees 20 minutes 52 seconds East, along the East-West mid-section line of said Section 8, 2,638.43 feet to a point on a line which is 33.00 feet West of, and parallel to, the East line of said Section 8;

Thence South 00 degrees 48 minutes 04 seconds East, along said East line, 357.89 feet to the point of beginning; and

Except commencing at the East quarter corner of said section 8;

Thence South 89 degrees 20 minutes 50 seconds West, along the East-West mid-section line of said Section 8, 33.00 feet to a point on the West right-of-way line which is parallel with, and 33.00 feet West of, as measured at right angles from, the East line of said Section 8;

Thence South 00 degrees 48 minutes 04 seconds East, along the said right-of-way line, 973.88 feet to the Southeast corner of "parcel of land" described in deed recorded in Document No. 1989-302758, Maricopa County Records, and the point of beginning;

Thence South 89 degrees 03 minutes 36 seconds West, along the South line of said "parcel of land", 1,308.41 feet to a point on the West line of the Northeast quarter of the Southeast quarter of said Section 8, said point being the Southwest corner of said "parcel of land";

Thence South 00 degrees 28 minutes 05 seconds East, along the West line of the Northeast quarter of the Southeast quarter of Section 8, 327.02 feet to the Southwest corner of the Northeast quarter of the Southeast quarter of Section 8;

Thence North 88 degrees 57 minutes 19 seconds East, along the South line of the Northeast quarter of the Southeast quarter of said Section 8, 1,310.32 feet to a point on said West right-of-way line which is parallel with, and 33.00 feet West of, as measured at right angles from, the East line of said Section 8;

Thence North 00 degrees 48 minutes 27 seconds West, along said right-of-way line, 324.61 feet to the point of beginning.

Parcel No. 2B:

That portion of the Southwest quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the center of Section 8, from which the South quarter corner of said Section 8 bears South 00 degrees 08 minutes 22 seconds East, 2,633.46 feet, said line being the East line of the Southwest quarter of said Section 8 and the basis for the bearings in this description;

Thence South 00 degrees 08 minutes 22 seconds East, along said East line, 276.69 feet to the point of beginning;

Thence South 00 degrees 08 minutes 22 seconds East, continuing along said East line, 16.75 feet to a point on the Northeasterly right-of-way line of the Grand Canal;

Thence North 54 degrees 29 minutes 27 seconds West, along said Northeasterly right-of-way line, 29.33 feet;

Thence South 89 degrees 19 minutes 03 seconds East, 23.78 feet to the point of beginning.

Parcel No. 2C:

Non-exclusive easement rights as created in Document No. 1986-196344, Maricopa County Records, over that property described as follows:

That portion of the Southwest quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the West quarter corner of said Section 8;

Thence South 02 degrees 59 minutes 04 seconds West, along the West line of said Section 8, 628.76 feet;

Thence North 42 degrees 29 minutes 10 seconds East, 35.92 feet to the point of beginning;

Thence continuing North 42 degrees 29 minutes 10 seconds East, 172.91 feet;

437541.6\db9506\18381-001
437541.6\db9506\18381-001

Thence North 19 degrees 29 minutes 10 seconds East, 146.00 feet;

Thence North 07 degrees 44 minutes 10 seconds East, 190.00 feet;

Thence North 48 degrees 29 minutes 10 seconds East, 200.00 feet;

Thence South 87 degrees 20 minutes 25 seconds East, 907.30 feet;

Thence South 61 degrees 09 minutes 41 seconds West, 226.87 feet;

Thence South 51 degrees 11 minutes 27 seconds West, 240.00 feet;

Thence South 41 degrees 11 minutes 27 seconds West, 600.17 feet;

Thence South 70 degrees 13 minutes 22 seconds West, 495.35 feet to the point of beginning.

## Parcel 3

Parcel No. 3:

That portion of the Northwest quarter of the Southwest quarter of Section 9, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at a brass cap marking the West quarter corner of said Section 9;

Thence South 00 degrees 04 minutes 52 seconds West, along the West line of the Southwest quarter of said Section 9, 70.04 feet to a point from which the Southwest corner of said Section 9 bears South 00 degrees 04 minutes 52 seconds West, 2,526.62 feet, said point being the point of beginning;

Thence leaving said West line, North 88 degrees 13 minutes 07 seconds East, 849.82 feet to a point on the Westerly right-of-way line of the Agua Fria Freeway (SR 101), according to Document No. 1999-136280, Maricopa County Records;

Thence South 03 degrees 56 minutes 14 seconds East, along said Westerly right-of-way line, 576.22 feet;

Thence South 04 degrees 05 minutes 21 seconds West, continuing along said Westerly right-of-way line, 643.74 feet to a point on the South line of said Northwest quarter of the Southwest quarter of Section 9;

Thence South 87 degrees 26 minutes 32 seconds West, along said South line, 845.65 feet to the Southwest corner of said Northwest quarter of the Southwest quarter of Section 9;

Thence North 00 degrees 04 minutes 52 seconds East, along the West line of said Northwest quarter of the Southwest quarter of Section 9, 1,228.29 feet to the point of beginning;

Except the West 33.00 feet, thereof; and

Except that portion of said premises which was conveyed to the United States of America, by Quit Claim Deed recorded in Book 115 of Deeds, page 446, Maricopa County Records, and

Except that portion described in Final Order of Condemnation recorded in Document No. 2005-1356682, Maricopa County Records.

## Parcel 4

Parcel No. 4:

That portion of the Southeast quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, being a part of the land conveyed in deeds recorded in Document No. 1986-418488 and Document No. 1986-727849 and in Document No. 1987-767546, Maricopa County Records, said portion being more particularly described as follows:

Commencing at the Southeast corner of said section 8;

Thence North 00 degrees 02 minutes 46 seconds West, along the East line of said Section 8, 1,298.33 feet to a point on the North line of the South half of said Southeast quarter;

Thence South 89 degrees 43 minutes 01 second West, along said North line, 1,591.27 feet;

Thence South 00 degrees 17 minutes 45 seconds West, 370.36 feet to the point of beginning;

Thence continuing South 00 degrees 17 minutes 45 seconds West, 440.12 feet;

Thence continuing South 00 degrees 17 minutes 45 seconds West 237.62 feet to the Northeast corner of the "Tolmachoff Condemnation";

Thence South 78 degrees 39 minutes 03 seconds West, along the Northerly line of said "Tolmachoff Condemnation", 214.41 feet to the Northwest corner of said "Tolmachoff Condemnation";

Thence North 00 degrees 17 minutes 45 seconds East, 280.89 feet;

Thence continuing north 00 degrees 17 minutes 45 seconds East 440.12 feet;

Thence South 89 degrees 42 minutes 15 seconds East, 209.99 feet to the point of beginning.

## Parcel 5

Parcel No. 5:

That portion of the Northwest Quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the Northwest corner of said Section 8;

Thence South 01 degree 11 minutes 07 seconds West, along the West line of the Northwest Quarter of said Section 8, 662.89 feet to a corner of that property described in Document No. 98-1147228, Maricopa County Records;

Thence North 87 degrees 35 minutes 55 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along the boundary of that property described in said Document No. 98-1147228, Maricopa County Records, 417.00 feet;

Thence North 01 degrees 11 minutes 07 seconds East (measured) North 03 degrees 35 minutes 00 seconds East (record), along said boundary, 175.00 feet;

Thence North 87 degrees 35 minutes 55 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said boundary, 237.00 feet;

Thence North 41 degrees 24 minutes 05 seconds East (measured) North 43 degrees 47 minutes 58 seconds East (record), along said boundary, 131.40 feet;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

Thence North 31 degrees 35 minutes 59 seconds East (measured) North 33 degrees 59 minutes 52 seconds East (record), along said boundary, 242.06 feet;

Thence North 04 degrees 12 minutes 47 seconds East (measured) North 06 degrees 36 minutes 40 seconds East (record), along said boundary, 142.32 feet to a point on the South line of the North 50.00 feet of the Northwest Quarter of said Section 8;

Thence North 87 degrees 36 minutes 07 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said South line and along said boundary, 230.93 feet to the point of beginning of the land described, herein;

Thence continuing North 87 degrees 36 minutes 07 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said South line and along said boundary, 467.50 feet;

Thence South 19 degrees 50 minutes 29 seconds West (measured) South 22 degrees 14 minutes 10 seconds West (record), leaving said South line and continuing along said boundary, 895.68 feet;

Thence South 87 degrees 36 minutes 07 seconds West (measured) North 89 degrees 59 minutes 48 seconds East (record), along said boundary, 196.59 feet;

Thence continuing South 87 degrees 36 minutes 07 seconds West (measured) North 89 degrees 59 minutes 48 seconds East (record), leaving said boundary, 3.33 feet to a point on a non-tangent curve, with a radius of 560.00 feet and from which the radius point of said curve bears North 67 degrees 34 minutes 31 seconds West;

Thence Northerly, along said curve, through a central angle of 22 degrees 57 minutes 10 seconds, 224.34 feet;

Thence North 00 degrees 31 minutes 41 seconds West, 612.56 feet to the point of beginning;

Except The North 15.00 feet as conveyed to the City of Glendale, an Arizona municipal corporation by Special Warranty Deed recorded in Document No. 2005-697850, Maricopa County Records.


