# EXHIBIT A

SERVICES, LLC, a limited liability      (continued caption)
company; VAN BUREN DEVELOPMENT,
LLC, a limited liability company;
SOUTHWEST DEVELOPMENT
PARTNERS, LLC, a limited liability
company; FORTUNA ASSET
MANAGEMENT, LLC, a limited liability
company,

        Plaintiffs/Judgment Creditors,

v.

DANIEL L. HENDON,

        Defendant/Judgment Debtor.
_____

1          The video deposition of HEATHER HENDON,

2     noticed by Marc Lazo, was taken on December 1, 2015, from

3     10:21 a.m. to 3:50 p.m. at the Offices of Esquire

4     Deposition Solutions, 3800 North Central Avenue, Suite

5     1700, Phoenix, Arizona 85012, before Sandra Marruffo,

6     Arizona certified reporter No. 50815.

7

8                          APPEARANCES

9     Representing the Plaintiffs:
           Wilson Keadjian & Browndorf
10         BY:  Marc Y. Lazo, Attorney
           62 Rail X Ranch Estates Place
11         Patagonia Arizona 85624
           888-690-5557
12         mlazo@whbllp.com

13    Representing HCM Retirement Trust Plaintiff:
           KENT SALVESON
14         2549 Eastbluff Drive
           Suite 459
15         Newport Beach, California 92660
           (949) 291-7393
16         kent1199@gmail.com

17    Representing the Witness:
           DICKINSON WRIGHT
18         BY:  Carolyn J. Johnsen, Attorney
           1850 North Central Avenue
19         Suite 1400
           Phoenix  AZ   85004
20         602-285-5000
           cjjohnsen@dickinsonwright.com

21

      Representing Daniel L. Hendon:
22         BURCH & CRACCHIOLO, PA
           Alan A. Meda
23         702 East Osborn Road
           Suite 200
24         Phoenix, Arizona 85014
           602-234-8797
25         ameda@bcattorneys.com

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 3 of 65

1                        APPEARANCES (continued)

2    Also Present:
     Drew Sherline
3    Shahram Sodeifi
     Barb Del'Ve, certified legal video specialist
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A.   Yes.

2      Q.   -- truth --

3      A.   -- I understand that.

4      Q.   Okay.  I'm going to be asking you for some

5  estimations, which you may not know, but which you might

6  have some personal knowledge of.  I'm entitled to your

7  estimate of responsive information.  I don't want you to

8  guess or speculate.  An example that's usually used to

9  differentiate between the two is:  You can estimate the

10 length of this table here because you've seen it and you

11 have some basis of personal knowledge.  You can't

12 estimate the length of the table in my living room cause

13 you've never been there; you've never seen it.  It

14 will -- the latter would be a pure guess, and we don't

15 want you to guess.  Do you understand that?

16     A.   Yes.

17     Q.   Okay.  It's important for you to wait to -- for

18 me to finish asking my question before you jump in with

19 an answer.  It works fine in a normal conversation, but

20 it's very hard to transcribe the record if we're talking

21 over each other.  Is that understood?

22     A.   Yes.

23     Q.   Okay.  And that's a great response:  Yes.  We

24 want yeses and nos.  We don't want uh-huhs and uh-uhs

25 because those don't transcribe well either.  Do you

1  understand that?

2        A.    Yes.

3        Q.    Okay.  Let me thee -- see.  To the extent that

4  you don't understand a question, please let me know and

5  I'll do my best to rephrase it in a manner until you

6  understand it.  Otherwise, if you don't ask me for that

7  clarification, I'm going to assume that you understood

8  the question fully and that you have given me all of the

9  information that you know as you sit here today in

10  response to that question.  Is that fair?

11        A.    Yes.

12        Q.    Okay.  If you need to take a break or for any

13  reason at any time, please let me know.  However, if

14  there's a question pending, I would like an answer to my

15  question before you take a break.

16        A.    Okay.

17        Q.    Is that okay?

18        A.    Okay.

19        Q.    Do you have any questions before we begin?

20        A.    No.

21        Q.    Okay.  So we're talking about your knowledge of

22  my client, Diversified Funding, before you had heard of

23  this lawsuit.  In what capacity did you formulate an

24  understanding of who Diversified was --

25              MS. JOHNSEN:  I'm going to object to this

1  questioning.

2              MR. LAZO:  Well --

3              MS. JOHNSEN:  You have a judgment.  And

4  she is not a -- she is not the debtor.  You don't have a

5  judgment against her.  This is a collection action under

6  Federal Rule 69.

7              MR. LAZO:  What is your objection,

8  Counsel?

9              MS. JOHNSEN:  And so the objection --

10             MR. LAZO:  What is your objection,

11 Counsel?

12             MS. JOHNSEN:  It's relevancy and it is

13 not --

14             MR. LAZO:  Then state your objection --

15             MS. JOHNSEN:  It's not relevant.

16             MR. LAZO:  -- and I'll move on.

17             MS. JOHNSEN:  I --

18             MR. LAZO:  Let me finish my question

19 before you state your objection.

20             MS. JOHNSEN:  All right.

21             MR. LAZO:  Okay?

22     Q.  BY MR. LAZO:  All right.  Did you understand my

23 question?

24     A.  Yes.

25     Q.  Okay.  What is the answer?

1              MS. JOHNSEN:  Objection to the question.

2    This is irrelevant and she doesn't need to answer these

3    questions.

4              Move on, Counsel.

5              MR. LAZO:  Hold on.  Relevance is not an

6    appropriate objection --

7              MS. JOHNSEN:  It is --

8              MR. LAZO:  -- in this deposition.

9              MS. JOHNSEN:  -- in this case because --

10             MR. LAZO:  Don't talk over me, Counsel.

11   I'm not going to tell you again.  Relevance is not an

12   appropriate objection.

13             You're leaning forward and threatening me,

14   and that kind of gesture is not going to work well for

15   you in this deposition.  It's not going to work well for

16   your client.  I'll terminate this deposition right now

17   and we'll do this again --

18             MS. JOHNSEN:  We can call --

19             MR. LAZO:  -- under proper court guidance

20   and discovery referee.

21             MS. JOHNSEN:  I'm happy to call the judge

22   right now if you want to.

23             MR. LAZO:  I don't want to call the judge

24   now.  I want a answer my -- I want a question -- I want

25   you to be able to let me say my question.  I want an

1  answer to my question.  And I don't want you to cut me

2  off when I'm asking a question.  I also want proper

3  objections.  You don't have the right to articulate

4  speaking objections and you don't have the right to

5  object on the basis of relevance.

6            MS. JOHNSEN:  Yes, I do because the court

7  has already issued a ruling --

8            MR. LAZO:  I -- I --

9            MS. JOHNSEN:  -- in this case --

10           MR. LAZO:  I'm very well aware of that

11 ruling.

12           MS. JOHNSEN:  And the very -- this

13 deposition is very limited in scope and it does not

14 pertain to what her knowledge is of Diversified Funding

15 or anything about this --

16           MR. LAZO:  That is --

17           MS. JOHNSEN:  -- lawsuit --

18           MR. LAZO:  -- not true.  If you're going

19 to instruct her not to answer, make that instruction.

20 Otherwise I'm entitled to a response.

21           MS. JOHNSEN:  I'm instructing you not to

22 answer.

23           MR. LAZO:  Are you going to be taking that

24 position every time I ask a question?

25           MS. JOHNSEN:  If it's not relevant, of

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 9 of 65

 1 | course I am.

 2 |          MR. LAZO:  Okay.  One second.  All right.

 3 | We're going to have a problem here with this deposition.

 4 | Obviously, we have a fundamental disagreement over the

 5 | scope of what my questioning is relevant to and the

 6 | breadth of my questioning, so I'm going to make that

 7 | statement right now.  And if we have to go in and -- for

 8 | an order compelling this deposition, we will.  But asking

 9 | her what her knowledge is of Diversified Funding and you

10 | objecting on relevance is absurd.  That is absolutely

11 | ludicrous.

12 |          I'm going to ask the question one more

13 | time.

14 |     Q.   BY MR. LAZO:  How did you learn about

15 | Diversified Funding before this lawsuit?

16 |          MS. JOHNSEN:  She's already answered the

17 | previous question and I'm instructing her not to answer,

18 | so move on to something --

19 |          MR. LAZO:  I am asking the same

20 | question to which I have not received a response.

21 |     Q.   BY MR. MEDA:  How did you learn of Diversified

22 | Funding before this lawsuit?

23 |          MS. JOHNSEN:  I'm objecting to the

24 | question and I'm instructing her not to answer.