APNs:
    Parcel 1: 102-60-011L 9 and 102-60-011Z 3;
    Parcel 2: 102-60-013A and 102-60-010Q;
    Parcel 3: 102-01-012E;
    Parcel 4: 102-60-028 and 102-60-029;
    Parcel 5: 102-60-019D and 102-60-019C / Maricopa

---

(Following Parcel Numbers not consecutively numbered with above Parcel designations.)

<u>Parcel No. 2:</u>

PARCEL NO. 1:

THE NORTH HALF OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT THAT PORTION THEREOF LYING SOUTH AND WEST OF THE LATERAL CANAL RUNNING NORTH AND SOUTH ON THE WEST SIDE OF SAID QUARTER SECTION ;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

EXCEPT THAT PART PORTION CONVEYED TO ROOSEVELT IRRIGATION DISTRICT, BY INSTRUMENT RECORDED JANUARY 25, 1928 IN BOOK 218 OF DEEDS, PAGE 93; AND

EXCEPT THAT PORTION THEREOF CONVEYED TO ROOSEVELT IRRIGATION DISTRICT, BY INSTRUMENT RECORDED FEBRUARY 16, 1929 IN BOOK 230 OF DEEDS, PAGE 363; AND

EXCEPT THE EAST 33 FEET THEREOF CONVEYED TO MARICOPA COUNTY BY INSTRUMENT RECORDED MAY 10, 1920 IN BOOK 145 OF DEEDS, PAGE 181.

EXCEPT BEGINNING AT THE EAST QUARTER CORNER OF SAID SECTION 8;

THENCE SOUTH 00°48'04" EAST ALONG THE EAST LINE OF SAID SECTION 8 A DISTANCE OF 338.83 FEET;

THENCE NORTH 89°19'03" WEST 33.01 FEET TO THE TRUE POINT OF BEGINNING;

THENCE NORTH 89°19'03" WEST 2615.47 FEET;

THENCE NORTH 54°04'51" WEST 33.43 FEET TO A POINT ON THE NORTH SOUTH MIDSECTION LINE OF SAID SECTION 8;

THENCE ALONG SAID MIDSECTION LINE NORTH 00°08'24" WEST 257.04 FEET TO THE CENTER OF SAID SECTION 8;

THENCE ALONG THE EAST-WEST MIDSECTION LINE OF SECTION 8 NORTH 89°20'52" EAST 2638.43 FEET TO A POINT ON A LINE 33.00 FEET WEST OF AND PARALLEL WITH THE EAST LINE OF SECTION 8;

THENCE ALONG SAID LINE SOUTH 00°48'04" EAST 357.89 FEET TO THE TRUE POINT OF BEGINNING; AND

EXCEPT THE PARCEL DESCRIBED AS FOLLOWS:
BEGINNING AT THE EAST QUARTER CORNER OF SAID SECTION 8;

THENCE SOUTH 89°20'50" WEST ALONG THE EAST WEST MID-SECTION LINE OF SAID SECTION 8, 33 FEET TO A POINT ON THE WEST RIGHT-OF-WAY LINE WHICH IS PARALLEL WITH AND 33 FEET WESTERLY AS MEASURED AT RIGHT ANGLES FROM THE EAST LINE OF SAID SECTION 8;

THENCE SOUTH 00°48'04" EAST ALONG THE SAID RIGHT-OF-WAY A DISTANCE OF 973.88 FEET TO THE SOUTHEAST CORNER OF PARCEL OF LAND DESCRIBED IN DEED RECORDED IN DOCUMENT NO. 89-302758 AND THE TRUE POINT OF BEGINNING;

THENCE SOUTH 89°03'36" WEST ALONG THE SOUTH LINE OF SAID PARCEL OF LAND TO A POINT ON THE WEST LINE OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 8, A DISTANCE OF 1308.41 FEET, SAID POINT BEING THE SOUTHWEST CORNER OF SAID PARCEL OF LAND DESCRIBED IN DOCUMENT NO. 89-302758;

THENCE SOUTH 00°28'05" EAST 327.02 FEET ALONG THE WEST LINE OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 8 TO THE SOUTHWEST CORNER OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 8;

THENCE NORTH 88°57'19" EAST 1310.32 FEET ALONG THE SOUTH LINE OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 8 TO A POINT ON SAID WEST RIGHT-OF-WAY LINE WHICH IS PARALLEL WITH AND 33 FEET WESTERLY AS MEASURED AT RIGHT ANGLES FROM THE EAST LINE OF SECTION 8;

437541.6\db9506\18381-001
437541.6\db9506\18381-001

THENCE NORTH 00°48'27" WEST 324.61 FEET ALONG SAID RIGHT-OF-WAY TO THE TRUE POINT OF BEGINNING.

PARCEL NO. 2:

A PORTION OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE CENTER OF SECTION 8 FROM WHICH THE SOUTH QUARTER CORNER OF SAID SECTION BEARS SOUTH 00°08'22" EAST A DISTANCE OF 2633.46 FEET, SAID LINE BEING THE EAST LINE OF THE SOUTHWEST QUARTER OF SAID SECTION 8 AND THE BASIS FOR THE BEARINGS IN THIS DESCRIPTION;

THENCE SOUTH 00°08'22" EAST, ALONG SAID EAST LINE 276.69 FEET TO THE POINT OF BEGINNING;

THENCE SOUTH 00°08'22" EAST, CONTINUING ALONG SAID EAST LINE 16.75 FEET TO THE NORTHEASTERLY RIGHT OF WAY OF THE GRAND CANAL;

THENCE NORTH 54°29'27" WEST, ALONG SAID NORTHEASTERLY RIGHT OF WAY LINE 29.33 FEET;

THENCE SOUTH 89°10'03" EAST 23.78 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

EASEMENT RIGHTS CREATED IN THE INSTRUMENT RECORDED AS 1986-196344 OVER THE FOLLOWING DESCRIBED PROPERTY:

A PORTION OF THE SOUTHWEST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE WEST QUARTER OF SAID SECTION 8;

THENCE, SOUTH 02°59'04" WEST ALONG THE WEST SECTION LINE A DISTANCE OF 628.76 FEET TO A POINT;

THENCE, NORTH 42°29'10" EAST A DISTANCE OF 35.92 FEET TO THE TRUE POINT OF BEGINNING;

THENCE CONTINUING NORTH 42°29'10" EAST A DISTANCE OF 172.91 FEET TO A POINT;

THENCE, NORTH 19°29'10" EAST A DISTANCE OF 146.00 FEET TO A POINT;

THENCE, NORTH 07°44'10" EAST A DISTANCE OF 190.00 FEET TO A POINT;

THENCE, NORTH 48°29'10" EAST A DISTANCE OF 200.00 FEET TO A POINT;

THENCE, SOUTH 87°20'25" EAST A DISTANCE OF 907.30 FEET TO A POINT;

THENCE SOUTH 61°09'41" WEST A DISTANCE OF 226.87 FEET TO A POINT;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

THENCE, SOUTH 51°11'27" WEST A DISTANCE OF 240.00 FEET TO A POINT;

THENCE, SOUTH 41°11'27" WEST A DISTANCE OF 600.17 FEET TO A POINT;

THENCE, NORTH 70°13'22" WEST A DISTANCE OF 495.35 FEET TO THE TRUE POINT OF BEGINNING.