25 |          What's your --

ESQUIRE
SOLUTIONS
                                          800.211.DEPO (3376)
                                          EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
                Desc Exhibit A   Page 10 of 65

1          MR. LAZO:  On the grounds --

2          MS. JOHNSEN:  -- next question?

3          MR. LAZO:  -- of relevance?

4          MS. JOHNSEN:  Yes.

5          MR. LAZO:  Okay.

6     Q.   BY MR. LAZO:  Have you attended any proceedings

7  in this case other than this deposition?

8          MR. MEDA:  Form and foundation.

9          You can answer.

10         THE WITNESS:  What do you mean by

11  "proceedings"?

12    Q.   BY MR. LAZO:  Anything in court, any kind of

13  meeting, any deposition, any expert witness testimonies,

14  anything like that.

15         MR. MEDA:  Same objection.

16         THE WITNESS:  Not that I am aware of.  I

17  obviously was involved with the bankruptcy case, but not

18  in relation to this.

19    Q.   BY MR. LAZO:  What bankruptcy case were you

20  involved with?

21    A.   The bankruptcy case in regards to the

22  businesses, Danny's Family Companies and all of the

23  affiliates.

24    Q.   Is it your understanding that there were two

25  bankruptcy cases filed?

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 11 of 65

1      A.   Yes, there were, but they were jointly

2  administered.

3      Q.   Okay.  Danny is your father.  When you say

4  "Danny," you're referring to Daniel Hendon, right?

5      A.   I said Danny's Family Companies.

6      Q.   Okay.

7      A.   I was referring to the companies.

8      Q.   Okay.  So what do you know about the bankruptcy

9  case regarding Danny's Family Companies?

10     A.   Well, that's a very broad question.

11     Q.   It is.

12     A.   Yes.

13     Q.   And I'm --

14     A.   I mean, I'd like you to be more specific.

15     Q.   Well, I don't have to be more specific as long

16  as you understand the question.

17     A.   I --

18     Q.   What do you know about that bankruptcy case?

19     A.   A lot.

20     Q.   Okay.

21     A.   Enough to take up the next four hours.

22     Q.   Why was it filed?

23          MS. JOHNSEN:  Objection on relevancy.

24          This has nothing to do with the --

25          MR. LAZO:  Counsel --

1    is absurd.

2              MS. JOHNSEN:  Fine.

3              MR. LAZO:  I'm putting you on notice of

4    that.

5         Q.   BY MR. LAZO:  Let me ask you this, Ms. Hendon:

6    What is your position with Danny's Family Companies?

7         A.   The company no longer exists, so I don't have a

8    position.

9         Q.   Okay.  Were you with the companies before?

10        A.   I was previously, yes.

11        Q.   What was your role there?

12        A.   I was the vice-president of operations.

13        Q.   From what dates approximately?

14        A.   I started with the company in 2005.

15        Q.   Let me stop you there.  When you say "the

16   company," you mean Danny's Family Companies, right?

17        A.   I do, yes.

18        Q.   Did those companies go by any other name?

19        A.   There was a series of LLCs, but as a group of

20   companies, we refer to them as Danny's Family Companies.

21        Q.   Okay.  And you were the vice-president of

22   operations, you said?

23        A.   Yes.

24        Q.   Were you the VP of operations for any LLC or

25   any kind of business entity other than Danny's Family

1  Companies?

2      A.   Like I said, the LLCs were held by Danny's

3  Family Companies, so I was the vice-president over those

4  entities.

5      Q.   Okay.  Who did you receive your paycheck from?

6      A.   Danny's Family Companies, but through an LLC

7  called CW Management.

8      Q.   Okay.  And what is your understanding of what

9  CW was?

10     A.   It was just used for payroll.

11     Q.   So when were you VP of operations, from what

12 time to what time?

13     A.   I would say approximately 2010 through the

14 duration of the company.

15     Q.   Until the company ceased to exist?

16     A.   Yes.

17     Q.   Okay.  Did you hold any other roles other than

18 VP of operations?

19     A.   I did.  Throughout that time I pretty much did

20 every position that was within the company --

21     Q.   When did you --

22     A.   -- at some point or another.

23     Q.   When did you start with the company?

24     A.   I told you 2005.

25     Q.   Okay.  I don't need any backtalk from you.

1   Just please answer my question.  Thank you.

2        A.   Okay.

3        Q.   When you started with the company in 2005, what

4   was your position?

5        A.   I was working in our warehouse.

6        Q.   Okay.  Did you have a title, a job title?

7        A.   I was the warehouse manager.

8        Q.   Okay.  What kind of duties did that encompass?

9        A.   I would check in goods.  I would do weekly car

10  wash orders, the products that we use at the facilities.

11  I managed our annual wash program, did inventory of the

12  items that we used in our maintenance department.

13       Q.   Who hired you in 2005?

14            MS. JOHNSEN:  I'm going to object to this

15  entire line of questioning based on relevance.  It has

16  nothing to do with this case.

17            MR. LAZO:  Counsel, you're talking too

18  much again.  Just state your objection.  If you have an

19  instruction, make the instruction and we'll move on.

20            MS. JOHNSEN:  The objection is relevance

21  and I'm instructing the answer -- the witness not to

22  answer.

23       Q.   BY MR. LAZO:  When did you cease to be the

24  warehouse manager?

25            MS. JOHNSEN:  Objection, relevance.  And

1  Family Companies?

2              MS. JOHNSEN:  Objection, relevance.

3      Q.   BY MR. LAZO:  You can answer until your

4  attorney --

5              MS. JOHNSEN:  I'm instructing you not to

6  answer.

7              MR. MEDA:  I think it's been asked and

8  answered anyway.

9              MR. LAZO:  Well, I'm not asking for your

10  comment, Counsel.

11              MR. MEDA:  Well, I'm making my objection.

12              Asked and answered.

13              Thank you.

14      Q.   BY MR. LAZO:  Tell me more about -- or tell me

15  everything you know about the loan that we discussed from

16  my client— Diversified.  You mentioned that you had heard

17  of it.  You knew that there was a loan.

18              MS. JOHNSEN:  Objection.  This is not

19  relevant.  It's beyond the scope of the court's ruling.

20              And I'm instructing you not to answer.

21              MR. LAZO:  Counsel, what is your

22  understanding of the scope of the court's ruling?

23              MS. JOHNSEN:  It's based on -- the scope

24  of the ruling?  It's in the transcript.

25              MR. LAZO:  What is your understanding of

ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 16 of 65

1    what the scope of my questioning is limited to?

2                    MS. JOHNSEN:  It's limited to

3    whether there -- there were four things that actually

4    were specified.  The liquor licenses, which you've

5    covered; the bank account that's held for Danny Hendon;

6    the loan from Ernie Garcia; and three questions about a

7    trust and that's it.

8                    MR. LAZO:  Do you have that ruling with

9    you?

10                   MS. JOHNSEN:  I do.

11                   MR. LAZO:  Can I see it, please.

12                   MS. JOHNSEN:  Sure.  In fact, maybe we

13   ought to make a copy of this and put it into the record.

14

15                   MR. LAZO:  I've seen the ruling, Counsel.

16   I just want to see where it states what you're telling

17   me.

18                   MS. JOHNSEN:  Fine.

19                   MR. LAZO:  You're handing me a transcript

20   correct?

21                   MS. JOHNSEN:  I am.

22                   MR. LAZO:  Is there an order that goes

23   with this transcript?

24                   MS. JOHNSEN:  No, she put her ruling in

25   the transcript itself.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 17 of 65

1          MR. LAZO:  For the record, you've handed
2   me a transcript and a minute entry dated June 18, 2015.
3   Is that correct?  And by the ruling you're referring to
4   the minute entry, right?
5          MS. JOHNSEN:  The ruling is in the
6   transcript and if you read the transcript, which you say
7   that you have, it indicates --
8          May I have that back?
9          MR. LAZO:  My question is:  When you say
10  it's beyond the scope of the court's ruling, what are you
11  referring to?
12         MS. JOHNSEN:  I'm referring to the ruling
13  made in the transcript.  And if you read it, it says:  Do
14  not depend on the minute entry.  Depend on my ruling.
15         MR. LAZO:  Okay.  So this is -- the
16  transcript is the basis of --
17         MS. JOHNSEN:  Yes.
18         MR. LAZO:  -- your objection?  Okay.  I
19  just wanted to get that clear for the record.  You can
20  have this back.
21         MR. SALVESON:  May I look at it, please?
22         MR. LAZO:  Sure, if counsel doesn't
23  object.
24     Q.   BY MR. LAZO:  Now, let me ask you this:  Your
25  counsel has unilaterally limited us to certain topics,

ESQUIRE
S O L U T I O N S
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 18 of 65

1    A.   That's my personal business.

2    Q.   No, no.

3    A.   I made an investment.

4    Q.   In what?

5           MS. JOHNSEN:  The same objection.  We will

6  not delve into her personal life.  We've talked about the

7  loan --

8           MR. LAZO:  Counsel, I'm asking her what

9  the loan is for.