## Parcel 1:

PARCEL NO. 4:

THAT PORTION OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER;

THENCE SOUTH 00 DEGREES 20 MINUTES EAST, ALONG THE EAST LINE OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER, 1239.71, TO A SET PIPE;

THENCE SOUTH 86 DEGREES 34 MINUTES WEST, ALONG A FENCE LINE, 248.35 FEET;

THENCE NORTH 00 DEGREES 20 MINUTES WEST, 1250.60 FEET TO A POINT ON THE NORTH LINE OF SAID SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER;

THENCE NORTH 89 DEGREES 05 MINUTES EAST, ALONG THE NORTH LINE OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER, 248 FEET TO THE POINT OF BEGINNING;

EXCEPT THAT PORTION OF THE SOUTHEAST QUARTER OF SAID SECTION 8, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 8;

THENCE SOUTH 89 DEGREES 27 MINUTES 05 SECONDS WEST, 1351.10 FEET ALONG THE SOUTH LINE OF SAID SOUTHEAST QUARTER;

THENCE NORTH 00 DEGREES 25 MINUTES 47 SECONDS EAST, 67.92 FEET ALONG THE EAST LINE OF THE SOUTHWEST QUARTER OF SAID SOUTHEAST QUARTER TO THE POINT OF BEGINNING;

THENCE CONTINUING ALONG SAID EAST LINE, NORTH 00 DEGREES, 25 MINUTES, 47 SECONDS EAST, 216.14 FEET;

THENCE SOUTH 87 DEGREES 02 MINUTES 52 SECONDS WEST, 163.43 FEET;

THENCE SOUTH 78 DEGREES 46 MINUTES 47 SECONDS WEST, 86.63 FEET;

THENCE SOUTH 00 DEGREES 25 MINUTES 47 SECONDS WEST, 202.31 FEET;

THENCE NORTH 87 DEGREES 21 MINUTES 32 SECONDS EAST, 248.35 FEET (RECORD) TO THE POINT OF BEGINNING, AS CONVEYED TO THE STATE OF ARIZONA IN DEED RECORDED IN RECORDING NO. 98-995631, OF OFFICIAL RECORDS.

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

PARCEL NO. 5:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS OVER THE FOLLOWING DESCRIBED PARCEL OF LAND:

BEGINNING AT A POINT 1343.41 FEET NORTH OF THE SOUTHEAST CORNER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

THENCE WEST, 1500 FEET;

THENCE SOUTH, 45 FEET;

THENCE EAST, 156.75 FEET ALONG AN IMAGINARY LINE WHICH DEIVIDES THE NORTH ONE HALF AND THE SOUTH ONE HALF OF SAID SOUTHEAST QUARTER OF SAID SECTION 8.

THENCE NORTH, 20 FEET;

THENCE EAST TO THE EAST SECTION LINE OF SAID SECTION 8;

THENCE NORTH 25 FEET TO THE POINT OF BEGINNING.

**Parcel 4:**

PARCEL NO. 6:

THAT PORTION OF THE SOUTHEAST QUARTER OF SECTION 8, TOWNSHIP 2 NORTH, RANGE 1 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA, BEING A PART OF THOSE DEEDS RECORDED IN DOCUMENT NO. 86-418488, DOCUMENT NO. 86-727849 AND IN DOCUMENT NO. 87-767546 OF OFFICIAL RECORDS, SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHEAST CORNER OF SAID SECTION 8;

THENCE NORTH 00 DEGREES 02 MINUTES 46 SECONDS WEST 1298.33 FEET UPON THE EAST LINE THEREOF TO THE NORTH LINE OF THE SOUTH HALF OF SAID SOUTHEAST QUARTER;

THENCE SOUTH 89 DEGREES 43 MINUTES 01 SECONDS WEST 1591.27 FEET UPON SAID NORTH LINE;

THENCE SOUTH 00 DEGREES 17 MINUTES 45 SECONDS WEST 370.36 FEET TO THE POINT OF BEGINNING;

THENCE CONTINUING SOUTH 00 DEGREES 17 MINUTES 45 SECONDS WEST 440.12 FEET;

THENCE CONTINUING SOUTH 00 DEGREES 17 MINUTES 45 SECONDS WEST 237.62 FEET TO THE NORTHEAST CORNER OF THE "TOLMACHOFF CONDEMNATION";

THENCE SOUTH 78 DEGREES 39 MINUTES 03 SECONDS WEST 214.41 FEET UPON THE NORTHERLY LINE THEREOF TO THE NORTHWEST CORNER OF SAID "TOLMACHOFF CONDEMNATION";

THENCE NORTH 00 DEGREES 17 MINUTES 45 SECONDS EAST 280.89 FEET;

THENCE CONTINUING NORTH 00 DEGREES 17 MINUTES 45 SECONDS EAST 440.12 FEET;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

THENCE SOUTH 89 DEGREES 42 MINUTES 15 SECONDS EAST 209.99 FEET TO THE TRUE POINT OF BEGINNING.

## Parcel 5:

That portion of the Northwest Quarter of Section 8, Township 2 North, Range 1 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the Northwest corner of said Section 8;

Thence South 01 degrees 11 minutes 07 seconds West, along the West line of the Northwest Quarter of said Section 8, 662.89 feet to a corner of that property described in Document No. 98-1147228, Maricopa County Records;

Thence North 87 degrees 35 minutes 55 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along the boundary of that property described in said Document No. 98-1147228, Maricopa County Records, 417.00 feet;

Thence North 01 degrees 11 minutes 07 seconds East (measured) North 03 degrees 35 minutes 00 seconds East (record), along said boundary, 175.00 feet;

Thence North 87 degrees 35 minutes 55 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said boundary, 237.00 feet;

Thence North 41 degrees 24 minutes 05 seconds East (measured) North 43 degrees 47 minutes 58 seconds East (record), along said boundary, 131.40 feet;

Thence North 31 degrees 35 minutes 59 seconds East (measured) North 33 degrees 59 minutes 52 seconds East (record), along said boundary, 242.06 feet;

Thence North 04 degrees 12 minutes 47 seconds East (measured) North 06 degrees 36 minutes 40 seconds East (record), along said boundary, 142.32 feet to a point on the South line of the North 50.00 feet of the Northwest Quarter of said Section 8;

Thence North 87 degrees 36 minutes 07 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said South line and along said boundary, 230.93 feet to the point of beginning of the land described, herein;

Thence continuing North 87 degrees 36 minutes 07 seconds East (measured) North 89 degrees 59 minutes 48 seconds East (record), along said South line and along said boundary, 467.50 feet;

Thence South 19 degrees 50 minutes 29 seconds West (measured) South 22 degrees 14 minutes 10 seconds West (record), leaving said South line and continuing along said boundary, 895.68 feet;

Thence South 87 degrees 36 minutes 07 seconds West (measured) North 89 degrees 59 minutes 48 seconds East (record), along said boundary, 196.59 feet;

Thence continuing South 87 degrees 36 minutes 07 seconds West (measured) North 89 degrees 59 minutes 48 seconds East (record), leaving said boundary, 3.33 feet to a point on a non-tangent curve, with a radius of 560.00 feet and from which the radius point of said curve bears North 67 degrees 34 minutes 31 seconds West;

Thence Northerly, along said curve, through a central angle of 22 degrees 57 minutes 10 seconds, 224.34 feet;

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

Thence North 00 degrees 31 minutes 41 seconds West, 612.56 feet to the point of beginning;

Except The North 15.00 feet as conveyed to the City of Glendale, an Arizona municipal corporation by Special Warranty Deed recorded in Document No. 2005-697850, Maricopa County Records.

APNs:          Parcel 1: 102-60-011L 9 and 102-60-011Z 3;
                  Parcel 2: 102-60-013A and 102-60-010Q;
                  Parcel 4: 102-60-028 and 102-60-029;
                  Parcel 5: 102-60-019D and 102-60-019C/Maricopa

437541.6 \ db9506 \ 18381-001
437541.6 \ db9506 \ 18381-001

# EXHIBIT 3



# PMA Prime Checking Account

## Activity summary

| | |
|---|---|
| Balance on 8/1 | 90,674.09 |
| Deposits/Additions | 637,205.94 |
| Withdrawals/Subtractions | - 271,109.09 |
| **Balance on 8/31** | **$456,770.94** |

Account number: **841173511**

**DANIEL HENDON**

*Wells Fargo Bank, N.A., Arizona (Member FDIC)*

Questions about your account: **1-800-742-4932**

Worksheet to balance your account and General Statement Policies can be found towards the end of this statement.