10          MS. JOHNSEN:  Ask -- you -- you've asked

11 that.  She's answered that question.

12   Q.   BY MR. LAZO:  What -- what is the answer to

13 that?  It was for a personal use?

14   A.   Yes.

15   Q.   Not a business use?

16   A.   I made an investment.

17   Q.   Okay.

18   A.   Yes.

19   Q.   To me that sounds like a business purpose

20 unless you're -- you're --

21   A.   I don't --

22   Q.   -- investing in something --

23   A.   It's my understanding that as long as that was

24 not given to anyone, that's my personal business.

25   Q.   No.  That -- that's -- I don't know what you

1  mean by that.  I'm just looking for an answer to my

2  question.

3              MR. MEDA:  What is the question?

4              MR. LAZO:  Counsel, don't interrupt me.

5              MS. JOHNSEN:  What is the question?

6              MR. MEDA:  Excuse me.  I'm asking what the

7  question on the table is, and I'm entitled to know that.

8              MR. LAZO:  I am asking the questions.

9  You're not being deposed here.  You have no standing to

10 make any kind of standing objections, so be quiet.

11             MS. JOHNSEN:  Ooh.

12             MR. MEDA:  Okay.  Let's be clear about

13 something --

14             MR. LAZO:  I'm not going to listen to

15 this.

16             MR. MEDA:  I will not be quiet.  I

17 represent a party in these proceedings.  I will make the

18 objections I deem appropriate.

19     Q.  BY MR. LAZO:  Ms. Hendon, you said --

20             MR. MEDA:  Is there a question on the

21 table?

22     Q.  BY MR. LAZO:  -- there was a $600,000 loan on

23 December 5th, 2014, correct?

24             MS. JOHNSEN:  Wait a minute.

25             Continue, Alan.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 20 of 65

1          MR. MEDA:  No, I just want to know what

2    the question on the table is.  If you're going to state a

3    new question, that's fine.

4        Q.   BY MR. LAZO:  You said there was a loan on

5    December 5th of 2014.  Is that correct?

6        A.   Yes.

7        Q.   Okay.

8          MS. JOHNSEN:  And let's state for the

9    record that we gave you a copy of the promissory note

10   that evidences that loan.  You have it, so the document

11   speaks for itself.

12       Q.   BY MR. LAZO:  What was the purpose of that

13   loan?  You said it was for an investment.  An investment

14   for what?

15       A.   That's my personal business.

16          MR. LAZO:  Can I see the promissory note,

17   Counsel?

18          MS. JOHNSEN:  Sure.  You have a copy of it

19   sitting there.

20       Q.   BY MR. LAZO:  I don't see that the purpose of

21   this loan is stated on this document.  Do you have a

22   different understanding?

23       A.   I think the document speaks for itself.

24       Q.   Well, it sure does.  But it doesn't speak to

25   what the purpose of the loan was.  So, again, I'm going

1  to ask you --

2     A.   I'm not sure the purpose of the loan is

3  relevant to this.

4     Q.   What did you tell Mr. Garcia you were going to

5  use the $600,000 for?

6     A.   He did not ask.

7     Q.   He just gave you 600,000?

8     A.   He did.

9     Q.   Was the loan secured by anything?

10    A.   It was not.

11    Q.   Okay.

12            MS. JOHNSEN:  I'll take the copy of my

13  transcript back, please.  I have some markings on it.

14            MR. SALVESON:  I'll give it to you as soon

15  as I'm finished reviewing it.  Thank you very much.  I'm

16  not done yet.

17            MS. JOHNSEN:  Excuse me?

18            MR. SALVESON:  Unless you want to copy --

19            MS. JOHNSEN:  Could I have it back?

20            MR. SALVESON:  Unless you want to have a

21  copy made.

22            MS. JOHNSEN:  Have a copy made.

23            MR. SALVESON:  Okay.

24            MR. LAZO:  Well, we'll do that off the

25  record, Counsel, if you don't mind.  This is my client's

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 22 of 65

1   dime.

2            And I -- and I'm reading the order, just

3   so you know, and the Court states that:  The questioning

4   will be limited to, among other things and topics, the

5   source of the money that's being used to pay estate

6   expenses and any loans made to her, i.e., Ms. Hendon, by

7   the Garcia entities or any other entity with respect to

8   the extinguishment, et cetera.

9            MS. JOHNSEN:  And she's testified to that.

10       Q.   BY MR. LAZO:  Okay.  Now you've told me that a

11   loan was made.

12       A.   Yes.

13       Q.   Yeah.

14            MR. LAZO:  And -- and the scope of

15   examination as to any loans made by the Garcia entities

16   was not limited by the Court, Counsel.

17            MS. JOHNSEN:  She's testified to the loans

18   that have been made.  I don't know what else you want her

19   to say.

20       Q.   BY MR. LAZO:  What was the $600,000 given to

21   you for?

22       A.   I told you I made an investment.

23       Q.   What was the investment in?

24            THE WITNESS:  I'm not gonna --

25            MS. JOHNSEN:  Objection --

1                THE WITNESS:  -- share that with you.

2                MS. JOHNSEN:  This is delving into her

3  personal life.  And it's beyond the scope of the

4  transcript.

5                May I have my transcript back, please, or

6  shall we copy it?

7                MR. SALVESON:  Yeah, we'll copy it.

8                MR. LAZO:  We'll copy it off the record,

9  Counsel.  Please don't interrupt me.

10                MS. JOHNSEN:  Let's copy it now --

11      Q.   BY MR. LAZO:  What was -- when was the

12  second --

13                MS. JOHNSEN:  -- or give it --

14      Q.   BY MR. LAZO:  -- loan made --

15                MS. JOHNSEN:  -- back to me.

16                MR. LAZO:  Counsel, please.  I'm asking a

17  question.

18                MS. JOHNSEN:  I understand that.

19      Q.   BY MR. LAZO:  When was the second loan?

20      A.   The second loan was in April --

21                MR. SALVESON:  Here's the first part. I'm

22  looking at the second part.

23                THE WITNESS:  -- of --

24                MS. JOHNSEN:  And I need this part too.

25                THE WITNESS:  -- 2015 I believe --

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 24 of 65

1          MR. SALVESON:  You'll get it back in a

2  minute.

3          MS. JOHNSEN:  No, sir.  Let's -- let's

4  just stop.  Let's go off the record.  Stop the

5  deposition.  I'd like to have the copy --

6          MR. LAZO:  No, Counsel.  I'm not going off

7  the record.  And you can't unilaterally stop the

8  deposition.

9          MS. JOHNSEN:  I'd like to have the copy --

10 my copy of --

11         MR. LAZO:  This is ridiculous.

12         MS. JOHNSEN:  -- the transcript back right

13 now.  Thank you very much.  I'm happy to make a copy for

14 you.

15         MR. LAZO:  Do you have a problem, Counsel?

16         MR. MEDA:  Yeah, I have a problem --

17         MR. LAZO:  You're staring at me with your

18 arms folded as if you're going to be jumping at me

19 lunging at me over the table.

20         MS. JOHNSEN:  Can I have my copy of my

21 transcript back, please.

22         MR. SALVESON:  You said I could read it.

23 I'm reading it.  I'll give it back to you in a moment.

24         MS. JOHNSEN:  Why don't we just make a

25 copy?

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 25 of 65

1              MR. LAZO:  Is this a staring contest?

2              MS. JOHNSEN:  Let's just make a copy of

3  it.

4              MR. LAZO:  Are you trying to intimidate

5  me?  Do you have anything else to say?

6              MR. MEDA:  When I have something to say, I

7  will say it.

8      Q.   BY MR. LAZO:  The second loan was in April of

9  this year; how much was it for?

10             MS. JOHNSEN:  I'm objecting to this line

11  of questioning right now until I have a copy of my

12  transcript back.  If you want to ask another question --

13             MR. LAZO:  That is the basis of your

14  questions -- or of your objection?

15             MS. JOHNSEN:  Yes, it is.  I've asked very

16  nicely.  I've indicated that we will have it copied.

17  We'll take two seconds to copy it --

18             MR. LAZO:  The problem, Counsel --

19             MS. JOHNSEN:  -- and we can go on --

20             MR. LAZO:  -- I'm having is you're --

21  you're unilaterally limiting the scope of my questioning.