## Interest you've earned

| | |
|---|---|
| Interest paid on 8/31 | $209.02 |
| Average collected balance this month | $82,032.61 |
| Annual percentage yield earned | 3.04% |
| Interest and bonuses paid this year | $1,325.17 |

## Transaction history

| Date | Description | Check No | Deposits/ Additions | Withdrawals/ Subtractions | Ending Daily Balance |
|---|---|---|---|---|---|
| | **Beginning balance on 8/1** | | | | **90,674.09** |
| 8/1 | Check | 13526 | | 3,579.27 | |
| 8/1 | Retail Services3 Checkpaymt 070801 3521 0000049994470950070730 | ^3521 | | 2,000.00 | |
| 8/1 | Check | 3520 | | 1,702.38 | |
| 8/1 | Check | 3525 | | 1,194.45 | |
| 8/1 | Socalgas Arc Pymt 070731 3522 185607655771362 | ^3522 | | 67.60 | |
| 8/1 | Check | 3524 | | 25.00 | 82,105.39 |
| 8/2 | Deposit | | 6,360.00 | | |
| 8/2 | Check | 3531 | | 2,000.00 | |
| 8/2 | Check | 3530 | | 5,000.00 | |
| 8/2 | Check | 3523 | | 11.39 | 81,454.00 |
| 8/3 | Dhr Payroll DD 080307 ACH Hendon, Daniel L | | 14,289.24 | | |
| 8/3 | Check | 3518 | | 5,000.00 | |
| 8/3 | Check | 3529 | | 450.00 | 90,293.24 |
| 8/6 | Check | 3528 | | 368.00 | 89,925.24 |
| 8/9 | ATM Withdrawal - 08/08 Mach ID 5449I Biltmore Phoenix AZ 4005 | | | 40.00 | |
| 8/9 | Check | 3545 | | 50,000.00 | 39,885.24 |
| 8/10 | Dhr Payroll DD 081007 ACH Hendon, Daniel L | | 14,289.24 | | |
| 8/10 | ATM Withdrawal - 08/09 Mach ID 4650Q Hilton Village Scottsdale AZ 4005 | | | 200.00 | 53,974.48 |
| 8/13 | Deposit | | 2,000.00 | | |
| 8/13 | Check | 3549 | | 380.00 | 55,594.48 |
| 8/15 | Capital One Arc Check Pymt 070815 3543 752910672227676604201I5 | ^3543 | | 500.00 | |
| 8/15 | Check | 3537 | | 130.00 | 54,964.48 |
| 8/16 | So Cal Edison Mailed Pmt 070815 3548 Xxxxx3582 | ^3548 | | 1,761.75 | |
| 8/16 | Check | 3550 | | 520.00 | |
| 8/16 | Retail Services1 Checkpaymt 070816 3534 0000001011861349070815 | ^3534 | | 400.00 | |
| 8/16 | Check | 3536 | | 375.00 | |
| 8/16 | Check | 3547 | | 96.72 | |
| 8/16 | Check | 3532 | | 40.01 | 51,771.00 |
| 8/17 | Dhr Payroll DD 08170/ ACH Hendon, Daniel L | | 14,289.24 | | |
| 8/17 | Check | 3538 | | 1,608.59 | |
| 8/17 | Check | 3553 | | 380.00 | |
| 8/17 | Check | +3539 | | 275.00 | |
| 8/17 | Check | 3533 | | 206.70 | |
| 8/17 | Check | 3542 | | 150.09 | 63,439.86 |
| 8/20 | Wash Client 908 Check Pymt 081707 03540 | ^3540 | | 19,629.30 | |

87655



## PMA PRIME CHECKING ACCOUNT (CONTINUED)

| Date | Description | Check No. | Deposits/ Additions | Withdrawals/ Subtractions | Ending Daily Balance |
|------|-------------|-----------|---------------------|---------------------------|----------------------|
| 8/20 | DIRECTV Check Pymt 081907 03535 | ^3535 | | 240.00 | 43,570.56 |
| 8/21 | Deposit | | 25,000.00 | | |
| 8/21 | Deposit | | 1,860.00 | | |
| 8/21 | Check | 3555 | | 5,350.95 | |
| 8/21 | Check | 3556 | | 600.00 | |
| 8/21 | Check | 3546 | | 390.00 | |
| 8/21 | Check | 3541 | | 177.65 | 63,911.96 |
| 8/22 | Check | 3544 | | 299.24 | 63,612.72 |
| 8/23 | Check | 3551 | | 3,400.00 | 60,212.72 |
| 8/24 | Dhr Payroll DD 082407 ACH Hendon, Daniel L | | 14,289.24 | | 74,501.96 |
| 8/28 | Check | 3557 | | 380.00 | 74,121.96 |
| 8/31 | WT Fed#00711 First National Ban /Org=Rightpath Limited Development Srf# 07083113002SJcyb Trn#070831097321 Rfb# | | 530,330.72 | | |
| 8/31 | Dhr Payroll DD 083107 ACH Hendon, Daniel L | | 14,289.24 | | |
| 8/31 | Wire Trans Svc Charge - Sequence: 070831097321 Srf# 070831130025Jcyb Trn#070831097321 Rfb# | | | 5.00 | |
| 8/31 | Check | 3576 | | 2,000.00 | |
| 8/31 | Check | 3575 | | 160,000.00 | |
| 8/31 | Check | 3552 | | 175.00 | |
| 8/31 | Interest Payment | | 209.02 | | 456,770.94 |
| **Ending balance on 8/31** | | | | | **456,770.94** |
| **Totals** | | | **$637,205.94** | **$271,109.09** | |

Key to symbols: ^ Converted check: Paper check converted to an electronic format by your payee or designated representative. Converted checks cannot be returned, copied or imaged.
+ Item converted to substitute check.

87656



WELLS FARGO

## Check Images



REF#6927339994 CK#  3556    600.00

REF#8836114691 CK#  3557    380.00

REF#6927593389 CK#  3575    160000.00

REF#6927593390 CK#  3576    2000.00

87685

# EXHIBIT 4

# OUTGOING DOMESTIC WIRE TRANSFER FORM

### Bank Name: First National Bank of Arizona

| SECTION A – ORIGINATOR'S INFORMATION | | |
|---|---|---|
| Customer or Business Name: Rightpath Limited Development Group | | Date: 8/31/07 |
| Street Address: 15509 N Scottsdale Rd | | |
| City: Scottsdale | State: AZ | Zip: 85254 |
| Acct Type: DDA | Account #: 53526047 | |
| SSN/Tax ID #: ☒ Notify customer when wire is sent | Fax # (required for notifications): | |

| BENEFICIARY INFORMATION | | |
|---|---|---|
| Receiving Bank Name: Compass Bank | | |
| Routing #: 122105744 | Bank Street Address: | |
| City: | State: AZ | Zip: |
| Customer to credit: Robert C. Banovac | Acct # to credit: 2501240436 | |
| Amount of Wire: $1,625,000.00 | | |
| Special Instructions: None | | |

### AUTHORIZATION

The Bank shall not be liable for any error or delay in transfer due to any cause other than the Bank's own negligence. The Bank shall only be liable for the Customer's actual loss arising from such negligence, not to exceed the amount of the funds transferred which the Bank is unable to recover. In no event shall the Bank be liable for indirect or consequential damages. I have read the above information and request the wire transfer of funds as stated.

Customer's Signature _____  Date _9/4/07_  Contact Phone _____

| SECTION B – BRANCH USE ONLY | | |
|---|---|---|
| Branch of Account: | Telephone #: | |
| How was Wire Request Received?  Fax | | Set up in PAYPlus: YES |
| Customer identification verified by: Signature Card - enter details below if applicable | | |
| Other/Notes: | | |
| Amount of Wire: $ | Fee: $18.00 | Total Amount Due: $ | Fee waived by: |
| Wire Reference Number: | Collected Funds: $ | |
| Received By: (if different than creator): | | |
| Created By: | Verified By: | |
| Employee verifying (call back) Wire Request (if faxed or phoned in)*: | | |
| Contact Name: | Time Contacted: | |

*Person verifying (call back) Wire Request MUST be different than the person accepting the Wire Request

| SECTION C – WIRE DEPARTMENT USE ONLY | |
|---|---|
| PAYplus account set up by: | PAYPlus account set up verified by: |
| Created By: | Verified By: |
| Wire Reference Number: | |

05/07/2006

# EXHIBIT 5

# Transfer Request

| | |
|---|---|
| Location # | Date Requested: 8/31/2007 |
| | Date Needed: 31-Aug-07 |
| Location Name: | Rightpath Limited Development Group |
| Amount: | $1,000,000.00  Requested By: Matt Baltzer |
| | Approved By. |

| Make Payable to. | From | 0 | c | #N/A | Rightpath Limited Development Group |
|---|---|---|---|---|---|
| Address: | To: | 403 | c | 53526578 | DFC III |
| | | | | | iC-checking Account |

Requested For: Equity contribution by Danny to DFC3

| G/L Account | Dept. | Description | Amount |
|---|---|---|---|
| | | | 51,000,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |

Recorded By

Check No

Cash
Management

## Book Transfer Confirmation

Transfer 1 - Aug 31 2007 14 43 05 AZT Ref 129666

| | | |
|---|---|---|
| From Account 53526047 - Rightpath Limited | $1,000,000.00 | |
| Previous Balance | | $586.18 |
| Previous Balance Available | | $6,857,049.10 |
| New Balance | | $586.18 |
| New Balance Available | | $5,857,049.10 |
| To Account 53526578 - Dannys Family Companies III | $1,000,000.00 | |
| Previous Balance | | $8,462.21 |
| Previous Balance Available | | $8,462.21 |
| New Balance | | $8,462.21 |
| New Balance Available | | $1,008,462.21 |
| Transfer Memo: | | |