22  That is in obvious defiance of this very order, which

23  does not limit --

24             MS. JOHNSEN:  I'm happy to --

25             MR. LAZO:  -- the scope --

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 26 of 65

1            MS. JOHNSEN:  -- call -- have you --

2            MR. LAZO:  Hold on.

3            MS. JOHNSEN:  -- call the judge.

4            MR. LAZO:  -- does not limit the scope of

5    the -- the questioning with regard to loans made to her

6    by the Garcia entities or any other entities.

7            MR. MEDA:  Counsel, the judge is

8    available.  If you have a problem --

9            MS. JOHNSEN:  Let's just get him on the

10   phone.

11           MR. MEDA:  -- we can get the judge on the

12   phone.

13           MS. JOHNSEN:  I'm happy to.

14           MR. LAZO:  No, that's not how I conduct

15   depositions.

16           MR. MEDA:  All right.  Well, just so that

17   you know that option --

18           MS. JOHNSEN:  Well, just so you know --

19           MR. MEDA:  -- that option is available.

20           MR. LAZO:  There you go.

21           Can I continue now?

22      Q.   BY MR. LAZO:  April 2015, what was that loan

23   for?

24      A.   It was for a million dollars.

25      Q.   Did you ever have a personal relationship with

1        A.    They were to --

2                MR. MEDA:  Object to form.

3                THE WITNESS:  They are personal and they

4   are for me to use as I see fit.

5        Q.    BY MR. LAZO:  Okay.  Do you use them for living

6   expenses?

7        A.    I do not.

8        Q.    Do you use them for -- to pay your rent --

9                MS. JOHNSEN:  Objection --

10       Q.    BY MR. LAZO:  -- or mortgage?

11               MS. JOHNSEN:  We're getting into personal

12  aspects of this loan.  And I've already indicated our

13  position is that it's beyond the scope of this ruling.

14  What she uses the produce from the loan is a personal --

15  of a personal nature.  And she can use it however she

16  wants and it's none of your business.

17               MR. LAZO:  Is that in the order --

18               MS. JOHNSEN:  If you want --

19               MR. LAZO:  -- Counsel?

20               MS. JOHNSEN:  If you --

21               MR. LAZO:  Is that in the order?

22               MS. JOHNSEN:  If you want to ask her

23  questions about whether she transferred money to

24  Daniel Hendon, then ask that question --

25               MR. LAZO:  Is that -- Is that --

 1                    MS. JOHNSEN:  -- because that's the only

 2    thing that's relevant --

 3                    MR. LAZO:  But, Counsel --

 4                    MS. JOHNSEN:  -- for purposes of --

 5                    MR. LAZO:  -- is that in the order?

 6                    MS. JOHNSEN:  -- this deposition.

 7                    MR. LAZO:  Is that in the order?

 8                    MS. JOHNSEN:  It's --

 9                    MR. LAZO:  Am I not allowed to ask her

10    about what those moneys were used for?

11                    MS. JOHNSEN:  I believe that is correct.

12                    MR. LAZO:  Okay.  Why don't you find that

13    for me.

14                    MR. MEDA:  You know what, here's what

15    we're going to do --

16                    MR. LAZO:  No, no, no, no.

17                    MR. MEDA:  Excuse me --

18                    MR. LAZO:  You know what?  We're not going

19    to do anything that starts --

20                    MR. MEDA:  Excuse me --

21                    MR. LAZO:  -- with, "Here's what we're --

22                    MR. MEDA:  I think that --

23                    MR. LAZO:  -- going to do."

24                    MR. MEDA:  I think that --

25                    MR. LAZO:  And you will not speak over me.

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 29 of 65

1              MR. MEDA:  I was --

2              MR. LAZO:  No.

3              MR. MEDA:  -- speaking --

4              MR. LAZO:  No.  This is my deposition and

5    I control it and you don't.  And you never start a

6    sentence with, "Here's what we're going to do."

7              MR. MEDA:  Excuse me --

8              MR. LAZO:  Counsel, are you lurching

9    towards me for any particular reason?

10             MR. MEDA:  I want to make sure that I'm

11   clear and concise --

12             MR. LAZO:  I don't need you --

13             MR. MEDA:  -- for the record --

14             MR. LAZO:  -- to be clear or concise

15   because your opinion doesn't matter.

16             MR. MEDA:  Well, I'm sorry you feel that

17   way.  So here's what we're going to do --

18       Q.   BY MR. LAZO:  How many other loans did

19   Mr. Hendon [sic] give you?

20             MR. MEDA:  For the record --

21       Q.   BY MR. LAZO:  Or how many other loans did --

22             MR. MEDA:  -- the judge is available.

23       Q.   BY MR. LAZO:  -- you receive from Mr. Garcia?

24             MR. LAZO:  I heard --

25             MR. MEDA:  I'm trying to clarify --

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 30 of 65

1              MR. LAZO:  -- what you said before,

2   Counsel.

3              MR. MEDA:  I want to make sure that you

4   understand --

5              MS. JOHNSEN:  Don't answer anymore

6   questions.

7              MR. MEDA:  -- that you have an opportunity

8   --

9              THE WITNESS:  I understand.

10             MR. LAZO:  Hold on.  There was just --

11             MR. MEDA:  -- to speak --

12             MR. LAZO:  There was --

13             MR. MEDA:  -- with the judge --

14             MR. LAZO:  -- just an instruction on the

15   record --

16             MR. MEDA:  -- if --

17             MR. LAZO:  -- that she's not to answer

18   anymore questions --

19             MR. MEDA:  -- you want to take advantage

20   of the opportunity.

21             MR. LAZO:  There was just an instruction,

22   Counsel, for her not to answer anymore questions?

23             MS. JOHNSEN:  I thought --

24             MR. LAZO:  Is that right?

25             MS. JOHNSEN:  I thought you said the

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 31 of 65

1   ground rules that said we're not -- nobody is going to

2   talk over each other, and Mr. Meda was talking.  And so I

3   certainly don't want my client to violate your

4   instructions that she's not to talk --

5                   MR. LAZO:  There's just been --

6                   MS. JOHNSEN:  -- over --

7                   MR. LAZO:  -- an instruction on the record

8   that -- that the deponent is not to answer anymore of my

9   questions.  Is that correct?

10                  MS. JOHNSEN:  Not until we resolve what

11  we're resolving.  Mr. Meda was speaking.  You told her at

12  the first of the deposition not to talk over anyone, and

13  so I want her not to talk over anyone until Mr. Meda is

14  finished.

15                  MR. MEDA:  Thank you.  I just want you to

16  be aware that the judge is available if you want to take

17  advantage of that opportunity.

18                  MR. LAZO:  Counsel, can you stop talking.

19  I'm speaking with my client.

20      Q.   BY MR. LAZO:  Have you made any payments

21  toward -- to Verde Investments or Mr. Garcia or

22  repayments for either of these loans?

23                  MS. JOHNSEN:  Same objection.

24                  MR. SALVESON:  Carol --

25                  MS. JOHNSEN:  Instructing the witness --

1          MR. SALVESON:  -- extinguishment is

2  included in the order.  Extinguishment includes loan

3  payments.

4          MS. JOHNSEN:  Extinguishment?

5          MR. SALVESON:  Read the order.  You want

6  to cite the order.  Read the order.

7          MS. JOHNSEN:  All right.  I think that's

8  fair.

9          MR. LAZO:  I have a question pending.

10    Q.   BY MR. LAZO:  Have you made any payments to

11  Mr. Garcia or Verde Investments?

12          MS. JOHNSEN:  While I'm reviewing the

13  order, as indicated or ordered by your co-counsel here,

14  I'd ask the witness just to refrain from answering until

15  I've had a chance to read it.

16          THE WITNESS:  Okay.

17          MR. LAZO:  What we're going to do is now

18  we'll go off the record.  We'll take a five-minute break.

19  I'd like your position on that when we come back.  Is

20  that fair, Counsel?

21          MS. JOHNSEN:  That's fine with me.

22          MR. SALVESON:  Okay.  Let's get a copy of

23  the order.

24          THE VIDEOGRAPHER:  We're off the record --

25          MR. LAZO:  Let's go off the record.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 33 of 65

1   States Attorney if you think it's so crucial.

2                   MR. SALVESON:  We're moving in that

3   direction.

4                   MR. LAZO:  Well, hold on.  Counsel, and

5   this goes for you as well, just trying to engage -- or

6   try to engage in a fact finding mission here.

7                   MS. JOHNSEN:  That's fine.

8                   MR. LAZO:  To the extent that these

9   questions aren't answered, we have a reasonable belief

10  and a reasonable suspicion that a lot of these loans

11  and -- and the moneys were circular, came back to

12  Mr. Hendon, came back to these entities or are being

13  fraudulently held.  Unless your client answers those

14  questions, we have no choice but to sue her.  If that's

15  what you want to happen, that's what will happen.