# EXHIBIT 6

# Transfer Request

| | |
|---|---|
| Location #: _____ | Date Requested: _____ 9/6/2007 |
| | Date Needed: _____ 6-Sep-07 |
| Location Name: Rightpath Limited Development Group | |
| Amount: $1,529,000.00 | Requested By: _____ Matt Baltzer |
| | Approved By: _____ |

| | | | | | |
|---|---|---|---|---|---|
| Make Payable to: | From: | 0 | c | 53526047 | Rightpath Limited Development Group |
| Address: | To: | 403 | c | 53526578 | DFC III |
| | | | | | |
| | | | Checking Crgas: | | |

Requested For: Equity Transfer

| G/L Account | Dept. | Description | Amount |
|---|---|---|---|
| | | | $1,529,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |

Recorded By: _____

Check No.: _____

Cash
Management

## Book Transfer Confirmation

Transfer 1 · Sep 06 2007 10:55:50 AZT Ref: 130570

| | |
|---|---|
| From Account 53526047 - Rightpath Limited | $1,529,000.00 |
| Previous Balance | $8,505,718.54 |
| Previous Balance Available | $4,026,452.69 |
| New Balance | $6,505,718.54 |
| New Balance Available | $2,497,452.69 |
| To Account 53526578 - Dannys Family Companies III | $1,529,000.00 |
| Previous Balance | $25,000.00 |
| Previous Balance Available | $994,496.05 |
| New Balance | $25,000.00 |
| New Balance Available | $2,523,496.05 |
| Transfer Memo: | |

# EXHIBIT 7

## Transfer Request

| | | | |
|---|---|---|---|
| Location #: | _____ | Date Requested: | 9/6/2007 |
| | | Date Needed: | 6-Sep-07 |
| Location Name: | Rightpath Limited Development Group | | |
| Amount: | $918,671.91 | Requested By: | Matt Baitzer |
| | | Approved By: | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Make Payable to: | From: | | 0 | c | 53526047 | Rightpath Limited Development Group |
| Address: | To: | | 403 | c | 53526578 | DFC III |
| | | | | | | |
| | | | (Checking Saves) | | | |

Requested For:  Rick uses Equity withdrawal to pay back Danny/DFC3 for outstanding loans

**Equity contribution by Danny to DFC3**

| G/L Account | Dept. | Description | Amount |
|---|---|---|---|
| | | | $918,671.91 |
| | | | |
| | | | |
| | | | |
| | | | |

Recorded By: _____

Check No.: _____

## Book Transfer Confirmation

Transfer 1 - Sep 06 2007 12:23:12 AZT Ref 130920

| | | |
|---|---|---|
| From Account 53526047 - Rightpath Limited | | $918,671.91 |
| Previous Balance | | $6,505,718.54 |
| Previous Balance Available | | $2,497,452.69 |
| New Balance | | $6,505,718.54 |
| New Balance Available | | $1,578,780.78 |
| To Account 53526578 - Dannys Family Companies III | $918,671.91 | |
| Previous Balance | | $25,000.00 |
| Previous Balance Available | | $2,523,495.05 |
| New Balance | | $25,000.00 |
| New Balance Available | | $3,442,157.96 |

Transfer Memo:  Rick uses equity widrawal to repay outstanding loans to Danny/DFC3

# EXHIBIT 8

# Transfer Request

Location #: _____     Date Requested: _____ 9/11/2007

    Date Needed: _____ 11-Sep-07

Location Name: Rightpath Limited Development Group

Amount: $103,000.00     Requested By: _____ Matt Baltzer

    Approved By: _____

Make Payable to:    From _____ 0 _____ c _____ Rightpath Limited Development Group
Address:    To: _____ c _____ Desert Ridge Holdings

_____ (Checking (legal)) _____

Requested For: Intercompany transfer- Use intercompany accounts

| G/L Account | Dept. | Description | Amount |
|---|---|---|---|
| | | | $103,000.00 |
| | | | |
| | | | |
| | | | |
| | | | |

Recorded By: _____

Check No.: _____

## Book Transfer Confirmation

Transfer 1 - Sep 11 2007 14:25:37 AZT Ref  31563
| | | |
|---|---|---|
| From Account 53526047 - Rightpath Limited | | $103,000.00 |
| Previous Balance | | $994,147.51 |
| Previous Balance Available | | $994,147.51 |
| New Balance | | $994,147.51 |
| New Balance Available | | $891,147.51 |
| To Account  53527027 - Desert Ridge Holdings | $103,000.00 | |
| Previous Balance | | $0.00 |
| Previous Balance Available | | $-102,270.21 |
| New Balance | | $ |
| New Balance Available | | $729.79 |
| Transfer Memo: | | |

Transfer 2 - Sep 11 2007 14:25:38 AZT Ref. 131564
| | | |
|---|---|---|
| From Account 53526233 - Dannys Fmly Limited Partnership | | $17,800.00 |
| Previous Balance | | $31,906.32 |
| Previous Balance Available | | $31,906.32 |
| New Balance | | $31,906.32 |
| New Balance Available | | $14,106.32 |
| To Account  53530369 - Bobs Aviation | $17,800.00 | |
| Previous Balance | | $-1,919.20 |
| Previous Balance Available | | $-17,710.10 |
| New Balance | | $-1,919.20 |
| New Balance Available | | $89.90 |
| Transfer Memo | | |

Transfer 3 - Sep 11 2007 14:25:39 AZT Ref. 131565
| | | |
|---|---|---|
| From Account 53526578 - Dannys Family Companies III | | $2,000.00 |
| Previous Balance | | $25,000.00 |
| Previous Balance Available | | $3,127,680.96 |
| New Balance | | $25,000.00 |
| New Balance Available | | $3,125,550.96 |
| To Account  53525989 - San Tan Marketplace Construction | $2,000.00 | |
| Previous Balance | | $753.18 |
| Previous Balance Available | | $-771.82 |
| New Balance | | $753.18 |
| New Balance Available | | $1,228.18 |
| Transfer Memo | | |