16                  MS. JOHNSEN:  You have no --

17                  MR. LAZO:  I would rather get the

18  questions under oath.

19                  MS. JOHNSEN:  You have no basis for that.

20  If you want to ask whether any of the money was

21  transferred to Mr. Hendon, then ask that question.

22                  MR. LAZO:  I know the answer to that

23  question.

24                  MS. JOHNSEN:  Or any of the entities.

25                  MR. LAZO:  And you know the answer to that

1 | question.

2 |            MR. MEDA:  I think you asked that question

3 | and I think she answered it.

4 |            MR. LAZO:  Right.  But that's the

5 | question.  That's the question that you trained her to

6 | answer.  And I'm really --

7 |            MS. JOHNSEN:  Excuse me?

8 |            MR. LAZO:  In all honesty, Counsel -- In

9 | all honesty, I'm trying to save another lawsuit.  But if

10 | you're not going to let her answer these questions, then

11 | we might as well just terminate this and -- and start

12 | another lawsuit and -- and conduct our discovery in that

13 | form.  But I -- I would really rather get an answer to

14 | this question.

15 |            I -- I would hope, Counsel, that you would

16 | agree that it's a bit odd that $1.6 million was loaned on

17 | a one piece of paper -- two pieces of paper without any

18 | security, without any method of repayment, without any

19 | showing of collateralization.  That is odd to me.  And I

20 | think it would be odd to you if this weren't your client.

21 | I'm not asking you to respond.

22 |            But all I'm trying to do is save a lawsuit

23 | against your client.  If that's where -- where you want

24 | us to go, we will.  I -- I would just like to get these

25 | questions answered.  If you are going to instruct her not

1  to answer, there's -- there's not much more I'm going to

2  have to ask her about because even as to the articulated

3  bases of questioning that the court allowed, you're not

4  evening -- even letting me get two questions in.

5              MS. JOHNSEN:  I don't think that her

6  personal business is any of your business.

7              MR. LAZO:  I agree.  And --

8              MS. JOHNSEN:  If you --

9              MR. LAZO:  -- and I don't want to know her

10 personal business.

11             MS. JOHNSEN:  And if you think that you

12 can pass Rule 11 on filing a lawsuit against her, then I

13 guess that's your prerogative.

14             MR. LAZO:  Well, I don't know that the

15 lawsuit would be a federal lawsuit, but in -- in any

16 event, I would like to know where this $1.6 million went

17 and where it stands to date and what the repayment

18 situation is.  Are you going to let me ask those

19 questions and let your client answer?

20             MS. JOHNSEN:  No.  And we have a call in

21 to the judge and he can rule on that, on whether that's

22 relevant.  That's my suggestion.  Just wait for the

23 judge.

24             MR. MEDA:  Can I see that promissory note

25 for a minute?

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 36 of 65

 1  have?

 2       A.    He does know of the loans, yes.

 3       Q.    How does he know?

 4       A.    Because I told him, but we have not discussed

 5  anything regarding the loans.

 6       Q.    Okay.  So you told him, "This guy gave me

 7  $600,000 on this date and another million on this date,"

 8  and that was the extent of your conversations?  Do you

 9  understand you're under penalty of perjury?

10       A.    I do.

11       Q.    Do you understand there are civil and

12  criminal penalties associated with lying under penalty of

13  perjury?

14       A.    I do.

15       Q.    Okay.  So I take it that these -- or this

16  investment that these moneys have gone into is not an

17  investment co-owned or co-ventured by your husband?  It's

18  just your investment exclusively?

19            MS. JOHNSEN:  We've already gone over

20  this.  Same objection.  Same instruction.

21            MR. LAZO:  No, Counsel, I haven't asked

22  that question.

23            MS. JOHNSEN:  Yeah, well, we -- it's the

24  same line of questioning.  You know that she's not going

25  to testify about any of the -- what happened to the money

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 37 of 65

1  other than whether it was transferred to Danny Hendon and

2  she's already testified about that.

3               MR. LAZO:  But that's because --

4               MR. SALVESON:  Look, the point of asking

5  about the loans is simply that we don't believe that they

6  were loans.  That's why the court is allowing us to ac --

7  to ask about the loans.  We think it's a fraudulent

8  transfer.  So everything about the loan is valid and

9  reasonable for us to ask about.

10              MS. JOHNSEN:  Please explain to me how

11 it's a fraudulent transfer.

12              MR. SALVESON:  Because it's not a loan.

13              MS. JOHNSEN:  And who is it a fraudulent

14 transfer from?

15              MR. SALVESON:  I think all the parties if

16 you want my opinion, but that -- that's just my opinion.

17 I think it's between her, her father, and a whole host of

18 other people that extend even to this room.  The point

19 being is that we don't believe that the loan is valid.

20 And if we don't believe the loan is valid, we can ask

21 anything we want to about that loan.  That's why it's in

22 this order that we can ask about the loan.

23              MS. JOHNSEN:  You've asked --

24              MR. SALVESON:  No, we haven't.  You've

25 denied us answers all the way through.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 38 of 65

 1              MR. LAZO:  You have, Counsel.

 2              MR. SALVESON:  We cannot get to whether or

 3   not those funds were validly used or in any way a

 4   business, personal, a bribe, a gift, a commission, a

 5   theft of bankruptcy property.  That's why --

 6              MS. JOHNSEN:  Why don't you --

 7              MR. SALVESON:  -- this is in here.

 8              MS. JOHNSEN:  -- ask those questions?

 9              You have asked what she did with those

10   moneys.

11              MR. SALVESON:  And we're allowed to ask

12   that question, what she did.

13              MS. JOHNSEN:  No.

14              MR. SALVESON:  It's a -- it's a loan that

15   may not be a loan.  You're trying to --

16              MS. JOHNSEN:  It's a loan --

17              MR. SALVESON:  Listen just --

18              MS. JOHNSEN:  It's a loan --

19              MR. SALVESON:  -- stop interrupting me for

20   minute --

21              MS. JOHNSEN:  All right.

22              MR. SALVESON:  -- please.

23              MS. JOHNSEN:  All right.

24              MR. SALVESON:  If the loan is not a loan,

25   then it's something else.  We don't believe it's a loan.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 39 of 65

1  So, if we can't identify the use of those loan proceeds

2  then we cannot identify whether or not it's a loan.

3                 MS. JOHNSEN:  Well, isn't the question for

4  Ernie Garcia then?

5                 MR. SALVESON:  No, she's the recipient of

6  the loan.

7                 MR. LAZO:  I'm going to turn the floor

8  over to Mr. Salveson for some follow-up questions.

9                 MS. JOHNSEN:  No.  I will not permit that.

10  One counsel.  One lawyer.  No.

11                 MR. LAZO:  I don't think it's -- it's your

12  discretion --

13                 MS. JOHNSEN:  No.

14                 MR. LAZO:  -- to permit that or deny it.

15                 MS. JOHNSEN:  Yeah, it is.

16                 MR. LAZO:  No, it's not.

17                 MS. JOHNSEN:  I'm not going -- I'm not

18  going to be double teamed by lawyers.

19                 MR. LAZO:  I promise you --

20                 MR. SALVESON:  We've been double teamed --

21                 MR. LAZO:  I promise you we won't double

22  team --

23                 MR. SALVESON:  -- by the two of you.

24                 MS. JOHNSEN:  He represents a different --

25  he represents a different --

Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 40 of 65

1           MR. MEDA:  I represent the judgment

2    debtor.

3           MR. LAZO:  Counsel --

4           MS. JOHNSEN:  He represents the judgment

5    debtor.  You've already told me that you're on the same

6    team.  So, no, we're not going to double team this --

7           MR. SALVESON:  Okay --

8           MS. JOHNSEN:  -- period.

9           MR. SALVESON:  -- then, I'll sit here,

10   I'll pose the questions to Marc and Marc will ask the

11   questions for me.

12          MR. LAZO:  And honestly, Counsel, I -- I

13   would just want to turn the mic over to Mr. Salveson for

14   awhile.  You should have no problems with that.

15          MS. JOHNSEN:  I do have a problem with it.

16   I'm not going to be double teamed.

17          MR. SHAHRAM SODEIFI:  You're here as a

18   party to this case.  He can represent you as a party to

19   this case.

20          MR. SALVESON:  May I represent you?

21          DREW SHERLINE:  Yes, please do.

22          MR. LAZO:  There you go.

23          MR. SALVESON:  Okay.

24          MR. LAZO:  Mr. Salveson --

25          MS. JOHNSEN:  Wait.  Wait a minute.  Wait

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A    Page 41 of 65

1  a minute.

2              MR. LAZO:  Counsel, please.

3              MS. JOHNSEN:  I want to know who is

4  representing who and who this person is who is sitting in

5  the room that I don't know.