# RightPath Limited Development
## Vendor QuickReport
### January 1, 2007 through May 30, 2012

| Type | Date | Num | Memo | Account | Amount |
|------|------|-----|------|---------|--------|
| **Desert Ridge Holdings** | | | | | |
| Check | 9/11/2007 | | | Rightpath Limited First Nationa | -103,000.00 |
| Check | 9/25/2007 | | | Rightpath Limited First Nationa | -47,150.00 |
| Check | 9/25/2007 | | | Rightpath Limited First Nationa | -1,300.00 |
| Check | 10/19/2007 | | | Rightpath Limited First Nationa | -24,015.00 |
| Check | 10/22/2007 | | | Rightpath Limited First Nationa | -46,000.00 |
| Check | 11/7/2007 | | | Rightpath Limited First Nationa | -70,000.00 |
| Check | 11/15/2007 | | | Rightpath Limited First Nationa | -30,000.00 |
| Check | 12/7/2007 | | | Rightpath Limited First Nationa | -66,000.00 |
| Check | 1/21/2008 | | | WELLS FARGO-3087726422 | -26,864.15 |
| Check | 1/23/2008 | | | WELLS FARGO-3087726422 | -25,855.38 |
| Check | 1/25/2008 | | | WELLS FARGO-3087726422 | -2,152.70 |
| Check | 1/28/2008 | | | WELLS FARGO-3087726422 | -12,960.00 |
| Check | 2/6/2008 | | | WELLS FARGO-3087726422 | -1,500.00 |
| Check | 2/8/2008 | | | WELLS FARGO-3087726422 | -300,000.00 |
| Check | 2/18/2008 | | | WELLS FARGO-3087726422 | -245,988.00 |
| Check | 2/29/2008 | | | WELLS FARGO-3087726422 | -30,000.00 |
| Check | 3/7/2008 | | | WELLS FARGO-3087726422 | -15,412.27 |
| Check | 3/20/2008 | | | WELLS FARGO-3087726422 | -45,076.08 |
| Check | 3/21/2008 | | | WELLS FARGO-3087726422 | -163.34 |
| Check | 3/31/2008 | | | WELLS FARGO-3087726422 | -50,000.00 |
| Check | 4/2/2008 | | | WELLS FARGO-3087726422 | -20,732.78 |
| Check | 4/3/2008 | | | WELLS FARGO-3087726422 | -17,433.83 |
| Check | 4/4/2008 | | | WELLS FARGO-3087726422 | -9,870.79 |
| Check | 4/9/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 4/18/2008 | | | WELLS FARGO-3087726422 | -200.00 |
| Check | 4/22/2008 | | | WELLS FARGO-3087726422 | -335.70 |
| Check | 4/29/2008 | | | WELLS FARGO-3087726422 | -148,335.60 |
| Check | 4/30/2008 | | | WELLS FARGO-3087726422 | -9,627.51 |
| Check | 5/1/2008 | | | WELLS FARGO-3087726422 | -4,553.14 |
| Check | 5/9/2008 | | | WELLS FARGO-3087726422 | -22,986.50 |
| Check | 5/12/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 5/13/2008 | | | WELLS FARGO-3087726422 | -1,020.00 |
| Check | 5/21/2008 | | | WELLS FARGO-3087726422 | -587.69 |
| Check | 5/27/2008 | | | WELLS FARGO-3087726422 | -20,000.00 |
| Check | 6/4/2008 | | | WELLS FARGO-3087726422 | -2,287.00 |
| Check | 6/6/2008 | | | WELLS FARGO-3087726422 | -4,816.01 |
| Check | 6/9/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 6/10/2008 | | | WELLS FARGO-3087726422 | -15,490.00 |
| Check | 6/11/2008 | | | WELLS FARGO-3087726422 | -1,943.00 |
| Check | 6/13/2008 | | | WELLS FARGO-3087726422 | -26,719.09 |
| Check | 6/23/2008 | | | WELLS FARGO-3087726422 | -440.49 |
| Check | 7/9/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 7/15/2008 | | | WELLS FARGO-3087726422 | -65.00 |
| Check | 7/23/2008 | | | WELLS FARGO-3087726422 | -50,000.00 |
| Check | 7/25/2008 | | | WELLS FARGO-3087726422 | -82,652.23 |
| Check | 8/1/2008 | | | WELLS FARGO-3087726422 | -6,140.00 |
| Check | 8/8/2008 | | | WELLS FARGO-3087726422 | -129,185.95 |
| Check | 8/14/2008 | | | WELLS FARGO-3087726422 | -13,259.00 |
| Check | 8/27/2008 | | | WELLS FARGO-3087726422 | -1,111.26 |
| Check | 9/11/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 9/23/2008 | | | WELLS FARGO-3087726422 | -436.53 |
| Check | 10/3/2008 | | | WELLS FARGO-3087726422 | -1,000.00 |
| Check | 10/8/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 10/23/2008 | | | WELLS FARGO-3087726422 | -260.41 |
| Check | 10/31/2008 | | | WELLS FARGO-3087726422 | -25,871.32 |
| Check | 11/12/2008 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 12/5/2008 | | | WELLS FARGO-3087726422 | -264.59 |
| Check | 12/8/2008 | | | WELLS FARGO-3087726422 | -662.73 |
| Check | 12/10/2008 | | | WELLS FARGO-3087726422 | -3,207.90 |
| Check | 12/24/2008 | | | WELLS FARGO-3087726422 | -5,228.77 |
| Check | 1/6/2009 | | | WELLS FARGO-3087726422 | -15,000.00 |
| Check | 1/8/2009 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 2/5/2009 | | | WELLS FARGO-3087726422 | -295.84 |
| Check | 3/5/2009 | | | WELLS FARGO-3087726422 | -5,000.00 |
| Check | 3/24/2009 | | | WELLS FARGO-3087726422 | -255.60 |
| Check | 4/9/2009 | | | National Bank of Arizona check | -5,121.01 |

Page 1

# RightPath Limited Development
## Vendor QuickReport
### January 1, 2007 through May 30, 2012

| Type | Date | Num | Memo | Account | Amount |
|------|------|-----|------|---------|--------|
| Check | 6/10/2009 | | | National Bank of Arizona check | -5,000.00 |
| Check | 7/7/2009 | | | National Bank of Arizona check | -5,000.00 |
| Check | 8/13/2009 | | | National Bank of Arizona check | -5,000.00 |
| Check | 9/23/2009 | | | National Bank of Arizona check | -5,000.00 |
| Check | 10/6/2009 | | | National Bank of Arizona check | -20,000.00 |
| Check | 11/18/2009 | | | National Bank of Arizona check | -5,000.00 |

Page 2

# EXHIBIT 9

# RightPath Limited Development
## Balance Sheet
### As of August 31, 2007

|  | Aug 31, 07 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Rightpath Limited First Nationa | 5,505,718.54 |
| **Total Checking/Savings** | 5,505,718.54 |
| | |
| **Other Current Assets** | |
| Construction Impound | 13,083.85 |
| Delayed Funding | 45,480,000.00 |
| Interest Reserve | 1,317,075.59 |
| N/R Desert Ridge Holdings | 12,321,128.77 |
| Tax Impound | 16,639.18 |
| **Total Other Current Assets** | 59,147,927.39 |
| | |
| **Total Current Assets** | 64,653,645.93 |
| | |
| **Fixed Assets** | |
| **Airport Area Land** | |
| 103rd & Glendale Land | 3,228,984.94 |
| Airport Ground Lease | 35,156.48 |
| Andreas Land | 115,917.78 |
| Scott Land | 55,271.92 |
| **Total Airport Area Land** | 3,435,331.12 |
| | |
| **Camelback Ranch** | |
| Mainland Investments/107th Miss | 421,960.69 |
| Camelback Ranch - Other | 8,319.50 |
| **Total Camelback Ranch** | 430,280.19 |
| | |
| Development Agreement | 716,073.44 |
| Glendale Aviation Investment | 6,190,000.00 |
| Interest on Land Purchases | 1,697,733.33 |
| **Main Street** | |
| 99th & Bethany Land | 545,606.43 |
| 99th & Maryland Land | 20,582,046.80 |
| Brown Land | 55.80 |
| Craft Land | 1,590,344.02 |
| Ferrantino Land | 2,025,854.48 |
| Mott Land | 55.80 |
| Owen-Herring Land | 352,596.25 |
| Ramsey Land | 19,228,974.22 |
| Schlegel Land | 1,554,627.72 |
| Talley Land | 26,550.81 |
| Main Street - Other | 287,750.95 |
| **Total Main Street** | 46,204,463.28 |
| | |
| **Total Fixed Assets** | 58,673,881.36 |
| | |
| **Other Assets** | |
| Loan Points | 5,419,277.28 |
| **Total Other Assets** | 5,419,277.28 |
| | |
| **TOTAL ASSETS** | 128,746,804.57 |
| | |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 1,024,965.02 |
| **Total Accounts Payable** | 1,024,965.02 |
| | |
| **Other Current Liabilities** | |
| Note Payable - Daniel Hendon | -226,000.00 |
| Note Payable - DFC III | 180,000.00 |
| Note Payable - Rick Burton | -147,464.91 |
| **Total Other Current Liabilities** | -193,464.91 |

# RightPath Limited Development
## Balance Sheet
### As of August 31, 2007

|  | Aug 31, 07 |
|---|---|
| **Total Current Liabilities** | 831,500.11 |
| **Long Term Liabilities** |  |
| Note Payable - Diversified Fund | 7,760,000.00 |
| Note Payable - Mortgages, Ltd. | 120,925,000.00 |
| **Total Long Term Liabilities** | 128,685,000.00 |
| **Total Liabilities** | 129,516,500.11 |
| **Equity** |  |
| Equity- Rick Burton | 350,168.11 |
| Equity - Daniel Hendon | -649,830.00 |
| Equity - Robert Banovac | 350,168.00 |
| Retained Earnings | -548,735.22 |
| Net Income | -271,466.43 |
| **Total Equity** | -769,695.54 |
| **TOTAL LIABILITIES & EQUITY** | 128,746,804.57 |

# RightPath Limited Development
## Balance Sheet
### As of September 30, 2007

|  | Sep 30, 07 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Rightpath Limited First Nationa | 418,369.73 |
| **Total Checking/Savings** | 418,369.73 |
| **Other Current Assets** | |
| Construction Impound | 13,083.85 |
| Delayed Funding | 45,480,000.00 |
| Interest Reserve | 613,127.19 |
| N/R Desert Ridge Holdings | 12,615,061.15 |
| N/R Glendale Aviation | 132,848.29 |
| Tax Impound | 19,330.70 |
| **Total Other Current Assets** | 58,873,451.18 |
| **Total Current Assets** | 59,291,820.91 |
| **Fixed Assets** | |
| **Airport Area Land** | |
| 103rd & Glendale Land | 3,229,029.54 |
| Airport Ground Lease | 44,095.23 |
| Andreas Land | 115,917.78 |
| Scott Land | 60,974.82 |
| **Total Airport Area Land** | 3,450,017.37 |
| **Camelback Ranch** | |
| Mainland Investments/107th Miss | 422,467.39 |
| Camelback Ranch - Other | 22,257.19 |
| **Total Camelback Ranch** | 444,724.58 |
| Development Agreement | 810,968.33 |
| Glendale Aviation Investment | 6,216,924.51 |
| Interest on Land Purchases | 2,200,561.46 |
| **Main Street** | |
| 99th & Bethany Land | 593,145.52 |
| 99th & Maryland Land | 20,793,705.82 |
| Brown Land | 55.80 |
| Craft Land | 1,590,344.02 |
| Ferrantino Land | 2,032,860.53 |
| Golf Course | 20,248.79 |
| Mott Land | 55.80 |
| Owen-Herring Land | 361,298.21 |
| Ramsey Land | 19,228,974.22 |
| Schlegel Land | 1,564,627.72 |
| Talley Land | 29,715.61 |
| Main Street - Other | 294,189.70 |
| **Total Main Street** | 46,509,221.79 |
| **Total Fixed Assets** | 59,632,418.04 |
| **Other Assets** | |
| Loan Points | 5,419,277.28 |
| **Total Other Assets** | 5,419,277.28 |
| **TOTAL ASSETS** | 124,343,516.23 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| Accounts Payable | 401,041.84 |
| **Total Accounts Payable** | 401,041.84 |
| **Total Current Liabilities** | 401,041.84 |
| **Long Term Liabilities** | |
| Note Payable- Jake Starr | 3,000,000.00 |