6              MR. SALVESON:  He's the man your client

7  defrauded.  That's who he is.

8              SHAHRAM SODEIFI:  I am the agent for the

9  entity Diversified Funding Group all the way throughout

10  this case.  Mr. Meda is well aware of who I am.  And you,

11  too shall soon be aware of who I am, but that is who I

12  am.  I represent Diversified Funding Group.

13              Mr. Sherline is one of the investors who

14  is a named plaintiff in this case.  This attorney shall

15  represent Mr. Sherline's interest in this case.  That

16  attorney represents Diversified Funding Group's interest

17  in this case.

18              MR. MEDA:  There's been, to my knowledge,

19  no notice of appearance --

20              MS. JOHNSEN:  Exactly.

21              MR. MEDA:  -- made in the case.

22              MR. LAZO:  Well, we just made that.

23              MR. SHAHRAM SODEIFI:  They've made notice

24  of appearance.

25              MS. JOHNSEN:  It's not in the case.  It's

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 42 of 65

1  based on your behavior on and off the record.

2           MR. MEDA:  I have no idea --

3           MS. JOHNSEN:  I have no --

4           MR. MEDA:  -- what you're even talking

5  about.

6           MS. JOHNSEN:  Nor do I.

7           MR. MEDA:  But, you know what, this is one

8  day I'm glad the deposition is being videotaped.

9           MR. SALVESON:  Did you, as operations --

10      Q.   BY MR. SALVESON:  Okay.  You had given some

11  basic testimony regarding your bank accounts or the bank

12  account that is in your name where money of an unknown

13  origin is deposited every month.  Is that correct?

14      A.   Yes.

15      Q.   Okay.  Would you explain to me why you opened

16  up this account?

17      A.   Because my dad asked me to.

18      Q.   Your dad asked you to?

19      A.   Yes.

20      Q.   Okay.  And what did he tell you when he asked

21  you to open up this account?

22      A.   That he would like me to pay his trustee fee

23  for him.

24      Q.   Okay.  And how does that money get into your

25  account?

1    A.   I don't know.

2    Q.   So if these funds were illegal or ill gotten or

3  fraudulently obtained, then you would be accepting those

4  moneys on his behalf and then paying them back out.  Is

5  that correct?

6              MR. MEDA:  Object to form and foundation.

7              MS. JOHNSEN:  Object.  Beyond the scope of

8  this deposition.

9    Q.   BY MR. SALVESON:  Given the fact that your

10  father has been convicted of fraud, on what basis would

11  you feel that these funds are not fraudulently obtained?

12              MR. MEDA:  Object to form.

13              MS. JOHNSEN:  Same objection.

14              MR. SALVESON:  Do you want to help?

15              MR. LAZO:  Yes.

16              MR. SALVESON:  Okay.

17                   FURTHER EXAMINATION

18    Q.   BY MR. LAZO:  Let -- let me ask the question

19  since Counsel invited us to.

20              Regarding payment of estate expenses, what

21  is your understanding of how -- what the source of the

22  funds used to pay bankruptcy estate expenses is?

23    A.   I already answered that I did not know.

24    Q.   Do you know anything about that?

25    A.   No, I do not.

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 44 of 65

1     Q.   Have you spoken to your father about that?

2     A.   No, I have not.

3     Q.   Are you concerned at all, Ms. Hendon, regarding

4  any sort of future incrimination of you by virtue of your

5  association with your father?

6     A.   I haven't done anything wrong, so, no, I'm not.

7     Q.   You are not concerned at all?

8     A.   No, I'm not.

9     Q.   Do you intend to raise the Fifth Amendment

10  right against self-incrimination in the future

11  proceedings?

12          MR. MEDA:  Object to form.

13          MS. JOHNSEN:  Object to form is right.

14          You may answer.

15          THE WITNESS:  Could you repeat it again?

16     Q.   BY MR. LAZO:  Sure.  Do you have any -- any

17  reason to believe that you will be raising the Fifth

18  Amendment right against self-incrimination in any future

19  proceedings brought against you?

20     A.   No --

21          MR. MEDA:  Object to form.

22          THE WITNESS:  -- I don't.

23          MR. LAZO:  And just to be clear, Counsel,

24  and I'm -- I'm sorry for -- thank you for indulging me.

25  This -- did all of the bank statements that you produced

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 45 of 65

1  objected to or has been:  What did you use the loan

2  proceeds for?  Are you going to repay the loan?  Has it

3  been repaid yet, and so forth, all of which I think are

4  personal in nature.  She has already testified that the

5  money was not transferred.

6            JUDGE GAN:  Okay.  So I got to hear from

7  Mr. Salveson or Mr -- is it Lavo?

8            MR. LAZO:  Yes, Your Honor.  This is Marc

9  Lazo.  Just very briefly -- and I'm handicapped here,

10  Your Honor, both Mr. Salveson and I are because we

11  weren't at this hearing, but we do have a copy of the

12  transcript in front of us.

13            Counsel has objected to far more than she

14  just told the Court.  This deposition has gone -- went

15  downhill very fast from the first line of questioning.

16  But essentially what she did state about the two subject

17  loans, there's a $1 million loan that was apparently

18  given in April of this year and a $600,000 loan given by

19  Mr. Garcia as well in December of last year.  Both are

20  evidenced by a single-page promissory note.  The loans

21  are unsecured.  There is no repayment provision.  There

22  is everything that reeks of fraud surrounding these two

23  loans.

24            The only questions that we've been able to

25  ask are, you know:  Did you receive these moneys and

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 46 of 65

1  that's pretty much it.  The deponent has told us that

2  they were an investment, the moneys were used for an

3  investment of a personal nature, and that's all we know.

4  We also know that the moneys, according to her, did not

5  go to her father as far as she's testified to today, but

6  beyond that, these loans reek of fraudulent transfer.

7         And, frankly, if I can get no additional

8  information, we're going to have to bring a lawsuit to

9  uncover this information.  I've never seen this much

10 money going from one person to another, especially

11 someone who apparently Ms. Hendon just met a couple

12 months before the acquisition of the companies, who would

13 loan this amount of money without any collateral, without

14 any security.  And, ironically, the first $600,000 loan

15 is due to be repaid in four days and I wasn't even able

16 to get an answer to my question as to whether Ms. Hendon

17 intends to repay that loan, whether she's been making,

18 you know, periodic payments this whole time, whether she

19 intends to repay the other loan.

20         This is $1.6 millions combined; it is a

21 substantial portion of the moneys that my client loaned

22 to Mr. Hendon and we really have the right to know what

23 the disposition of these funds is, particularly because

24 they came from someone who's, in our opinion, a

25 middleman, a strawman buyer for a purchase that was

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 47 of 65

1  orchestrated by Mr. Hendon.

2              This was clearly a line of questioning

3  that the prior judge, on page 24 of the transcript

4  clearly states, "You're going to be limited to the liquor

5  licenses, the source of the money that's being used to

6  pay estate expenses, and any loans made to her," meaning

7  Ms. Hendon, "that's being used by the Garcia entities or

8  any other entity with respect to the extinguishment

9  because I don't really think we could call it a transfer.

10 But we could call it whatever we want," et cetera.  So

11 the judge clearly contemplated a line of questioning

12 regarding any loans made to Ms. Hendon by the Garcia

13 entities or any other entity with respect to the

14 extinguishment.

15             The only question we've been able to ask

16 was the question we already knew the answer to:  Was

17 there a loan that was made?  We've gotten no further

18 response from her and this -- this entire deposition has

19 been an exercise in futility because of this gamesmanship

20 quite frankly.  We haven't gotten any meaningful

21 information this entire morning.  And I'll defer to

22 Mr. Salveson if he wants to add anything.

23             MR. SALVESON:  I don't have anything

24 further.

25             JUDGE GAN:  Is it Mr. Lazo?

1  one more hour.  We have been here since 10:20 without a

2  lunch break.

3              MR. LAZO:  Your Honor, I'm happy to take a

4  lunch break.  I'm not seeing the four-hour limit in the

5  order at all.

6              MS. JOHNSEN:  If you would give me a

7  moment, I can find it.

8              JUDGE GAN:  I don't think -- I mean, my

9  review of the minute entry was that she didn't give a

10  specific time frame.

11             MS. JOHNSEN:  But she did --

12             JUDGE GAN:  I believe what she said was

13  what Ms. Johnsen said, which was that the State rules and

14  time elements under the State rules would apply.  And, in

15  general, that timeframe is accurate.