Case 2:11-ap-01972-SHG    Doc 78    Filed 10/03/13    Entered 10/03/13 15:54:01    Desc
Main Document    Page 93 of 107

# RightPath Limited Development
## Balance Sheet
### As of September 30, 2007

|                                    | Sep 30, 07     |
|------------------------------------|----------------|
| Note Payable - Diversified Fund    | 7,760,000.00   |
| Note Payable - Mortgages, Ltd.     | 120,925,000.00 |
| **Total Long Term Liabilities**    | 131,685,000.00 |
| **Total Liabilities**              | 132,086,041.84 |
| **Equity**                         |                |
| Equity- Rick Burton                | -2,249,831.89  |
| Equity - Daniel Hendon             | -2,249,830.00  |
| Equity - Robert Banovac            | -2,249,832.00  |
| Retained Earnings                  | -548,735.22    |
| Net Income                         | -444,296.50    |
| **Total Equity**                   | -7,742,525.61  |
| **TOTAL LIABILITIES & EQUITY**     | 124,343,516.23 |

# EXHIBIT 10

| From: | Curtis Leonard |
| To: | Shahram Sodeifi; Jeremy Lewis |
| Cc: | Rick L Burton; Danny Hendon; Kent Despain; Ceasar Perez |
| Subject: | RE: Ferrantino Commitment Letter (TERMS AND CONDITIONS) |
| Date: | Tuesday, July 24, 2007 6:53:38 PM |

I believe we are in agreement except for maybe a couple of tweaks to the language but I will confirm in the morning after I speak to the partners.

Go ahead and begin preparing the commitment so it can be finalized tomorrow.

Have a good night.

**Curtis P. Leonard, CMA, CFM**
Chief Financial Officer
Rightpath Limited
3131 E. Camelback Road, Suite 212
Phoenix, AZ 85016
602.977.2999 Main
602.977.7707 Fax
602.670.1093 Cell
curtis@rightpathlimited.com
rightpathlimited.com



---

**From:** Shahram Sodeifi [mailto:dfg@cox.net]
**Sent:** Tuesday, July 24, 2007 6:46 PM
**To:** Curtis Leonard; Jeremy Lewis
**Cc:** Rick L Burton; Danny Hendon; Kent Despain; Ceasar Perez
**Subject:** Re: Ferrantino Commitment Letter (TERMS AND CONDITIONS)

Curtis,

your items #1 and #2 are agreeable, however, please correct one item

remove / strike the word "profit" in front of distributions. Lender shall have a right to receive a pay-down or pay-off of the loan ahead of any distributions to the members. This priority proceeds pledge / distribution is to only fall behind items such as (debt service and legal expenses, appraisal costs, surveys, engineering costs). Any other items to come ahead of lender's priority distribution must first be approved by lender and not be a line item expense that back-doors any distributions to members of the LLC. (i.e. such as a new airplane is not a valid expense of the LLC and can not come ahead of lender in the distribution chain)

... and also we will add the following 6 simple items to the list for a full commitment letter.

3. The penalty section for a distribution to the members without lender's consent and acknowledgement shall be $2.8M and deemed earned and payable upon such a distribution taking place. Furthermore, there shall be a cure period to allow a correction of this default under the priority pledge / distribution agreement and if the default is not cured then, in addition to the penalty, Rightpath will lose its rights

DH-DFG012377

EXHIBIT __10__
WITNESS __Despain__
DATE __7.10.13__
CARRIE SMALANSKAS RPR CRR

for the re-assignment of the Ferrantino parcel.

4. Lender to have a direct tie and/or rights to proceeds directly out of escrows (you and Jeremy can work on the language on this one)

5. A letter from Snell, on their letterhead, to Rightpath stating that in their opinion it is fine for Rightpath to pledge and/or assign the Ferrantino contract in the manner we have discussed. This letter does not need to be addressed to lender, but to Rightpath ... we simply request a copy of it for our records.

6. Legal review of zoning, PAD, and any additional City of Glendale zoning / development items to confirm that all will convey with the Ferrantino property. This can be done by legal council and should be rather simple to review. Legal council must determine that all items will convey with the property in case of a default.

7. An assignment of the Ferrantino contract / escrow with all execution rights thereupon and an assignment of all LOIs, contracts, and offers by end users for the subject parcel. Furthermore, all extension fees due on the Ferrantino property must be paid by Rightpath at least 10 days ahead of the time they are due. If a extension payment is not made and /or Lender has to step up and make said extension payment on the behalf of Rightpath .. then it is considered a material monetary default and Rightpath loses its interest in Ferrantino property and is still liable to lender for the principal balance and return on the loan. The proceeds pledge and guarantees shall still be deemed in effect.

8. A letter from Rightpath (signed by all its members) stating that all material information in conjunction with the assignment of the Ferrantino contract and other material information in regards to other structural aspects of this transaction have been provided to lender and there are no items that the members are aware of that would pose a conflict in regards this transaction taking place. (Jeremy and Curtis to work on exact verbiage)

I believe that's it . please confirm your group's mutual agreement to the items herein so that we can move forward.

Regards,

Shahram



----- Original Message -----
From: Curtis Leonard

DH-DFG012378

Gentlemen,

To follow up on our conversation yesterday, here is what we believe will get this deal done and give you the security your investors need:

1. Assignment of Proceeds - The Manager of RLDG, Hendon MLB Development, LLC, will sign an assignment of proceeds confirming that there will not be any profit distributions made to the members without the prior written consent of DFG and/or the retirement of the DFG loan. This document will include (or be included in separate documents) the following provisions:
   a. The consent of all of the members authorizing the Manager to enter into the assignment and loan docs;
   b. A substantial penalty if a profits distribution is made to the members without the payoff or written authorization from DFG;
   c. DFG will have complete access to information that is provided to the members including information on contracts in escrow and items listed in Section 8 of the Amended and Restated Operating Agreement for RLDG dated 11/13/06;
   d. In the event of an uncured event of default, we are willing to negotiate the complete assignment of the Ferrantino Contract.
2. Personal Guarantees of the three principles, Danny Hendon, Robert Banovac and Rick Burton. Their personal financial statements and tax returns have been provided along with the audit of Danny's companies for 2005 and the draft audit for 2006.

As we discussed, the partners are not willing to discuss having additional members added to RLDG.

If the provisions listed above in addition to the other terms we have previously agreed to are acceptable, please insert these provisions into a commitment to fund which I will have the partners sign and return with a deposit in the amount of $25,000.00.

Please give me a call to discuss.

**Curtis R. Leonard, CMA, CFM**
Chief Financial Officer
Rightpath Limited
3131 E. Camelback Road, Suite 212
Phoenix, AZ 85016
602.977.2999 Main
602 977.7707 Fax
602.670.1093 Cell
curtis@rightpathlimited.com
rightpathlimited.com