16             But, Ms. Johnsen, I would like to have

17  this concluded today if possible, especially if we have

18  counsel from out of state, rather than having to

19  reschedule it if it's possible to do that.  And if it

20  means you spend two hours or you spend three hours but

21  you're done, specifically at five o'clock no matter what

22  happens, or if you want to call me back at 4:00 and tell

23  me that you have spent two more hours and you don't think

24  another hour is justified at that point, I'll be glad to

25  listen to that.

1          But I don't think we're going to play an

2  hour and then they haven't got it completed then you're

3  going to terminate the deposition then they are going to

4  file a motion to have the deposition taken again then

5  we're going to have another hearing and then we're going

6  to have another deposition.  Make sense?

7          MS. JOHNSEN:  I understand, Judge.  I have

8  a commitment at four o'clock that I cannot change.  And I

9  was under the impression this would be a four-hour

10  deposition.

11          JUDGE GAN:  Well, I think that that was a

12  fair interpretation by you.

13          Does that mean you need to leave at 3:30?

14  Or what time can you stay till?

15          MS. JOHNSEN:  I can stay until quarter of

16  4:00.

17          JUDGE GAN:  Okay.  Gentlemen, I'm going to

18  give you that.  And if you need more time than that

19  quarter of 4:00 period, then you're going to need to file

20  something with me and we'll have to have a hearing about

21  that.  All right?

22          MR. LAZO:  Okay, Your Honor.  We will do

23  our best to conclude.  We don't want to have to come back

24  either.  We did fly in from out of town.

25          And, you know, just to make a complete

1  record, the three hours that have been consumed have

2  mostly been argument between counsel, so I really

3  appreciate Your Honor's indulgence and allowance in that

4  regard.

5          MS. JOHNSEN:  Your Honor, could I ask one

6  clarification of your ruling.  I appreciate the ruling,

7  of course.  But I wanted to make sure that the questions

8  about her -- what she did with the money only pertain to

9  the money that she received from Mr. Garcia.  I don't

10 really want them going into any of her other personal

11 affairs, and I don't believe that's what you intended,

12 but I wanted to make sure.

13         JUDGE GAN:  Well, Counsel, Mr. Lazo, isn't

14 that what you were asking me about when you asked me

15 about the loans that were made under the two promissory

16 notes that are unsecured?

17         MR. LAZO:  Yeah, absolutely.  I mean, we

18 would definitely want to know what happened to those

19 moneys.  But to the extent that, you know, we need to ask

20 her a question of whether she's given her father any

21 moneys or her father's given her any moneys, you know,

22 that needs to be an obvious contemplation of what the

23 prior judge ruled.  We just want to make sure that we dot

24 our I's and cross our T's with regard to any fraudulent

25 conveyances, Your Honor.

1  establish that there's no controversy and then you can

2  move on down the road.  Okay?

3                  MR. SALVESON:  Thank you.

4                  MR. LAZO:  Thank you so much, Your Honor.

5                  JUDGE GAN:  Does that make sense,

6  Ms. Johnsen?  Do you have anything you want to add to

7  that?  I don't want to preclude you from commenting on

8  this issue.

9                  MS. JOHNSEN:  No, thank you.  I just want

10 to reserve my rights, obviously, to object to them having

11 any of her personal accounts because I don't think that

12 that is a subject of this matter, but I think maybe we

13 can cross that bridge when we get to it.

14                  JUDGE GAN:  Okay.  Okay.  I appreciate it.

15 And I agree with you, but I don't want to allow her to

16 use her personal -- that, quote, personal" account or

17 personal financial information as a method to preclude

18 legitimate discovery.  On the other hand, Judge Hollowell

19 was concerned about preserving her privacy.  So we'll

20 just have to let it play and see where it goes.  And

21 you'll make your objections as necessary and then we'll

22 address it at a further hearing.

23                  MS. JOHNSEN:  That seems fair.  Thank you.

24                  MR. LAZO:  Thank you, Your Honor.

25                  JUDGE GAN:  Thank you both.  Thank you

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 52 of 65

1 | all.

2 | And, Mr. Meda, did you have anything else

3 | you needed to add?

4 | MR. MEDA:  No, Judge.  I don't.  I only

5 | would have emphasized that this is a debtor's exam.  You

6 | know, Mr. Hendon obviously is a judgment debtor.  This is

7 | not an examination of Ms. Hendon.  This is not an

8 | examination of her personal affairs.  It's an examination

9 | to determine whether Mr. Hendon has assets with which to

10 | pay this judgment, but I think you've addressed those

11 | issues.

12 | JUDGE GAN:  All right.  I appreciate all

13 | of your input.  Thank you, and we'll stand at recess.

14 | MR. LAZO:  Thank you, Your Honor.

15 | MS. JOHNSEN:  Thank you, Judge.

16 | MR. SALVESON:  Take five minutes.

17 | (A break was taken from 1:02 p.m. to 2:25

18 | p.m.)

19 | THE VIDEOGRAPHER:  We're back on the

20 | record at 2:25.

21 | FURTHER EXAMINATION

22 | Q.  BY MR. LAZO:  Ms. Hendon, do you realize you're

23 | still under oath?

24 | A.  I do.

25 | Q.  Did you speak with anyone other than your

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 53 of 65

1  attorney since we took a break from this deposition?

2      A.   I called my mother to let her know that I was

3  going to be late to pick up my child.

4      Q.   Anyone else?

5      A.   I called my assistant to let him know I wasn't

6  going to be back in the office.  I e-mailed my boss to

7  let him know that I was going to be tied up longer than I

8  thought I was going to be.

9      Q.   Anything other than those kinds of --

10     A.   No.

11     Q.   -- housekeeping things?

12     A.   No.

13     Q.   Including texts?

14     A.   Including texts?  Yes.

15     Q.   Okay.  So we've had some communication with the

16  judge who has let us delve back into this issue regarding

17  these loans from Ernie Garcia.  You were there listening

18  to that colloquy, weren't you?

19     A.   I was, yes.

20     Q.   Okay.  So let me ask you this:  What did you

21  tell Mr. Garcia, if anything, the first million

22  dollars -- the first $600,000 was going to be used for?

23     A.   I didn't tell him what it was going to be used

24  for.

25     Q.   Do you have knowledge that he ever acquired

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 54 of 65

1  that knowledge from any source?

2      A.   Not that I'm aware of.

3      Q.   What did you use that money for?

4      A.   Which -- which loan did you ask me about?

5      Q.   Let's -- the next line of questioning is going

6  to be exclusively the December 5th, 2014, loan for

7  600,000.  That's your understanding, right?

8      A.   Yes.

9      Q.   You received all of that money, right?

10     A.   I did, yes.

11     Q.   How did you receive that money?

12     A.   What do you mean:  How did I receive it?

13     Q.   Was it by a wire, a personal check?  Was it a

14  lump of cash?

15     A.   You know what, I can't recall if it was a check

16  or a wire.

17     Q.   Okay.  One of the two?

18     A.   Yes.

19     Q.   Which account did it go into?

20     A.   It went into a checking account.

21     Q.   Is that your personal checking account?

22     A.   Yes.

23     Q.   With which bank?

24     A.   Bank of America.

25     Q.   Do you still have that checking account?

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 55 of 65

1      A.   I do, yes.

2      Q.   Do you know the last four numbers of that

3  account?

4      A.   I do not.

5      Q.   Do you have more than one personal checking

6  account with Bank of America?

7      A.   Yes, I do.

8      Q.   Okay.  Is there any reason that the moneys went

9  into this personal account?

10      A.   No.

11      Q.   Can you identify anything else about this

12  particular account that distinguishes it from other

13  accounts?

14      A.   No.

15      Q.   Just a regular -- is it an interest bearing

16  checking account?

17      A.   I'm not sure.

18      Q.   Other than you, who has access to that account?

19      A.   No one.

20      Q.   Okay.  Not even your husband?

21      A.   No.

22      Q.   Do you have any sort of testamentary documents?

23  By that I mean a living trust or a will in case something

24  happens to you.  You mentioned you have a daughter?

25      A.   Yes.

1      Q.   Do you have any beneficiaries?

2      A.   I have a son.

3      Q.   You have a son?

4      A.   Yes.

5      Q.   Okay.

6      A.   And I do have a trust, yes.

7      Q.   Okay.  Is that a living trust that is set up

8  currently?

9      A.   Yes.

10      Q.   What is the name of that living trust?

11      A.   I believe it's the Heather A. Hendon Living

12  Trust.

13      Q.   How long has it been around?

14      A.   I'm not sure.

15      Q.   Who set that up for you?

16      A.   I set it up myself.

17      Q.   Did you have an attorney help you?

18      A.   I did.

19      Q.   Okay.  What is that attorney's name?

20      A.   Rob Boland.

21      Q.   B-O --

22      A.   L-A-N-D.

23      Q.   Is that the only -- I'm going to call it

24  "testamentary document" that you're privy to?