DH-DFG012379

# EXHIBIT 11

**Daniel L. Hendon**
**Personal Financial Statement Comparison**

| | 1/31/2007 | 6/30/2007 | 9/6/2007 | 1/31/2008 | 12/1/2008 |
|---|---|---|---|---|---|
| **ASSETS:** | | | | | |
| Cash | $ 49,855 | $ 2,500,000 | $ 3,500,000 | $ 4,500,000 | $ 2,000,000 |
| Short Term Investments | 6,000,000 | 7,400,000 | - | - | - |
| Unlisted Securities | 111,680,203 | 105,930,203 | 114,430,203 | 115,797,203 | 118,230,203 |
| Real Estate Owned | 33,700,000 | 80,991,000 | 181,850,000 | 215,335,000 | 119,883,000 |
| Automobiles & Personal Property | 1,000,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| **TOTAL ASSETS** | $ 152,430,058 | $ 198,321,203 | $ 301,280,203 | $ 337,132,203 | $ 241,613,203 |
| | | | | | |
| **LIABILITIES:** | | | | | |
| Note Payable - Guffey | 300,000 | 200,000 | - | - | - |
| Notes Payable on Businesses | 58,122,000 | 63,651,000 | 68,415,000 | 66,499,000 | 65,666,666 |
| Mortgages on Real Estate Owned | 24,150,000 | 30,925,000 | 109,230,000 | 122,055,000 | 69,792,000 |
| **TOTAL LIABILITIES** | 82,572,000 | 94,776,000 | 177,645,000 | 188,554,000 | 135,458,666 |
| **NET WORTH** | 69,858,058 | 103,545,203 | 123,635,203 | 148,578,203 | 106,154,537 |
| **TOTAL LIABILITIES AND NET WORTH** | $ 152,430,058 | $ 198,321,203 | $ 301,280,203 | $ 337,132,203 | $ 241,613,203 |
| | | | | | |
| *Net Unlisted Securities (car wash entities)* | $ 53,558,203 | $ 42,279,203 | $ 46,015,203 | $ 49,298,203 | $ 52,563,537 |
| *Net Real Estate Owned* | 9,550,000 | 50,066,000 | 72,620,000 | 93,280,000 | 50,091,000 |

# EXHIBIT 12

# Daniel L Hendon

**Personal Financial Statement**
**Includes: Danny's Family LTD Etc**
**For Period Ending: 6-30-2007**

**Assets:**

| | |
|---|---|
| Cash & Short Term Investments | $9,900,000 |
| Unlisted Securities | 105,930,203 |
| Real Estate Owned | 80,991,000 |
| Automobiles & Personal Property | 1,500,000 |
| **Total Assets** | **$198,321,203** |

**Liabilities:**

| | |
|---|---|
| Notes on Business | $63,851,000 |
| Mortgages on Real Estate | 30,925,000 |
| **Danny's Net Worth** | **$103,545,203** |
| **Total Liabilities & Net Worth** | **$198,321,203** |



**Cash & Short Term Investments:**

| | |
|---|---|
| Cash | 2,500,000 |
| Note Receivable R. Burton | 900,000 |
| Note Receivable Desert Ridge Holdings | 6,500,000 |
| **Total Investments** | **9,900,000** |

**Fair Market Value of Securities:** FMV

| | |
|---|---|
| Paradise Village Car Care Center | 7,000,000 |
| National Car Care Dev. Corp (Scottsdale/Bell) | 4,000,000 |
| Twentieth & Highland, LLC | 7,500,000 |
| Scottsdale Carwash Partners, LLC | 7,500,000 |
| 84th & Bell, LLC | 9,900,000 |
| 3rd & Bell, LLC | 7,500,000 |
| Danny's Tatum, LLC | 4,000,000 |
| 83rd & Union Hills,LLC | 4,000,000 |
| Mayo & Scottsdale | 500,000 |
| Barcelona Restaurants IV, LLC | 1,200,000 |
| 59th & Bell, LLC | 1,400,000 |
| Danny's Happy Valley, LLC | 7,500,000 |
| Danny's Raintree & Northsight, LLC | 10,000,000 |
| Danny's Fuel, LLC | 2,000,000 |
| Danny's FLW,LLC | 500,000 |
| Danny's Glass, LLC | 1,000,000 |
| Danny's Crossroads,LLC | 7,500,000 |
| Danny's Tustin, LLC | 1,500,000 |
| Danny's Santan Market Place,  LLC | 12,000,000 |
| Danny's Avondale, LLC | 3,500,000 |
| Danny's Travel Center, LLC(net of Debt) | 2,030,203 |
| Danny's Cornerstone, LLC | 2,900,000 |
| Hendon Air Charters, LLC (Hawker) | 1,000,000 |
| **Total Securities** | **105,930,203** |

**Real Estate Owned:**                                                   **FMV**

| | |
|---|---|
| 7616 Foothill Drive, Paradise Valley | 9,000,000 |
| 37 Linda Isle, Newport Beach, CA | 16,000,000 |
| Barcelona Restaurant & Lerouge | 8,000,000 |
| Barcelona Business Center, LLC | 4,200,000 |
| Danny's Office, LLC | |
|   15509 N Scottsdale RD, AZ | 4,000,000 |
| Desert Ridge Holdings, LLC (1/3 interest) | 36,932,667 |
| Mainstreet Glendale (1/3 Interest) | 2,858,333 |

**Total**                                                                    **80,991,000**

**Notes on Securities:**

| | |
|---|---|
| Comerica | 29,000,000 |
| MI Bank | 17,301,000 |
| 1st National Bank of Arizona | 14,600,000 |
| 1st Source Bank (Hawker) | 1,250,000 |
| Western Security | 1,500,000 |
| Guffey Note | 200,000 |

**Total Securities**                                                **63,851,000**

**Mortgages On Real Estate:**

| | |
|---|---|
| Comerica (Barcelona Plaza) | 9,725,000 |
| Oxford Investments (Newport) | 6,500,000 |
| Washington Mutual (Paradise Valley) | 5,500,000 |
| Washington Mutual (Newport) | 9,200,000 |

**Total Mortgages**                                              **30,925,000**

**Real Estate Detailed Notes:**

| | Desert Ridge | Mainstreet |
|---|---|---|
| Acres | 269 | 80 |
| FMV | $273,638,000 | $80,000,000 |
| Debt | $162,840,000 | $71,425,000 |
| Equity | $110,798,000 | $8,575,000 |
| 1/3 Interest | $36,932,667 | $2,858,333 |

# EXHIBIT 13

**Curtis P. Leonard, CMA, CFM**
Chief Financial Officer
Rightpath Limited
3131 E. Camelback Road, Suite 212
Phoenix, AZ 85016
602.977.2999 Main
602.977.7707 Fax
602.670.1093 Cell
curtis@rightpathlimited.com
rightpathlimited.com



---

**From:** Shahram Sodeifi [mailto:dfg@cox.net]
**Sent:** Sunday, July 08, 2007 11:15 PM
**To:** Rick Burton; Curtis Leonard
**Cc:** Jeremy Lewis; Ceasar Perez
**Subject:** Underwriting for $7.5M Loan Req. - Ferrantino

Rick / Curtis

I spoke to Ceasar tonight and we will be looking to begin underwrite this transaction this week.  In addition to the information that has been provided thus far, we also need to get personal financial statements from (Rick, Danny and Bob) w/ Danny's being audited (as previously indicated)

Since every time I bring up issues / concerns  ... the personal guarantees are thrown at me like they are gold .. I expect them to be thrown at me with the same enthusiasm now that we are going to do the necessary due diligence for the investors.

Also, as usual, there needs to be a "good faith" deposit for DFG to prepare legal and docs.  Please check with Ceasar and/or Jeremy as to the amount of said deposit.

Regards,

S.



| From: | Kent Despain |
|---|---|
| Sent time: | Tuesday, July 10, 2007 2:06:51 PM |
| To: | Curtis Leonard <Curtis@rightpathlimited.com> |
| Subject: | RE: Underwriting for $7.5M Loan Req. - Ferrantino |
| Attachments: | Draft2006.pdf   dh63007.pdf |

Curtis,

Please find attached Danny's personal financial and the draft 2006 audit.

Kent

---

**From:** Curtis Leonard [mailto:Curtis@rightpathlimited.com]
**Sent:** Monday, July 09, 2007 3:48 PM
**To:** Kent Despain
**Subject:** RE: Underwriting for $7.5M Loan Req. - Ferrantino

Maybe he was referring to last years.... I am not sure. I will clarify with Danny.

**Curtis P. Leonard, CMA, CFM**
Chief Financial Officer
Rightpath Limited
3131 E. Camelback Road, Suite 212
Phoenix, AZ 85016
602.977.2999 Main
602.977.7707 Fax
602.670.1093 Cell
curtis@rightpathlimited.com
rightpathlimited.com



---

**From:** Kent Despain [mailto:Kent@DannysFamilyCompanies.com]
**Sent:** Monday, July 09, 2007 3:45 PM
**To:** Curtis Leonard
**Subject:** RE: Underwriting for $7.5M Loan Req. - Ferrantino

That,s a little awkward since the earliest the statement will be ready are Monday. I do have a draft audit.

Kent

---

**From:** Curtis Leonard [mailto:Curtis@rightpathlimited.com]
**Sent:** Monday, July 09, 2007 10:32 AM
**To:** Kent Despain
**Cc:** kentdespain@hotmail.com
**Subject:** FW: Underwriting for $7.5M Loan Req. - Ferrantino

Kent,

At Rick's request, I have forwarded the personal financial statements for the partners to Shahram. It is my understanding that Danny agreed to provide a copy of his audited statements. Can you please have a set ready to go to Shahram's office? I will confirm with Danny when he arrives that he wants these to go out.

Thank you.