25      A.   What do you mean by that?

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A    Page 57 of 65

1      A.    What do you mean by "privy"?

2      Q.    Well, is there anyone else who would stand to

3  gain something if you passed away?

4      A.    No.

5      Q.    Just your son?

6      A.    Uh-huh.

7      Q.    That's a yes?

8      A.    Yes.

9      Q.    And this is the son that you have with your

10  current husband?

11      A.    Yes.

12      Q.    Do you have any bank accounts or any assets

13  that are held within the living trust?

14      A.    I believe my home is in the trust.

15      Q.    Where is your home?

16      A.    My address is on there.  I live on 36th Street

17  and Camelback.

18      Q.    Here in Phoenix?

19      A.    Uh-huh.

20      Q.    Okay.  Do you live anywhere else?

21      A.    No.

22      Q.    Where does your husband live?

23      A.    In the same place.

24      Q.    Do you have any residences in Vegas?

25      A.    My husband --

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 58 of 65

 1                 MS. JOHNSEN:  Wait.  Wait a minute.  This

 2  is far beyond what the judge allowed you to question.

 3  It's far beyond.  And, in fact, the ruling in -- on --

 4                 MR. LAZO:  Counsel --

 5                 MS. JOHNSEN:  -- page 27 --

 6                 MR. LAZO:  -- please.  We have very

 7  limited time here.  What's your objection?

 8                 MS. JOHNSEN:  Well, I didn't take a lunch

 9  break and you all did, so, you know, you took some time.

10                 It's beyond the scope of --

11                 MR. LAZO:  Counsel, what's your objection?

12  Are you instructing her not to answer?

13                 MS. JOHNSEN:  It's beyond the scope of

14  this ruling.

15                 Yes, I'm instructing her not to answer.

16      Q.    BY MR. LAZO:  Okay.  So if something happened

17  to you, you have -- Let me back up a little bit.

18                 600,000, we're still on that loan.  Was

19  any of that money placed in the living trust?

20      A.    No.

21      Q.    Okay.  It was just put into a checking account?

22      A.    Yes.

23      Q.    What was it used for?

24      A.    I invested it in a recycle steel company.

25      Q.    What is the name of that company?

1      A.    It's called Prudential.

2      Q.    Just Prudential?  Prudential Holdings?

3      A.    Just Prudential.

4      Q.    What prompted you to seek a $600,000 loan from

5  Mr. Garcia in order to make an investment in Prudential?

6      A.    Originally when Mr. Garcia and I were talking

7  about him purchasing the notes, our intention was for us

8  to partner on the car washes.  That was originally why he

9  had purchased those notes.

10      Q.    To partner with you in the acquisition of the

11  notes?

12      A.    No.

13      Q.    Okay.

14      A.    His intention, when he originally purchased the

15  notes, was to be a partner in Danny's Family Companies.

16      Q.    Okay.  How do you know that?

17      A.    Because I was there during those dealings.

18      Q.    Were those dealings between Mr. Garcia and your

19  father?

20      A.    And I was also present.

21      Q.    Anyone else?

22      A.    There were many people that were present.

23  Mr. Meda was present.  Mr. Garcia was present.

24  Mr. Johnson was present.

25      Q.    "Mr. Johnson" being Mr. Garcia's lawyer?

1     Q.   -- after the deal wasn't consummated?

2     A.   No.

3     Q.   Okay.  When did you learn that Danny was not

4  going to -- Ernie was not, in fact, going to make you a

5  partner?

6     A.   After he purchased the notes and the company

7  was not performing.  It was a couple months.

8     Q.   And this would have been in mid-2014, something

9  like that.

10    A.   Sometime in 2014, yes.

11    Q.   Now, did Ernie ever approach you as the VP of

12 operations and ask you why the businesses weren't

13 performing pursuant to what he had observed in the due

14 diligence documents or in accordance with those

15 documents?  In other words, why weren't they as

16 profitable as they had been made out to be?

17    A.   Mr. Garcia was looking at financial statements

18 from the year prior.

19    Q.   2013?

20    A.   Yes, prior to when the businesses were raided.

21    Q.   Raided?

22    A.   Yes.

23    Q.   Okay.  In other words, prior to when all of the

24 illegal employees were essentially ousted?

25    A.   Essentially, yes.

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 61 of 65

1      Q.   Okay.  So how did that ousting impact the

2   profitability of the companies?

3      A.   I lost the entire workforce of the company.

4      Q.   Okay.  Why weren't you able to hire sufficient

5   replacements?

6      A.   They raided the company on a Saturday at

7   noon --

8      Q.   Who is "they"?  Who is your understanding of

9   "they"?

10      A.   ICE.

11      Q.   Okay.

12      A.   And the U.S. Attorney and basically terminated

13   a thousand employees.

14      Q.   That day?

15      A.   Yes.

16      Q.   And this was a Saturday in 2014?

17      A.   It was, I believe, in 2013, August 17th, I

18   think.

19      Q.   What did you do to -- what was your

20   understanding of the legal status of these thousand or so

21   employees prior to their ousting?  Did you have a belief

22   that they were entitled to work in the United States?

23          MS. JOHNSEN:  Objection.  That's

24   irrelevant to this proceeding, beyond the scope of what

25   we're doing here.

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com

Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 62 of 65

1              So you don't need to answer that.

2       Q.    BY MR. LAZO:  Foundationally, what -- did you

3    have an idea that the writing was on the wall or did this

4    raid come as a complete surprise to you?

5       A.    It was a surprise, yes.

6       Q.    You had no idea that Danny's Family Companies

7    were being investigated for employing illegal aliens?

8       A.    No, I did not.

9       Q.    Do you know if Ernie Garcia knew that before he

10   purchased the notes?

11      A.    I can't answer for Ernie Garcia.

12      Q.    So some time after Ernie -- and help me

13   understand.  After the raiding occurred, was it difficult

14   for you to replace those positions as VP of operations in

15   a timely manner?

16      A.    It was very difficult, yes.

17      Q.    Is that why the profitability went down?

18      A.    Yes.

19      Q.    Are there any other reasons why the

20   profitability went down?

21      A.    You're talking about employees that had worked

22   for a company for 25 years.  Replacing a thousand people,

23   skilled laborers, is very difficult.

24      Q.    Was Ernie made known of the raid before he

25   purchased the notes?  Did he know that that had occurred?

ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 63 of 65

1      A.   Yes, he did.

2      Q.   Okay.  And how do you know that he knew?

3      A.   Because we discussed it.

4      Q.   You discussed that issue?

5      A.   Yes.

6      Q.   Did Ernie raise concerns about the issue prior

7  to proceeding with the purchase?

8      A.   He was concerned, yes.

9      Q.   What was your response, being that you were the

10 primary person he interfaced with?

11     A.   I was also concerned about establishing a

12 workforce.

13     Q.   Okay.  Did you have any discussions about:

14 Hey, the profitability in 2014 might significantly

15 decline because of this?  Were there any discussions

16 about that?

17     A.   There were mentions of it, yes.

18     Q.   Okay.  So Ernie was, in your mind, prepared to

19 take that risk on in proceeding with the purchase as far

20 as you knew?

21     A.   I can't speak for Ernie.

22     Q.   Well, he knew about it, right?

23     A.   He knew about it.

24     Q.   And he proceeded in the face of that risk

25 right?

ESQUIRE
S O L U T I O N S

800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG   Doc 195-1   Filed 03/18/16   Entered 03/18/16 14:46:38
Desc Exhibit A   Page 64 of 65

1      A.   He did.

2      Q.   Okay.  After that, after he learned that the

3  profitability wasn't what he expected it to be, did he in

4  any way blame you or your father for that?

5      A.   No, he did not blame us.

6      Q.   What were his sentiments as expressed to you?

7      A.   He explained that the business was quite a bit

8  more complicated than he had anticipated.

9      Q.   Was he running it exclusively at that point?

10     A.   No, but I had expressed my concerns about the

11 workforce to him.

12     Q.   Okay.  Were you still VP of operations?

13     A.   I was, yes.

14     Q.   Were you doing the same things you had done

15 prior to his purchasing the notes?

16     A.   I was, yes.

17     Q.   Was he there on a daily basis?

18     A.   No, he was not.

19     Q.   How often would you interface with him after he

20 purchased?

21     A.   Maybe once a week, once every two weeks, to

22 provide him with an update on how things were going.

23     Q.   Did you interface with him through e-mail --

24     A.   No.

25     Q.   -- or was it always over the phone?

ESQUIRE
SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com
Case 2:11-ap-01972-SHG    Doc 195-1    Filed 03/18/16    Entered 03/18/16 14:46:38
Desc Exhibit A    Page 65 of 65